No. 2019-1256

# United States Court Of Appeals for the Federal Circuit

**KINGSTON TECHNOLOGY COMPANY, INC.,**
***Appellant,***

***v.***

**SPEX TECHNOLOGIES, INC.,**
***Appellee.***

APPEAL FROM THE UNITED STATES PATENT AND TRADEMARK OFFICE, PATENT TRIAL AND APPEAL BOARD IN INTER PARTES REVIEW NO. IPR2017-01021

## KINGSTON TECHNOLOGY COMPANY, INC.'s OPENING BRIEF

DAVID M. HOFFMAN, ESQUIRE
FISH & RICHARDSON PC
111 CONGRESS AVENUE, SUITE 810
AUSTIN, TX 78701
(512) 472-5070

OLIVER J. RICHARDS, ESQUIRE
FISH & RICHARDSON PC
12390 EL CAMINO REAL
SAN DIEGO, CA 92130
(858) 678-5070

*Counsel for Appellant Kingston Technology Company, Inc.*

April 1, 2019

## CERTIFICATE OF INTEREST

1. The full name of every party represented by me is: Kingston Technology Company, Inc.

2. The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is: Kingston Technology Company, Inc.

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party represented by me are: None.

4. The names of all law firms and the partners or associates that appeared for the party now represented by me in the trial court or agency or are expected to appear in this Court (and who have not entered an appearance in this Court) are: Law Offices of S. J. Christine Yang; Christine Yang, Martha Hopkins.

5. The title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal: Kingston Technology Company, Inc. v. SPEX Technologies, Inc., Federal Circuit Case Nos. 19-1342 and 19-1599; SPEX Technologies Inc. v. Kingston Technology Corp., et al., Case No. 8:16-CV-01790 JVS (ARGx); SPEX Technologies Inc. v. Western Digital Corp., et al., Case No. 8:16-CV-01799 JVS (ARGx); SPEX Technologies Inc. v. Toshiba America Electronics Components, Inc., et al., Case No. 8:16-CV-01800 JVS (ARGx); SPEX Technologies Inc. v. Apricorn, Case No. 2:16-CV-07349 JVS (ARGx).

Dated: April 1, 2019

*/s/ Oliver J. Richards*
Oliver J. Richards

## TABLE OF CONTENTS

CERTIFICATE OF INTEREST ........ i

TABLE OF CONTENTS ........ iii

STATEMENT OF RELATED CASES ........ ix

STATEMENT OF JURISDICTION ........ x

STATEMENT OF THE ISSUES ........ xi

INTRODUCTION ........ 1

STATEMENT OF THE CASE ........ 3

I. The Technology: Secure Data Storage in PC Memory Cards ........ 3

II. The Challenged ’135 Patent: A “Modular” Security PCMCIA Card ........ 6

III. The Prior Art: Jones and the Other Prior Art References Disclose the Claimed Modular Device ........ 14

A. Like the ’135 Patent, the Jones Reference Teaches Using Encryption To Store Data on a Portable PCMCIA-Compliant Storage Device. ........ 14

B. The PCMCIA Standard Specification Provides Additional Detail As to How both the “Modular Device” of the ’135 patent and the “Secure Memory Card” of Jones Perform the “Receiving” and “Providing” Steps. ........ 19

C. Other Prior Art References Disclose Various other Limitations of the Challenged Claims. ........ 22

IV. The Proceedings Below ........ 23

A. After SPEX Sued Kingston and Other Companies For Alleged Infringement of the ’135 Patent, Kingston Petitions for Review. ........ 23

B. SPEX Answers In Its Preliminary Patent Owner Response; and the Board Declines Institution for Claims 55–57 ........ 25

C. In the Related District Court Litigation, SPEX's Expert Admits that Any PCMCIA Compliant Device Teaches the Disputed "Receiving" and "Providing" Steps And Accuses Data Storage, Like that Taught by Jones, As a "Defined Interaction." ........ 28

D. The Board Institutes Claims 55–57, Kingston Provides Supplemental Evidence of SPEX's Litigation Positions And the Teachings of PCMCIA, and the Board Holds Its Hearing. ........ 34

E. The Board Rejects Kingston's Challenge to Claims 55–57, Applying an Overly-Strict Inherency Standard and Ignoring the Evidence of SPEX's Litigation Positions. ........ 36

SUMMARY OF THE ARGUMENT ........ 38

ARGUMENT ........ 41

I. The Board's Determination that Jones Does Not Teach the Disputed Limitations of Claims 55–57 Should Be Reversed ........ 41

A. The Board Erred By Applying an Overly-Strict Standard for Inherency That Required More Detail from Jones than Disclosed in the '135 Patent. ........ 41

B. The Board Erred by Ignoring Admissions in Litigation Concerning the Scope of Its Claims and the Teaching of the Prior Art. ........ 50

C. The Board's Decision Is Contradictory to the Unrebutted and Unimpeached Evidence In this Case. ........ 53

CONCLUSION ........ 55

CERTIFICATE OF SERVICE AND FILING....57

CERTIFICATE OF COMPLIANCE....58

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Altaire Pharm., Inc. v. Paragon Bioteck, Inc.*,
889 F.3d 1274 (Fed. Cir. 2018) .......... 53

*Ariosa Diagnostics v. Verinata Health, Inc.*,
805 F.3d 1359 (Fed. Cir. 2015) .......... 50

*Belden Inc. v. Berk-Tek LLC*,
805 F.3d 1064 (Fed. Cir. 2016) .......... 47

*Consol. Edison Co. v. NLRB*,
305 U.S. 197 (1938) .......... 39

*Cont'l Can Co. USA v. Monsanto Co.*,
948 F.2d 1264 (Fed. Cir. 1991) .......... 48

*In re DeLisle*,
56 C.C.P.A. 1319, 406 F.2d 1386 (C.C.P.A. 1969) .......... 45

*In re Graves*,
69 F.3d 1147 (Fed. Cir. 1995) .......... 46

*Integra Lifesciences I, Ltd. v. Merck KGaA*,
496 F.3d 1334 (Fed. Cir. 2007) .......... 39, 55

*Koninklijke Philips Elecs. N.V. v. Cardiac Sci. Operating Co.*,
590 F.3d 1326 (Fed. Cir. 2010) .......... 39

*KSR Int'l Co. v. Teleflex Inc.*,
550 U.S. 398 (2007) .......... 44

*Lockwood v. Am. Airlines*,
107 F.3d 1565 (Fed. Cir. 1997) .......... 44

*In re: Lukach*,
442 F.2d 967 (C.C.P.A. 1971) .......... 43

*McGinley v. Franklin Sports, Inc.*,
262 F.3d 1339 (Fed. Cir. 2001) .......... 40

*Merck & Co. v. Biocraft Labs.*,
874 F.2d 804 (Fed. Cir. 1989) .......................................................................45

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut Auto Inc. Co.*,
463 U.S. 29 (1983) ....................................................................................50

*In re Mouttet*,
686 F.3d 1322 (Fed. Cir. 2012).....................................................................39

*Neuman v. Rivers*,
125 F.3d 315 (6th Cir. 1997).........................................................................51

*ParkerVision, Inc. v. Qualcomm Inc.*,
621 F. App'x 1009 (Fed. Cir. 2015) ...............................................................49

*Perricone v. Medicis Pharmaceutical Corp.*,
432 F.3d 1368 (Fed. Cir. 2005).....................................................................48

*Randal Mfg. v. Rea*,
753 F.3d 1355 (Fed. Cir. 2013).....................................................................50

*Shinn Fu Co. of Am. V. Tire Hanger Corp*,
701 F. App'x 942 (Fed. Cir. 2017) .................................................................50

*Standard Havens Products, Inc. v. Gencor Industries, Inc.*,
953 F.2d 1360, 1369 (Fed. Cir. 1991) ............................................................48

*Sundance, Inc. v. DeMonte Fabricating Ltd.*,
550 F.3d 1356 (Fed. Cir. 2008).....................................................................44

*Telemac Cellular Corp. v. Topp Telecom, Inc.*,
247 F.3d 1316 (Fed. Cir. 2001).....................................................................48

*Titanium Metals Corp. of Am. v. Banner*,
778 F.2d 775 (Fed. Cir. 1985).......................................................................44

*Ultratec, Inc. v. CaptionCall, LLC*,
872 F.3d 1267 (Fed. Cir. 2017).....................................................................51

*Vicor Corp. v. SynQor, Inc.*,
869 F.3d 1309 (Fed. Cir. 2017).....................................................................40

**Statutes**

28 U.S.C. § 1295(a)(4)(A) .......... x

35 U.S.C. § 141(c) .......... x

35 U.S.C. § 142 .......... x

**Other Authorities**

37 C.F.R. § 90.3(a)(1) .......... x

Fed. R. Evid. 801(d)(b)(2) .......... 51

## STATEMENT OF RELATED CASES

Kingston indicates that the following cases pending before this Court may be impacted by the outcome of this appeal. Kingston Technology Company, Inc. v. SPEX Technologies, Inc., Federal Circuit Case Nos. 19-1342 and 19-1599.

There is also co-pending district court litigation pending relating to the '135 patent that may be affected by the outcome of this appeal as follows: SPEX Technologies Inc. v. Kingston Technology Corp., et al., Case No. 8:16-CV-01790 JVS (ARGx); SPEX Technologies Inc. v. Western Digital Corp., et al., Case No. 8:16-CV-01799 JVS (ARGx); SPEX Technologies Inc. v. Toshiba America Electronics Components, Inc., et al., Case No. 8:16-CV-01800 JVS (ARGx); SPEX Technologies Inc. v. Apricorn, Case No. 2:16-CV-07349 JVS (ARGx).

## STATEMENT OF JURISDICTION

Kingston appeals from a Final Written Decision of the Patent Trial and Appeal Board, issued October 1, 2018. Appx160. Kingston timely filed its notice of Appeal with the PTAB on November 30, 2018, within the 63-day deadline set by the applicable statutes and regulations. *See* Appx18401845; 35 U.S.C. § 142; 37 C.F.R. § 90.3(a)(1). This Court thus has jurisdiction under 28 U.S.C. § 1295(a)(4)(A) and 35 U.S.C. § 141(c).

## STATEMENT OF THE ISSUES

1. Whether the Board erred in finding prior art did not disclose limitations of the '135 patent relating to how the claimed device connects to a host computer when both the written description of the '135 patent and the prior art in question rely on the same PCMCIA standards to describe how the connection is established.

2. Whether the Board erred in requiring Kingston to prove that particular processes described in PCMCIA standard documents were inherent in the prior art, where the prior art explicitly states that it is compliant with the PCMCIA standard.

3. Whether, in finding the PCMCIA standards not part of the prior art, the Board applied an overly-strict and inflexible standard of inherency by requiring that the prior art reference explicitly disclose how it accomplishes steps instead of referencing a widely-available and well-known standard to provide those steps.

4. Whether the Board erred in ignoring Patent Owner's litigation expert's admission that the PCMCIA standard in the prior art taught the "receiving" and "providing" steps of claim 55.

5. Whether the Board erred in ignoring contrary claim construction positions taken by the Patent Owner in district court.

6. Whether the Board's conclusion that claims 55–57 are patentable is supported by substantial evidence where the only evidence of record shows that each and every element of these claims was taught by the prior art Jones reference.

## INTRODUCTION

This appeal arises from an IPR brought by Kingston against the ’135 patent owned by Appellee SPEX Technologies. The ’135 patent describes and claims a “modular security device” which a user can connect with a host computer, and which provides certain security functions to that host computer. For example, one of the primary disclosed embodiments of the claimed “modular security device” is a portable storage device that is designed in accordance with the well-known PCMCIA standard for a portable storage and is able to store encrypted data on that PCMCIA storage device.

The primary piece of prior art in this case—an international patent application to Jones—also describes a PCMCIA portable storage device that can store encrypted data. It is undisputed that, like the ’135 patent, the Jones reference describes a device that a user can connect to a host computer to securely store data on that device in an encrypted form. It is also undisputed that the Jones reference teaches that its described security device is compliant with the PCMCIA standard that is used in the preferred embodiment of the ’135 patent.

This appeal turns on the Board’s conclusion regarding two sets of disputed limitations from challenged claims of the ’135 patent. The first set of limitations relate to how the modular device claimed by the ’135 patent identifies itself to a host computer when it is first connected. In describing how the respective security devices connect with a host computer, both the challenged patent and the prior art in the IPR

point to the well-known PCMCIA as setting forth how the limitations are performed. Both the prior art and the '135 patent provide a commensurate level of detail about the PCMCIA standard. Both Kingston's IPR expert and SPEX's litigation expert concluded that such a teaching was sufficient to teach the limitations. Yet the Board required more detail of the prior art than is provided in the written description of the '135 patent, and found the limitation not taught by the prior art even where Kingston submitted the very standards documents referenced in both the patent and the prior art. Because the Board applied the wrong legal test in reaching its decision, holding that Kingston had to turn to inherency for the Board to consider the documents, and because the Board ignored key evidence in reaching its conclusion, the Board's determination that these two limitations are not taught should be reversed.

The second set of limitations involved in this appeal addresses what functions the portable security card provides to the host computer. In particular, these limitations require that the claimed modular security device provide both a security function and a "defined interaction," such as the storage of encrypted data, to the host computer. Despite Jones's explicit teaching that its described portable card stores encrypted data, and despite SPEX's own assertion that storing encrypted data is sufficient to meet these limitations for the purposes of infringement, the Board ignored this and other evidence of record and found these limitations not taught by the prior art. This conclusion too is erroneous and merits reversal.

## <u>Statement of the Case</u>

### I. <u>The Technology</u>: Secure Data Storage in PC Memory Cards

As noted in the introduction, both the '135 patent and the prior art in this case generally relate to securely storing data on a portable memory device. In particular, each describes a portable memory device that a user can connect to a personal computer and then transfer data from the computer to the device so that the user can then transfer that data to another device (or simply carry around the data with her to be used at a later time). Neither the '135 patent nor the prior art in this case, though, purport to have invented the technology to store data on a portable memory device. Both the '135 patent and the primary Jones reference rely on standardized technology set forth by the Personal Computer Memory Card Industry Association (PCMCIA) for the disclosure of how the portable memory devices connect and transfer data between a personal computer and the memory device. *See, e.g.,* Appx75, at 8:17-24; Appx308, at Abstract.

At the time of both Jones and the '135 patent, PCMCIA cards were "commonly used to provide additional high-speed memory capacity to [a] connected host computer" and were also able to provide additional functionality, such as "fax and data modems [or] network access." Appx313, at ll. 9–11. As those old enough may recall, PCMCIA cards (one of which is pictured to the right for demonstrative purposes) were,



at one time, "widely accepted for use in laptop and notebook computers" that had specialized slots for inserting the cards. *See* Appx313, at 5–9. How devices compliant with the PCMCIA standards (called "PC Cards" or "PCMCIA Cards") operate is defined by a set of documents put out by the governing standards organization. *See, e.g.,* Appx76, at 10:36-41 (referencing the "Card Information Structure" specification of the PCMCIA standard); Appx1556-1630 (relevant portions of specification for the PCMCIA standard). These standards documents, or specifications, set forth both the hardware requirements for PCMCIA cards as well as the software necessary for a computer to work with a PCMCIA card. *See* Appx1560; Appx1564-1570. Thus, the manufacturer of a computer who wanted to enable the computer to read PCMCIA cards could consult the standards and build a PCMCIA-slot in their computer that would be guaranteed to work with PCMCIA cards; operating system makers who wanted to allow their operating systems to read PCMCIA cards could consult the standard to develop the necessary software; and manufacturers of memory cards could consult the standard to build memory cards that would work with the aforementioned computer and operating system. As with USB, WiFi, Bluetooth, and many other technologies that involve devices and software made by many companies, compliance with the standard is essential so that all of the devices can interoperate.

The portable storage of data, though, presents a security problem—the user may lose the portable device or the device might otherwise fall into the hands of someone who should not have access to the data on the device. *See, e.g.*, Appx313, at

ll. 16–23. To address this problem, both the '135 patent and the prior art in this case teach that the data stored on the portable memory device should be encrypted—or, in other words, the data should be scrambled such that someone without the encryption key would not be able to see the contents of the stored data. Only where the portable memory device is connected to a computer and then decrypted with an appropriate key can the contents of the data be read.

However, neither the '135 patent nor the prior art in this case claim to have invented encryption either. Indeed, encryption is nearly as old as writing itself (*see* Appx1484-1485, at ¶ 55) and the use of encryption to protect data using computer systems precedes that '135 patent by well over a decade (*see* Appx1485, at ¶ 57). Thus, as with the technology required to connect the memory devices to computers and communicate with computers, the '135 patent and the prior art rely again on standardized technology developed by others. For example, the '135 patent states that its purported invention can be used with both known symmetric or assymetric (public key) encryption algorithms, for example the Federal Information Processing Standards (FIPS) algorithm, the Data Encryption Standard (DES) algorithm, and the Rivest–Shamir–Adleman (RSA) algorithm. *See* Appx82, at 21:51-65. The primary Jones reference, similarly, references well-known standard encryption algorithms. *See* Appx310, at ll. 18-28. The details of these algorithms are neither described in the patent and/or the prior art, nor are they important for purposes of appeal.

Rather than the technology to connect a memory device to a computer (which is set forth by the PCMCIA standards) nor the algorithm to encrypt the data (which were invented by others), both the '135 patent and the prior art in this case focus on how encryption can be incorporated into a portable storage device so as to allow secure portable storage. Despite this, the disputes in the IPR below had nothing to do with these purportedly inventive aspects of the '135 patent and instead centered around the '135 patents' incorporation of standardized technology that, according to SPEX's own litigation expert, was unquestionably known in the art. This, and other aspects of the PTAB's erroneous conclusion that claims 55-57 of the '135 patent are patentable over the prior art raised in this proceeding, will be discussed further below.

## II. The Challenged '135 Patent: A "Modular" Security PCMCIA Card

The '135 patent, entitled "Modular Security Device," generally discloses a portable device used to "communicate with a host computing device to enable one or more security operations to be performed by the modular device on data" either stored on the host computer or on the security device. *See* Appx61, at Abstract. The claimed "modular" device consists of at least two modules: (1) a "security module that is adapted to enable performance of one or more security operations on data," such as encryption; and (2) "a target module that is adapted to enable a defined interaction with a host computing device." *See* Appx73, at 3:28–31. "The target module can be embodied by any of a variety of modules having different types of functionality (e.g., data storage, data communication, data input and output, user identification)."

Appx73, at 3:31–35. The "defined interaction" these various embodiments of a target module performs depends on the type of module. *See, e.g.,* Appx73, at 4:44–47 (explaining what a "defined interaction is" according "to exemplary embodiments of the target module"). Thus, a data storage target module will perform a defined interaction of storing data, whereas a data communication target module may perform the defined interaction of data communication. *See id*

The primary embodiment disclosed by the '135 patent is a PCMCIA-compliant PC-card, as shown below:




FIG. 4B

*See* Appx64. As shown in this figure, "[t]he module device 410 can have a size and shape such that the modular device 410 can be inserted into a Type II card slot, and the connector 413 can conform physically to the specification for Type II PCMCIA cards, so that the modular device 410 can be inserted into a Type II PCMCIA card slot of a host computer device to enable communication between the host computing device and the modular device 410." Appx75, at 8:17–24. The modular device

shown, as discussed above, is made up of two different modules—a first module 411 which preferably is the security module and a second module 412, which preferably is the target module such as a memory card. *See* Appx75, at 8:25–33.[1]

The dispute in this case centers around claim 55 and 57 of the '135 patent. Claim 55 is reproduced below, with the disputed limitations shown in bold:

> 55. For use in a modular device adapted for communication with a host computing device, the modular device comprising a security module that is adapted to enable one or more security operations to be performed on data and a target module that is adapted to enable a defined interaction with the host computing device, a method comprising the steps of:
>
> ***receiving a request from the host computing device for information regarding the type of the modular device;***
>
> ***providing the type of the target module to the host computing device in response to the request; and***
>
> operably connecting the security module and/or the target module to the host computing device in response to an instruction from the host computing device.

Appx84, at 26:11–24. The preamble of the claim recites the modular device that is the focus of the disclosure of the '135 patent discussed above. During the

---

[1] Notably, though the figure shows two separate physical modules, and though Kingston contended in the parallel district court action between the parties that the '135 patent required separate physical "modules," the PTAB did not resolve this claim construction dispute (see Appx10–11) and Kingston does not challenge the PTAB's application of the term "module" for the purposes of this appeal.

proceedings below, SPEX did not dispute that the preamble was taught by the prior art in this case, and thus we will not dwell on those portions of the claim. *See* Appx11 (recognizing that "Patent Owner does not challenge Petitioner's specific mapping of the structures disclosed in the asserted prior art references to the recited modules"). The remaining portion of the claim recites steps performed by the modular after it is connected to a host computer. In particular, the two disputed limitations—the "receiving" and "providing" steps—address how the host computer knows what kind of device is connected. The last step provides that, after the computer identifies the device, the device is "operably connected" to the computer.

With respect to the disputed limitations, the specification of the '135 patent is thin on details. As noted above, the focus of the specification is the operation of the "security" and "target" modules to provide security operations to a host computer, such as the storage and encryption of data. The explanation provided, though, indicates that these disputed steps are performed as part of the standard procedure for when a new device is connected to a host computer. For example, with respect to figure 5 (shown below) the specification provides that the "host computing devices detects the presence of the modular device" as part of "a standard aspect of the operating system of the host computing device" (step 502). Appx76, at 9:45–50. *See also* Appx65 (Figure 5):




FIG. 5

As the ’135 patent then explains that “[t]ypically, once the presence of a new peripheral device is detected by the operating system software of the host computer device, the operating system software . . . also identifies the type of peripheral device” by using “a standard software device driver” (steps 503 and 504 above). Appx76, at 9:51–58; *see also* Appx77, at 12:1–4 (noting that that the identification of the peripheral device “can be implemented as part of the host driver, as indicated above”).

As a primary example of this type of standardized software, the ’135 patent points to the PCMCIA specification which, according to the patent, “specifies such operation.” *See* Appx76, at 10:11–22; *see also* Appx76, at 9:61–65 (“The Card Services or Socket Services programs that often are bundled with the Windows95™ operating system software for us in performing various ‘housekeeping’ functions associated with a PCMCIA interface are examples of such drivers.”) In particular, the ’135 patent

explains that "[o]ne way in which the operating system software of a host computing device can identify the type of a peripheral device is to access a known memory section of a memory device of the peripheral device, as established by an interface standard developed for that type of peripheral device, that stores data representing the type of peripheral device." Appx76, at 10:27–34. As the '135 patent acknowledges, this is how the PCMCIA specification provides for this identification to work—"[t]he PCMCIA standard, for example, includes a specification called the Card Information Structure, that defines, among other things, a location in a portion of the memory of a PCMCIA card denoted as 'attribute memory', that stores data identifying the type of the PCMCIA card." Appx76, at 10:36–41. It is through this process of "receiving" a request to read this data stored in attribute memory and "providing" the data to the host computer that the modular device establishes its identity with the host computer. *See, e.g.,* Appx76, at 10:28–49; *see also* Appx77, at 11:20–38.

The other limitations in dispute on appeal comes from claim 57. Claim 57 reads, with the disputed limitation in bold, as follows:

> 57. For use in a modular device adapted for communication with a host computing device, the modular device comprising a security module that is adapted to enable one or more security operations to be performed on data and a target module that is adapted to enable a defined interaction with the host computing device, a method comprising the steps of:
>
> ***communicating with the host computing device to exchange data between the host computing device and the modular device;***

> ***performing one or more security operations and the defined interaction on the exchanged data;***
>
> mediating communication of the exchanged data between the host computing device and the modular device so that the exchanged data must first pass through the security module; and
>
> operably connecting the security module and/or the target module to the host computing device in response to an instruction from the host computing device.

Appx84, at 26:34–53. The structure of this claim largely follows the structure of claim 55: the preamble recites the makeup of the modular device and the rest of the claim recites steps performed by the modular device. In this instance, though, the recited steps relate to the how the modular devices interacts with a host computer when after it has been connected and appropriately identified. In particular, the two disputed limitations provide that the modular device will communicate data with the host computer and then will perform security operations and "the defined operation" on that exchanged data. As noted above, the '135 patent explains that the "defined interaction" performed by the modular device will depend on the type of "target module" used. Thus, for example, if the "target module" used is a data storage device, these steps provide that data is communicated from the host computing device, a security operation (e.g., encryption) is performed on that data, and then the defined interaction (e.g., data storage) is performed. *See, e.g.,* Appx73, at 3:31–35 (noting that "data storage" is an example of the type of functionality provided by the target module); Appx73, at 4:44–47 (explaining "defined interaction" according to

"exemplary embodiments of the target module"); Appx79, at 16:39–60 (noting that "[a] modular device according to the invention that includes a memory module can be used, for example, to securely store data"). Again, the '135 patent claims no invention in how any of these target modules work—they are each standard functions of a PCMCIA card, *see* Appx313, at ll. 9–11, and thus the "defined interactions" that are provided by the card are simply the functions provided by different types of PCMCIA cards.

The remaining steps provide that data from the host computer must be "mediated" through the security module and that the security module and/or the target module must "operably" connect to the host computer in response to an instruction. These limitations, though, were not disputed by SPEX following institution or were found to be present in the prior art by the Board for other claims (*see generally* Appx45–51; Appx1653–1666), and thus the Board did not specifically address them with respect to claim 57 in its final written decision.

The only other claim that is the subject of this appeal is claim 56. Claim 56 depends from claim 55, and reads:

> 56. A method as in claim 55, wherein the security module is adapted to enable communication with the host computing device and the target module, and the target module is adapted to enable communication with the security module and prevent direct communication with the host computing device, the method further comprising the step of controlling the security module to communicate with the target module so as to obtain

> information from the target module that can be used to identify the type of the target module.

Appx84, at 26:25–34. As the Board's only reason for rejecting Kingston's challenge to this claim resulted from its dependence from claim 55 (*see* Appx18–30), we need not address the additional specific limitations of this claim here.

## III. <u>The Prior Art</u>: Jones and the Other Prior Art References Disclose the Claimed Modular Device

### A. Like the '135 Patent, the Jones Reference Teaches Using Encryption To Store Data on a Portable PCMCIA-Compliant Storage Device.

Kingston's challenge to claims 55–57 of the '135 patent, and the entirety of the Board's reason for rejecting it, centered around a single prior art reference—WO 95-16238 to Jones. *See* Appx308–328. Like the '135 patent, the Jones reference discloses a portable PCMCIA card that is capable of performing security operations on data, such as encryption. *See* Appx308, at Abstract. In particular, the Jones references discloses a "personal computer memory card," shown in the below excerpted figure from Jones as 100, that "interconnect[s] with a host computer 110 by means of a hardware and software interface that conforms to the Personal Computer Memory Card International Association (PCMCIA) standard." Appx313, at ll. 5–7; *see also* Appx326:




Fig. 1

According to Jones, "[t]he secure memory card 100 stores data in a common memory array 150," which, like the memory target module contemplated by the '135 patent is "preferably implemented with non-volatile flash memory integrated circuits." *See* Appx313, at ll. 29–32; *see also* Appx79, at 16:39–45 (the '135 patent explaining that "a target module of a modular device according to the invention can be embodied as a memory module adapted to enable non-volatile storage of data" such as a "NAND flash memory device"). As the Jones reference acknowledges, this is a standard function of a PCMCIA card. *See* Appx313, at ll. 9–11.

Also as with the '135 patent, Jones teaches hardware that performs security operations, such as encryption, on data received from a computer to be stored in that memory array. The secure memory card of Jones contains an "encryption-decryption unit 177 which preferrably emplements [sic] a symmetrical key algorithm" for

encryption; and a smartcard integrated circuit 250 which "encrypts data from the data bus buffer 173" (which buffers data received from the host computer) "prior to storing the data in the common memory array 150." Appx317, at ll. 3–10. The encryption-decryption unit 177 and the smartcard I.C. 250 also work in combination to "decrypt[] the data back into its original form when it is retrieved from the common memory array 150." *Id.* During the proceedings below, SPEX did not challenge Kingston's mapping of either the memory array 150 to the claimed "target module" of the '135 patent nor the mapping of these security components of Jones to the "security module" of the '135 patent. *See* Appx11.

As noted above, the first set of disputed limitations involved on appeal are the "receiving" and "providing" steps which relate to how the claimed modular device identifies itself to the host computer. With respect to these limitations, Jones, like the '135 patent, relies on references to standardized technology to detail how its described secure memory card communicates with a computer when first connected. As Jones explains, "[t]o implement the PCMCIA interface standard, the secure memory card includes a non-volatile attribute memory 190 which stores information enabling the host computer to automatically identify the particular PCMCIA card as soon as the card and host are connected, and to automatically establish the appropriate hardware/software interface using suitable driver software which executes on the host computer 110." Appx314, at ll. 24–29. This "attribute memory [] stores information which specifies the nature of the memory card 100" and is organized

according to "section 5 of the PCMCIA PC Card Standard, Release 2.01." Appx317, at ll. 24–29.

Jones describes two different scenarios that may come into play when a card is first connected to a host computer. First, for computers already equipped with certain PCMCIA-compliant software, such as "[t]he standard 'Socket Services' and 'Card Services' card-interface software," the process of connecting the card is "significantly simplif[ied]" because this software "provid[es] much of the functionality required for communication with socketed PCMCIA cards." Appx317, l. 32–Appx318, l. 4. This teaching of Jones mirrors the disclosure of the '135 patent concerning PCMCIA drivers. *See* Appx76, at 9:55–65 (discussing "Card Services or Socket Services programs" bundled with the operating system that allows the computer to "identif[y] the type of peripheral device."

Second, Jones teaches that for "computers which are not provided with standard PCMCIA Card Services and Socket Services functions, the device driver directly interrogates" data stored "in the attribute memory." Appx318, at ll. 4–9. This again mirrors the explanation from the '135 patent. *See* Appx76, at 10:26–41 (explaining how the host computing device "can identify the type of a peripheral device" by accessing "attribute memory"). It is through these processes that the host computer is able to "automatically identify the particular PCMCIA card as soon as the card and host are connected" in Jones. Appx314, at ll. 24–29.

The second set of limitations involved in this appeal, as also discussed above, relate to what functions the claimed modular security device provides to the host PC, specifically requiring that the modular security device "communicate" data with a host computer and then perform a security operation and a "defined interaction" with the communicated data. With respect to these disputed limitations of claim 57, Jones's teachings again mirror the disclosure of the '135 patent. Jones teaches that the host computer communicates data with Jones's disclosed secure memory card. *See, e.g.,* Appx314, at ll. 1–4 ("Data transfers between the common memory array 150 and the host computer 110 are accomplished via the interface terminals 171, a data bus buffer 173, an internal data bus 175, a [sic] internal encryption/decryption unit 177, a gate 178 and an internal data bus 179."). Jones teaches that the hardware elements that map to the '135 patent's "security module" perform a security operation on the transferred data, namely encryption. *See, e.g.,* Appx317, at ll. 3–15 (explaining that "[t]o provide additional security, the data transferred over the 16-bit data bus" from the host computer is encrypted using "a symmetrical key [encryption] algorithm" to "protect[] data stored in the common memory array"). And Jones teaches that its secure memory card performs what the '135 patent calls a "defined interaction" on that data—namely storing the encrypted data into the memory array. *See id.* (explaining that the encryption occurs "prior to storing the data in the common memory array"). These steps exactly echo the steps performed by the '135 patent's

modular device when equipped with a memory target module, as discussed *supra* pp. 12–13.

To be sure, Jones also teaches all of the other elements of claims 55–57 that are not at issue on this appeal. For example, Jones teaches the claimed steps of "operably connecting the security module and/or target module to the host computing device" from claims 55 and 57 (*see* Appx45–51; Appx1818–1820); of "mediating" communication between the host computer and the portable device such that the data must pass through the security module before the target module from claim 57 and the substantively identical "adapted to enable" limitation from claim 56 (*see* Appx1821–1822; Appx1826–1827); and of "controlling the security module to communicate with the target module so as to obtain information from the target module that can be used to identify the type of the target module" from claim 56 (*see* Appx1822–1823; *see also* discussion supra pp. 16–17). Thus, Jones teaches each and every element of every claim at issue on this appeal.

### B. The PCMCIA Standard Specification Provides Additional Detail As to How both the "Modular Device" of the '135 patent and the "Secure Memory Card" of Jones Perform the "Receiving" and "Providing" Steps.

The Board initially declined to institute IPR against claims 55–57 because the Board believed the disclosure of Jones was insufficiently detailed so as to teach the "receiving" and "providing" steps of claim 55. *See* Appx706–709. After the Board later instituted on these claims following the Supreme Court's *SAS* decision, Kingston

submitted as supplemental information excerpts from the PCMCIA specification referenced in Jones and in the '135 patent. *See generally* Appx1556–1621 (excerpts from version 2.01 of the PCMCIA PC Card Standard); Appx1622–1630 (excerpts from version 2.0 of the PCMCIA Card Services Specification); Appx314, at ll. 19–23 (Jones, noting that "[t]he present embodiment of invention conforms to the PC Card Standard Specification, Release 2.01, published in November, 1992" and providing the address from which those interested can request information about this specification); Appx76, at 10:35–41 (the '135 patent, noting that "[t]he PCMCIA standard, for example, includes a specification called the Card Information Structures, that defines, among other things, a location in a portion of the memory of a PCMCIA card, denoted as 'attribute memory', that stores data identifying the type of PCMCIA card").

These PCMCIA specifications resolve any questions as to how both Jones and the '135 patent accomplish the "receiving" and "providing" steps. Both Jones and the '135 patent reference "attribute memory" which stores information in the Card Information Structure (CIS) concerning the identity of the card. *See* Appx76, at 10:36–41; Appx314, at ll. 24–29. The PCMCIA specification explains, in detail, the contents of the CIS stored in attribute memory. Specifically, the specification explains that the CIS stores information that can be used to identify the device to the host computer in "device-information tuples" which contain information about "device speed, device size, device type, and address-space layout." Appx1582. This is exactly

the type of information which a PCMCIA card uses to identify itself to a host computer. *See* Appx76, at 10:26–41; Appx314, at ll. 24–29; *see also* Appx1526–1527.

The PCMCIA standard also provides additional details concerning how the information stored in attribute memory is read by the host PC—it discloses numerous function and commands which the host PC can send to a PCMCIA device to query the information in the CIS, including the device-information tuples which contain information about the identity of the card. For example, the PCMCIA standard explains that when a PCMCIA card is first connected to a computer, the computer sends a command to query the information stored in attribute memory to determine what kind of PCMCIA card has been inserted. *E.g.* Appx1625 (explaining that at card insertion, the host PC supplies voltage to the card and "Card Services then attempts to read the Card Information Structure (CIS)"). In addition, the specification also discloses specific commands, such as "GetConfiguationInfo" which is sent by the host PC to the PCMCIA PC-Card. *See* Appx1627–1628. In response to this command, the PCMCIA PC-Card "returns information about the specified socket and PC Card configuration." Appx1627. Other commands disclosed by the PCMCIA specification which can be used to read device-identification data include "GetTupleData" which "retrieves the contents of [a] tuple" such as the "device-information tuple" described above, *see* Appx1623; and the "callback" command which is issued when a card is inserted into a host PC that uses other commands

(such as "GetTupleData" and "GetConfigurationInfo") to automatically read device information from the CIS, *see* Appx1625–1626.

Although the PCMCIA specification provides an extraordinary level of technical detail as to how PCMCIA cards identify themselves to host computers, this level of detail should be unnecessary for the purposes of this case. As noted above, both the '135 patent and Jones have commensurate levels of detail concerning how the "receiving" and "providing" steps are accomplished. As Kingston attempted to explain to the Board, there is no reason to require more detail from the prior art as to how the "receiving" and "providing" steps are accomplished than is disclosed in the '135 patent itself.

### C. Other Prior Art References Disclose Various other Limitations of the Challenged Claims.

Lastly, though Jones and the PCMCIA standard were the focus of the Board's decision, Kingston additionally cited numerous other pieces of prior art that taught limitations of the challenged claims. These references included:

- A 1986 publication titled "Security Modules: Potent Information Security System Components," authored by Charles Wood and Howard Zeidler (referred to in the petition as "Security Modules"). *See* Appx329–341.

- A 1996 publication titled "Common Interface Specification for Conditional Access and Other Digital Video Broadcasting Decoder Applications (referred to in the petition as "Common Interface Specification"). *See* Appx342–430.

- U.S. Patent No. 5,675,645, to Schwartz et al. that was filed in 1995. *See* Appx431–467.

- U.S. Patent No. 5,237,609, to Kimura, issued in 1993. *See* Appx468–487.

In addition to presenting a challenge based on Jones alone, the petition also asserted unpatentability based on Jones in combination with Security Modules, and Jones in combination with Schwartz and/or Kimura (for claim 57 only). *See* Appx1802–1803. However, as the Board's decision did not rest on any of the limitations taught by these additional prior art references, we need not address them here.

## IV. <u>The Proceedings Below</u>

### A. After SPEX Sued Kingston and Other Companies For Alleged Infringement of the '135 Patent, Kingston Petitions for Review.

The dispute between the parties did not start when Kingston petitioned the USPTO for inter partes review of the '135 patent. As is nearly always the case, the present IPR followed district court litigation alleging infringement of the patent under review. In this case, SPEX sued Kingston, along with a number of other companies, alleging infringement of the '135 patent and a closely-related sister patent, U.S. Patent No. 6,088,802 ("the '802 patent"). Although only the '135 patent is under review in this appeal, both patents are relevant to the outcome because of SPEX's actions in the parallel district court action, as will be discussed further below.

The specific dispute on appeal here began when Kingston petitioned the PTAB to institute *inter partes* review of claims 55–58 of the '135 patent. *See generally* Appx1796–1839. As noted above, Kingston's petition centered around the Jones reference, and presented challenges to each of claims 55–58 based on the Jones

reference alone and in combination with the other prior art references. Kingston's petition, supported by a declaration from an engineer with over thirty years of industry experience in electrical engineering and encryption (*see* Appx513–514), explained how Jones, either alone or in combination with the other references, taught each and every single limitation of the challenged claims.

With respect to the disputed "receiving" and "providing" steps of claim 55, Kingston's petition pointed to Jones' teachings, described above. As Kingston explained to the Board, the host computer communicates control signals via the PCMCIA interface, and that when the secure memory card of Jones is inserted into a PCMCIA-capable computer, the host computer reads the attribute memory on the card, thus allowing the computer "to automatically identify the particular PCMCIA card as soon as the card and host are connected." *See* Appx1817 (quoting Appx314, internal quotation indications omitted); Appx531. Kingston also explained to the Board that "[t]he Jones system is able to identify the type of modular device even in cases wherein the host computer is not provided with PCMCIA Card Services and Socket Services function." Appx1817; Appx531–532.

As to the disputed "communicating" and "performing" steps of claim 57, Kingston pointed to the fact that Jones discloses receiving data from a host computer, encrypting that data, and storing that data in the memory array on the secure memory card, as discussed above. *See* Appx1815 (discussing how Jones's "memory arrays" store data received from the host computer, which met the "target module"

limitation); Appx1824 (discussing how that data is communicated); Appx 1824–1825 (discussing security operations performed on that data); *see also* Appx529; Appx539–541. In particular, Kingston explained to the Board that, in the system taught by Jones, a host computer sends data to Jones's secure memory card to be stored via a data bus that is part of a standard PCMCIA interface. *See* Appx1824; Appx539. Kingston also explained that, prior to the data being stored, the Jones secure memory card performs a security operation on the data, namely encryption. *See* Appx1824–1826; Appx539–541.

With respect to the remaining limitations, Kingston's petition walked through and explained how Jones taught each and every single one. *See* Appx1818–1820 (the "operably connecting" step); Appx1821–1823 (the additional limitations of claim 56); Appx1826–1828 (the "mediating" step of claim 57). Kingston's petition also explained how Jones also anticipated claim 58, which is not at issue on appeal because the Board ultimately found it unpatentable. *See* Appx1827–1830. And Kinston's petition how Jones in combination with each of the other references also rendered the challenged claims unpatentable. *See* Appx1830–1836.

### B. SPEX Answers In Its Preliminary Patent Owner Response; and the Board Declines Institution for Claims 55–57.

SPEX answered in a pre-institution preliminary patent owner response. *See generally* Appx562–599. In its response, SPEX argued that Jones's discussion of how PCMCIA standards allowed for identification of a card when inserted into a computer

was not sufficiently detailed enough to disclose the "receiving" and "providing" steps of claim 55, despite the fact that the '135 patent also relies on the PCMCIA standard to explain these limitations. *See* Appx584–586. According to SPEX, Jones's disclosure that Jones's teaching about PCMCIA control signals and that the PCMCIA standard allows for a card to be "automatically" identified when inserted into a computer did not disclose a "request" for information and "providing" the requested information because "neither the Petition, nor its expert, provides any explanation as to how the automatic identification" process works. *See* Appx584–585. SPEX also argued that Jones's teaching of a device driver "interrogat[ing] the CIS structure in the attribute memory" was also insufficient because of an alleged lack of detail. *See* Appx585.

As for the disputed limitations of claim 57, SPEX argued the communication of data, without more, could not satisfy claim 57's requirement that the modular device perform a "defined interaction" on data because the defined interaction would then be commensurate with the "communicating with the host computing device" step. *See* Appx589–590. What SPEX's argument ignored, though, was Jones's explicit teaching (and the petition's discussion of the teaching) that Jones' secure memory card not only communicates with the host computer, but also stores data received from the host computer, just like one embodiment described in the specification of the '135 patent. *See* Appx314; Appx317; *see also* Appx1815 (explaining that "Jones's modular device also includes target memory modules 190 and 150 that each store and

retrieve data on command by host personal computer 110"). SPEX's feigned ignorance of this key teaching of Jones (which, relevantly, is titled "Secure Computer ***Memory*** Card") was justified because Kingston's petition did not, according to SPEX, explicitly state that the "defined interaction" was the storage of data and not the communication of data, even though Kingston identified the "target module" which performed the defined interaction to be the memory array where data was stored.

Based on SPEX's arguments, the Board declined to institute as to claims 55–57, though the Board did institute (and ultimately found unpatentable) claim 58. The Board's reasoning for non-institution of these claims essentially mirrored SPEX's arguments. The Board declined to institute as to claim 55 and claim 56 (which depends from claim 55) because it concluded that Jones' statement that a host computer "automatically" identifies a card according to PCMCIA specifications was not sufficiently detailed to teach "receiving" a request and "providing" a response to a request. *See* Appx708–709. The Board also declined to institute on claim 57—ignoring, as SPEX's argument did, Jones's separate explicit teachings of communicating and storing data. *See* Appx709–711.

### C. In the Related District Court Litigation, SPEX's Expert Admits that Any PCMCIA Compliant Device Teaches the Disputed "Receiving" and "Providing" Steps And Accuses Data Storage, Like that Taught by Jones, As a "Defined Interaction."

With only one claim instituted, the district court litigation continued to progress in parallel with the IPR proceeding under review here. Both parties hired experts, expert reports were served, and those experts were deposed. The deposition of SPEX's litigation expert became acutely relevant to this IPR, as SPEX's litigation expert took positions in the district court litigation that were directly contrary to positions SPEX took in this IPR regarding the teachings of Jones. However, before diving into those inconsistencies, some background concerning the district court litigation is necessary.

As noted above, SPEX sued Kingston and others alleging infringement of the '135 patent and the closely-related '802 patent. The specifications for these two patents are nearly identical, and the inventions claimed by both patents are, as the claim terms have been interpreted by the district court,[2] also closely related. As

[2] The main difference between the two patents is that the '802 patent describes a "peripheral" device with a "security means" and a "target means", whereas the '135 patent describes its purported invention as a "modular" device with a "security module" and a "target module." *Compare generally* Appx61–84 *with* Appx1632–1652. Before the district Court, Kingston contended that the '135 patent's use of the word "module" required separate physical components, especially when compared with the different language used in the '802 patent. The district court, though, interpreted these terms so as to have the same meaning. *See* Order Regarding Claim Construction, D.I. 122, *SPEX Technologies, Inc. v. Kingston Technology Company, Inc.*, Case

relevant here, elements from claim 38 from the '802 patent are identical to the disputed elements of claim 55 of the '135 patent. Both claims are below, with the relevant portions emphasized:

| **'802 Patent, Claim 38** | **'135 Patent, Claim 55** |
|---|---|
| For use in a peripheral device adapted for communication with a host computing device, performance of one or more security operations on data, and interaction with a host computing device in a defined way, a method comprising the steps of: | For use in a modular device adapted for communication with a host computing device, the modular device comprising a security module that is adapted to enable one or more security operations to be performed on data and a target module that is adapted to enable a defined interaction with the host computing device, a method comprising the steps of: |
| ***receiving a request from a host computing device for information regarding the type of the peripheral device; and*** | ***receiving a request from the host computing device for information regarding the type of the modular device;*** |
| ***providing to the host computing device, in response to the request, information regarding the type of the defined interaction.*** | ***providing the type of the target module to the host computing device in response to the request; and*** |
| | operably connecting the security module and/or the target module to the host computing device in response to an instruction from the host computing device. |

No. 8:16-cv-01790 (C.D. Cal. Oct. 18, 2017). For the purposes of this appeal, Kingston does not dispute the application of the district court's constructions, though Kingston reserves the right to later challenge those constructions should the district court case result in a final judgment that is appealed to this Court.

*Compare* Appx1652, at 22:12–23 *with* Appx84, at 26:12–24. As SPEX's litigation expert acknowledged, the two disputed limitations from claim 55 in this appeal are substantively identical to limitations from Claim 38—after all, the '135 patent defines the term "defined interaction" according to the type of target module. *See* Appx1096–1097; *see also* Appx73, at 4:44–47.

In the district court case, Kingston asserted that claim 38 of the '802 patent and claim 55 of the '135 patent were anticipated by the U.S. counterpart to the Jones reference at issue in this IPR (which shares a specification with the Jones reference here). *See* Appx1546-Appx1555 (the U.S. counterpart to Jones); Appx1526–1528 (Kingston's litigation expert report re: claim 38 of the '802 patent); Appx1531–1532 (Kingston's litigation expert report re: claim 55 of the '135 patent). Other defendants asserted other prior art that, like Jones, also discussed and disclosed PCMCIA compliant devices. *See*, *e.g.*, Appx1166–1167 (deposition of SPEX's litigation regarding the "Harari" PCMCIA reference). SPEX's litigation expert served a single report that addressed the Jones reference asserted by Kingston and the other PCMCIA-references asserted by the other defendants, and all defendants participated in a single deposition of SPEX's expert. *See* Appx1107–1109

The reason all this matters is because SPEX's litigation expert repeatedly admitted in deposition that any PCMCIA-compliant device, like that taught by Jones and the other PCMCIA references, would practice the "receiving" and "providing" steps of claim 38 of the '802 patent, which (as noted above) are substantively identical

to the disputed "receiving" and "providing:" steps at issue in this appeal. For example, with regard to a reference called Harari's disclosure of a PCMCIA-compliant card, SPEX's litigation expert was asked by another defendant's counsel whether the reference "discloses receiving a request from the host computing device for information regarding the type o[f] the peripheral device through its disclosure of using the PCMCIA standard." Appx1166:5–9. In response, though SPEX's expert thought that the party's expert failed to adequately address PCMCIA in his report, the expert answered:

> [I]f one understands the details of the PCMCIA interface, and I pointed to [it] in one of my infringement reads – I think it was GetTuple or something – I'd have to go look at my infringement report – but I think there is a way that a – in the PCMCIA standard you can have the host through a driver request for information about what is this thing you just plugged into that port, and then there is a way for the PCMCIA compliant device to answer that inquiry.

Appx1166:10–20. And when the expert was asked directly whether this meant he believed that, because the reference disclosed a PCMCIA card, that reference would teach elements 38a (the "receiving" step) and 38b (the "providing") step, he unequivocally answered that these steps "would have been met" because "there's a way within the standard that the host can ask the device for information, and the – there is a way for the device to provide information recording the type – regarding the type of defined interaction." Appx1166:24–1167:24.

Kingston's counsel picked up where the other defendants' counsel left off. Referencing back to the questions discussed above, counsel for Kingston asked directly whether the expert believed "there was a teaching of Element 38a" when a reference discloses a PCMCIA compliant device, and the expert again admitted that there was, answering that if "the host device and the device that's plugged into the PCMCIA terminal are both compliant with the standard, there is a teaching in the standard … as to how a request for information will take place." Appx1241:15–1242:3. Counsel for Kingston also asked—being very careful as to not "put any words in [the expert's] mouth"—whether the PCMCIA standard teaches "providing to the host computing device in response to a request information regarding the type of defined interaction." Appx1243:7–21. The expert again admitted that "[t]hat is – is within the standard, yes." Appx1243:22. And, finally, closing the loop on these questions, another counsel asked SPEX's litigation expert whether he agreed "that a reference to a standard in a patent means that the items of that standard are inherently disclosed within the patent." Appx1387:16–18. SPEX's expert answered: "[T]he disclosure of that standard is – is brought into that patent, yeah" and that a person of skill would "rely on things that are in that standard as part of your understanding of the scope, say, of the claims, is a good example." Appx1387:19–24.

Notably, SPEX had plenty of opportunity to walk away from these statements of its expert, but did not. Following the deposition, counsel for Kingston sent counsel for SPEX a letter asking for the basis for SPEX's continued assertion of claim

38 of the ’802 patent and claim 55 of the ’135 patent in light of the admissions made by its expert in deposition. *See* Appx1726–1728. To date, SPEX has not disavowed the admissions made by its expert nor provided any substantive response explaining how it can continue to maintain these claims are valid despite its litigation expert’s admission that the steps are practiced by the prior art.

One other aspect of the district court litigation became relevant to this IPR—SPEX’s own interpretation as to the scope of its claims in its infringement positions. In district court, SPEX has accused encrypted USB drives sold by Kingston of infringing both the ’135 and ’802 patents. *See* Appx1071, at ¶¶ 68–69. As SPEX’s litigation expert acknowledges in his infringement expert report, these are typical USB storage sticks that encrypt the data that is stored on them. *See id.* Thus, to support its infringement read, the expert accused the data storage on these devices as meeting the “target module” element of the ’135 patent. *See* Appx1096; Appx1076–1077. According to SPEX’s infringement read, this alleged target module performs a “defined interaction” because it stores data. *See* Appx1098; Appx1093–1094; Appx1076–1077. Despite SPEX accusing storing encrypted data received from a computer of infringing the disputed limitations, SPEX has denied that such storing of encrypted data taught by Jones meets the second set of disputed limitations involved in this appeal.

### D. The Board Institutes Claims 55–57, Kingston Provides Supplemental Evidence of SPEX's Litigation Positions And the Teachings of PCMCIA, and the Board Holds Its Hearing.

All of these admissions made in district court may never have become part of this IPR, as the Board originally denied institution as to claims 55–57. However, following the Supreme Court's decision in *SAS* holding that the PTAB's practice of partial institution was in violation of the Patent Act, the Board issued an order in this IPR instituting as to all challenged claims despite its initial determination regarding claims 55–57. Following this amended institution, Kingston sought, and obtained, permission to submit evidence regarding SPEX's litigation positions (discussed above) and additional evidence regarding the PCMCIA standard, namely the specification documents discussed *supra* pages 19–22. *See* Appx1001–1002.

The Board also allowed both parties to submit supplemental briefs regarding this supplemental evidence. *See* Appx1003. In its supplemental brief, Kingston pointed the Board to the evidence of SPEX's litigation expert's admission, SPEX's infringement position, and the teachings of the PCMCIA specification and explained the relevance of each to the claims at issue. *See generally* Appx1006–1020. In response, SPEX offered only distraction and equivocation, contending that Kingston was attempting to inject new arguments (which would have been appropriate given the new evidence that could not have been obtained before) and claiming that Kingston had misrepresented statements made by its expert in deposition (despite the repeated, clear admissions highlighted above). *See* Appx1653–1666.

The oral hearing held by the Board largely focused on the supplemental evidence submitted by Kingston, and again SPEX offered only equivocation. Despite the fact that Kingston had served the full PCMCIA specifications on SPEX in the district court litigation, counsel for SPEX claimed to be ignorant about the content of the standard and argued that the Board couldn't rely on the documents submitted because (instead of submitting hundreds and hundreds of pages that make up the full specification) Kingston only submitted excerpts from those documents in the IPR proceeding. *See* Appx1767–1769 (Q: "Is there anything in the PCMCIA tandard that proves a different method for automatic identification beyond what Petition has identified in Exhibit 1017?" A: "Your Honor, all we have is the exhibit that was put in as 1017."); *see also* Appx1770–1772. SPEX's counsel attempted to justify his ignorance by stating that he was "not the counsel in the District Court proceeding" and that his access to a deposition and an expert report from the district court case that were not marked confidential was limited somehow by the protective order in that case—despite litigation counsel being present at the hearing. *See* Appx1769–1770; Appx1787. In short, neither in their briefing nor at the hearing was SPEX able to offer any real, substantive points regarding the supplemental evidence provided by Kingston.

### E. The Board Rejects Kingston's Challenge to Claims 55–57, Applying an Overly-Strict Inherency Standard and Ignoring the Evidence of SPEX's Litigation Positions.

Ultimately, the Board ended up where it started and concluded that though claim 58 was not patentable over Jones, claims 55–57 were. Just as it had in the institution decision, the Board's decision rested entirely on the disputed limitations from claims 55 and 57.

Despite the supplemental evidence explaining exactly how the PCMCIA standard provides for commands to retrieve identification data from a PCMCIA card, the Board still concluded that the disclosure of Jones was insufficiently detailed to teach the "receiving" and "providing" limitations of claim 55. In so deciding, the Board turned to the standard for inherency and concluded that Jones's explicit reference to a particular version of a standard was insufficient for the teaching of that same version of the standard to be inherently part of Jones. *See* Appx27–29. As the Board explained, "[a]lthough the GetTupleData or GetConfigurationInfo commands appear to provide two potential ways that a host computer could request information from a PCMCIA-complaint card, we are not persuaded that either command is *necessarily* involved in the 'automatic[] identif[ication]' recited by Jones." Appx27 (alterations in original). In support, apparently ignoring that SPEX's counsel had full access to the complete versions of the PCMCIA specifications and could have submitted additional pages should it have tried, the Board stated that "[w]ithout the complete versions of these documents or persuasive evidence that the GetTupleData

and GetConfigurationInfo commands provided the only means by which a PCMCIA-compliant card could have provided module type information to a host, we can only speculate as to what else might be disclosed in them." Appx28. Nowhere did the Board address Kingston's argument, clearly articulated at the hearing, that the teachings in Jones itself were sufficient as they matched the level of detail provided in the '135 patent. *See* Appx1745–1746 (noting that the standards weren't included with the initial petition "[b]ecause we believe that the prior art had the same level of detail as the 135 patent, and thus, gave a sufficient amount of disclosure"). And nowhere in the Boad's decision did the Board address the clear admissions made by SPEX's litigation expert, discussed above.

As to the disputed limitations of claim 57, the Board adhered to the position it took in the institution and denied consideration of how SPEX had interpreted the scope of the claim in litigation because, according to the Board, asserting that Jones stored data was a "new argument not presented or relied upon in the Petition." Appx33. Thus, according to the Board, regardless of Jones's explicit teaching of data storage Kingston's discussion of it in the petition, "[w]hether or not Patent Owner in district court litigation asserted that 'data storage' may, itself, be a 'defined interaction' within the meaning of that term in claim 57" was irrelevant. *See* Appx34.

This appeal then followed.

## SUMMARY OF THE ARGUMENT

The Board's decision that claims 55–57 are patentable over Jones should be set aside. As to the "receiving" and "providing" steps of claim 55, the Board erroneously concluded that Kingston had to prove that the PCMCIA standards where inherent in the Jones disclosure. Both the '135 patent and Jones point to the PCMCIA standards in explaining how the host computer identifies the PCMCIA card when it is inserted, and thus Jones alone should have been sufficient to prove anticipation without inherency. The PCMCIA standards are simply supporting evidence to back up that conclusion, providing additional detail missing from both Jones and the '135 patent. To the extent inherency was required, the Board further erred in applying an overly-strict standard where the Board concluded that Jones's explicit reference to the PCMCIA standards was insufficient to show that the functions described in the standard were necessarily used. When this evidence is considered along with SPEX's litigation expert's admissions (ignored by the Board), there can be no doubt that these limitations are taught.

As to the disputed limitations of claim 57, the Board willfully ignored the explicit teachings of Jones and how SPEX had interpreted the scope of its claim in district court. There is, and can be, no question that Jones teaches exactly the same series of steps described and claimed by the '135 patent, and the same series of steps SPEX accused of infringing. As SPEX put forth no evidence to the contrary, this Court should reverse and find these limitations taught as well.

## STANDARD OF REVIEW

This Court reviews the legal determinations made by the Board de novo and the factual determinations of the Board for substantial evidence. *See, e.g., In re Mouttet*, 686 F.3d 1322, 1330 (Fed. Cir. 2012). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). However, a review for substantial evidence does not entitle a Court to disregard all evidence contrary to the conclusion reached. For example, when reviewing jury verdict for substantial evidence, this Court has held that , "[t]he rule that a jury verdict is reviewed for support by 'substantial evidence' does not mean that the reviewing court must ignore the evidence that does not support the verdict." *Integra Lifesciences I, Ltd. v. Merck KGaA*, 496 F.3d 1334, 1345 (Fed. Cir. 2007). Indeed, on review for substantial evidence, a court must not only "give credence to the evidence favoring" the conclusion but must also consider "evidence supporting the moving party that is uncontradicted and unimpeached" (emphasis added))

Importantly for this appeal, this Court reviews not only what the Board concluded but also ***how*** the Board reached those conclusions. As the Court is well aware, the Board is not entitled to deference as to its substantive aspects of patent law. *See Koninklijke Philips Elecs. N.V. v. Cardiac Sci. Operating Co.*, 590 F.3d 1326, 1336 (Fed. Cir. 2010) ("The PTO lacks substantive rulemaking authority."). Decisions relying on incorrect legal standards, even if the fact-finding underlying the decision is reviewed

for substantial evidence, should be set aside. *See*, *e.g.*, *McGinley v. Franklin Sports, Inc.*, 262 F.3d 1339, 1350 (Fed. Cir. 2001) (noting that jury verdicts reviewed for substantial evidence should be set aside if "premised on incorrect legal standards"). Likewise, any Board action that lacks a rational explanation should be set aside as arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law under the Administrative Procedure Act (APA). *See, e.g., Vicor Corp. v. SynQor, Inc.*, 869 F.3d 1309, 1319-20 (Fed. Cir. 2017). "[A]n agency's [fact] finding may be supported by substantial evidence," yet "nonetheless reflect arbitrary and capricious action." *Id.* at 1323 (quoting *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 284 (1974)).

## ARGUMENT

### I. The Board's Determination that Jones Does Not Teach the Disputed Limitations of Claims 55–57 Should Be Reversed

#### A. The Board Erred By Applying an Overly-Strict Standard for Inherency That Required More Detail from Jones than Disclosed in the '135 Patent.

The Board's decision that Jones did not teach the disputed "receiving" and "providing" limitations of claim 55 (and thus also claim 56) turned exclusively on the Board's decision that Jones' reference to the PCMCIA standard was insufficiently detailed to teach these limitations. According to the Board, because Jones lacked sufficient detail in its disclosure, Kingston had to turn to inherency to demonstrate this limitation was present in the prior art. *See* Appx27 ("Because Jones does not *expressly* disclose the receiving and providing steps of claim 55, it was Petitioner's burden to show that those steps were necessarily present, i.e., that they were inherently disclosed.") The Board then concluded that Jones's reference to the PCMCIA standard was insufficient to demonstrate that the functions described in the specification for the PCMCIA standard were "necessarily" present in Jones's PCMCIA card. Each of these determinations by the Board was legal error, and merits reversal or at least vacatur.

##### 1. The Board Erred in Requiring Kingston to Prove Jones Meets the "Receiving" and "Providing" Steps By Inherency.

First, the Board erred in turning to inherency at all. As discussed above in the background section, the "receiving" and "providing" steps in claim 55 cover how a

host computer identifies a PCMCIA card when the card is inserted. *See* Appx76, at 9:45–58. The specification of the '135 patent itself identifies the PCMCIA standard as a method by which a host computer can identify a card. *See* Appx76, at 10:28–34 ("[o]ne way in which the operating system software of a host computing device can identify the type of a peripheral device is to access a known memory section of a memory device of the peripheral device, as established by an interface standard developed for that type of peripheral device, that stores data representing the type of peripheral device.") *see also* Appx76, at 9:61–65; Appx76, at 10:11–22. And, after repeated and acute questioning by the panel of the Board during the hearing, counsel for the patent owner was forced to admit that, according to the specification of the '135 patent, a PCMCIA card can be used as one embodiment of the purported invention claimed by the '135 patent. *See* Appx1762–1763 (acknowledging that the "specification [of the '135 patent] discusses PCMCIA, specification discloses PCMCIA"); Appx1764–1765 (acknowledging that a PCMCIA physical card can be used to practice the invention of the '135 patent).

Jones, like the specification of the '135 patent, points to the PCMCIA standard as the method by which a host computer identifies a card when it is inserted. *See* Appx314, at ll. 24–29 (explaining that as part of the "PCMCIA interface standard," the card stores information that allows "the host computer to automatically identify the particular PCMCIA card as soon as the card and host are connected"). Jones mentions the exact same parts of the standard as the '135 specification and describes

the PCMCIA specification to the same level of detail as the ’135 specification. For example, the ’135 specification tells us that "‘attribute memory’[] stores data identifying the type of PCMCIA card" as part of the PCMCIA Card Information Structure specification (*see* Appx76, at 10:36–41), and Jones tells us that "attribute memory [] stores information which specifies the nature of the memory card 100" and is organized according to "Section 5 of the PCMCIA PC Card Standard, Release 2.01"—which is the section that address the Card Information Structure (*see* Appx317, at ll. 24–29; Appx1568–1569). The ’135 patent also describes the "Card Services or Socket Services programs" that are "use[d] in performing various ‘housekeeping’ functions associated with a PCMCIA interface" as an example of a device driver that can be used by the host computer to identify a PCMCIA card (*see* Appx76, at 9:61–65); and Jones explains that the host PC can identify a PCMCIA card using "[t]he standard ‘Socket Services’ and ‘Card Services’ card-interface software" (*see* Appx317, l. 32–Appx318, l. 4).

Because Jones describes the exact methods disclosed by the ’135 patent as accomplishing the "receiving" and "providing" steps of claim 55, Jones anticipates them without having to turn to either the PCMCIA standards documents or inherency. That the ’135 patent may disclose other embodiments of the purported invention that use different methods is immaterial. It has long been black-letter law that "the description of a single embodiment of broadly claimed subject matter constitutes a description of the invention for anticipation purposes." *In re: Lukach*,

442 F.2d 967, 970 (C.C.P.A. 1971) (citing *In re Ruscetta*, 255 F.2d 687 (1958)); *see also, e.g., Titanium Metals Corp. of Am. v. Banner*, 778 F.2d 775, 782 (Fed. Cir. 1985) ("It is also an elementary principle of patent law that when, as by a recitation of ranges or otherwise, a claim covers several compositions, the claim is 'anticipated' if one of them is in the prior art."). The '135 specification explains that the "receiving" and "processing" steps can be accomplished using methods set out by the PCMCIA standard, and Jones discloses the exact same thing to the same level of detail. This should have been sufficient for the Board to find anticipation, and the Board erred in requiring more where the "[p]atent itself does not disclose the level of detail that [the Board demanded] of the prior art." *See Lockwood v. Am. Airlines*, 107 F.3d 1565, 1570 (Fed. Cir. 1997).

Although the PCMCIA specification documents were not required to prove anticipation, the Board should not have required Kinston to resort to inherency for the Board to consider them. These documents simply demonstrate what a skilled artisan would already understand from the teachings of Jones. As this Court has explained, "[w]hat a prior art reference discloses or teaches is determined from the perspective of one of ordinary skill in the art." *Sundance, Inc. v. DeMonte Fabricating Ltd.*, 550 F.3d 1356, 1361 n.3 (Fed. Cir. 2008). A person of skill in the art is "not an automaton," and thus the teachings of the prior art need not be laid out in haec verba. *See KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 421 (2007). This Court and its predecessor have therefore held that what a prior art reference teaches is determined

not only by what references expressly state but also by what they "would reasonably suggest to one of ordinary skill in the art." *In re DeLisle*, 56 C.C.P.A. 1319, 1322, 406 F.2d 1386, 1389 (C.C.P.A. 1969); *see also, e.g., Merck & Co. v. Biocraft Labs.*, 874 F.2d 804, 807 (Fed. Cir. 1989).

Just as this Court understands the word "anticipation" without being provided a detailed explanation of the precedents that define the term, and just as a patentee need not explain what voltage is in the written description of an invention in the electrical engineering art, Jones did not need to expressly detail the entirety of the PCMCIA specification in its written description in order for a skilled artisan to understand that the contents of the specification are part of the teachings of Jones. Jones explicitly states that the secure memory card it describes is compliant with the PCMCIA specifications, it names the exact version of the specification with which it is compliant, and it provides the reader the necessary information required for a reader of its disclosure to find the information. *See* Appx314, at ll. 19–23 (stating that "[t]he present embodiment of the invention conforms to the PC Card Standard Specification, Release 2.01, published in November, 1992" and providing the address at which a reader could request a copy of the specification). A skilled artisan at the time of the '135 patent (which was just a few years after Jones) would either be familiar with the PCMCIA specifications or could look them up according to the information provided in the disclosure to brush up on details the artisan may not have fully committed to memory. Just because we, as lawyers and judges in 2019, may turn

to the specification mentioned by the disclosure of Jones as supporting evidence to understand what a skilled artisan in the 1990's would understand from reading from Jones does not mean that the legal doctrine of inherency must be invoked.

As this Court has explained, "[a] reference anticipates a claim if it discloses the claimed invention 'such that a skilled artisan could take its teachings, *in combination with his own knowledge of the particular art and be in possession of the invention*." *In re Graves*, 69 F.3d 1147, 1152 (Fed. Cir. 1995) (emphasis in original) (citing and quoting *In re LeGrice*, 301 F.2d 929, 936 (C.C.P.A. 1962)). As supporting evidence as to how a skilled artisan would understand the teachings of Jones, the PCMCIA specifications answer the Board's questions as to exactly how PCMCIA-compliant cards like Jones perform the "receiving" and "providing" steps, and provide evidence as to the knowledge of a skilled artisan at the time. As discussed extensively above in the background section, the specification provides numerous functions that can be used by a host computer to read device-identifying information from a host computer, and explains that these functions are performed automatically when a PCMCIA-compliant card is plugged into a PCMCIA-compliant computer. *See* Section III.B, *supra*. As even the Board recognized, the commands pointed to by Kingston in the PCMCIA documents "appear to provide two potential ways a host computer could request information from a PCMCIA-compliant card." Appx27. The Board erred, however, in requiring Kingston to meet the standard for inherency for the Board to consider them.

That Kingston's expert for the IPR never addressed the PCMCIA documents specifically is similarly no justification for ignoring them. *See* Appx28, at n. 14. As an initial matter, Kingston's litigation expert Dr. Villasenor addressed the documents at length in his expert report served on SPEX, the relevant excerpts of which were submitted to the Board. *See* Appx1531–1532; Appx1504–1508. Contrary to the Board's suggestion that SPEX had no opportunity to cross examine the litigation expert, SPEX deposed Dr. Villasenor for two days, and could have sought to submit any material from Dr. Villasenor's deposition that they believe detracted from the opinions in the report submitted to the Board. In any event, the documents themselves are evidence and "[n]o rule requires [a filing before the Board in an IPR] be accompanied by any declaration, let alone one from an expert guiding the Board as to how it should read prior art." *Belden Inc. v. Berk-Tek LLC*, 805 F.3d 1064, 1079 (Fed. Cir. 2016).

#### 2. The Board's Application of This Court's Inherency Precedents Was Overly-Strict.

To the extent that application of this Court's precedents regarding inherent anticipation was, however, required, the Board misapplied them. The Board held that even though Jones explained that its disclosed secure memory card was compliant with a specific version of the PCMCIA standard, the description of how that standard operated from the very document referenced by Jones was not "necessarily" how the invention of Jones operated. This too is legal error.

As this Court has explained, "[a]n anticipatory reference … need not duplicate word for word what is in the claims. Anticipation can occur when a claimed limitation is 'inherent' or otherwise implicit in the relevant reference." *Standard Havens Products, Inc. v. Gencor Industries, Inc.*, 953 F.2d 1360, 1369 (Fed. Cir. 1991). Where a reference leaves a gap concerning its teachings, "such gap in the reference may be filled with recourse to extrinsic evidence." *Cont'l Can Co. USA v. Monsanto Co.*, 948 F.2d 1264, 1268 (Fed. Cir. 1991). Either the reference itself, or the extrinsic evidence filling the gap, though, "must make clear that the missing descriptive matter is necessarily present in the thing described in the reference, and that it would be so recognized by persons of ordinary skill. *Id.* (citing *In re Oelrich*, 666 F.2d 578, 581 (CCPA 1981)); *see also Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1328 (Fed. Cir. 2001) (explaining that "recourse to extrinsic evidence is proper to determine whether a feature, while not explicitly discussed, is necessarily present in a reference").

However, the requirement that inherent material be necessarily part of the reference should not preclude common sense inferences drawn from the reference and extrinsic evidence. *See Perricone v. Medicis Pharmaceutical Corp.*, 432 F.3d 1368, 1379–80 (Fed. Cir. 2005) (affirming a district court's determination at summary judgment that claims directed to applying a composition to aging skin were inherently anticipated despite any explicit mention of aging in the prior art reference because "all skin ages"). Nor does the inherency doctrine justify ignoring undisputed evidence in favor of speculation or unsupported arguments. For example, this Court has reversed

a district court's denial of JMOL where evidence supported an alleged infringer's contention that an element was inherently present, despite unsupported arguments to the contrary made by the patent owner's expert. *See ParkerVision, Inc. v. Qualcomm Inc.*, 621 F. App'x 1009, 1024 (Fed. Cir. 2015). Yet the Board ignored common sense inferences from the Jones reference and ignored uncontroverted evidence from the PCMCIA standards, justifying its decision to do so by pointing to the standard for inherency.

The Jones reference explicitly states that its secure memory card is compliant with a specific version of the PCMCIA standard. *See* Appx314. SPEX's litigation expert explicitly admitted a person of skill in the art would necessarily consult a standard specification when the standard is mentioned in a patent or prior art. Appx1387:19–24. Nothing in the Jones reference suggests that the secure memory card is only "partially" or "sometimes" compliant with PCMCIA standards, nor is there any reference to particular portions of the standard that are to be ignored. The Board cited no evidence that Jones only partially practices the PCMCIA specification—it only cited its own speculation about what non-excerpted portions of the specification might say.[3] As nothing in this Court's inherency jurisprudence

---

[3] Kingston elected to not provide hundreds and hundreds of pages—much of which are entirely irrelevant to the issues involved in the IPR—for efficiency. To be clear, though, SPEX had in its possession the full set of standards documents, as Kingston had served the documents on SPEX in the district court litigation. SPEX could have

sanctions placing unsupported speculation over common the evidence of record, the Board's decision regarding inherency should be reversed.

### B. The Board Erred by Ignoring Admissions in Litigation Concerning the Scope of Its Claims and the Teaching of the Prior Art.

The Board's decision was also legally erroneous because it ignores key evidence and arguments. Agency decisions that "fail[] to consider . . . important aspect[s] of the problem" being considered are arbitrary and capricious and cannot stand. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut Auto Inc. Co.*, 463 U.S. 29, 43 (1983). This Court has routinely held that Board decisions that ignore important arguments or evidence must be vacated or reversed. *See*, *e.g.*, *Shinn Fu Co. of Am. V. Tire Hanger Corp*, 701 F. App'x 942, 944–45 (Fed. Cir. 2017) (non-precedential) (ruling that the Board's failure to consider argument and evidence relating to a proposed obviousness combination was arbitrary and capricious); *Ariosa Diagnostics v. Verinata Health, Inc.*, 805 F.3d 1359, 1366 (Fed. Cir. 2015) (vacating Board decision for failing to fully consider record evidence about a skilled artisan's knowledge); *Randal Mfg. v. Rea*, 753 F.3d 1355, 1362 (Fed. Cir. 2013) (vacating Board decision because it ignored record evidence relevant to the obviousness analysis that demonstrated the knowledge and perspective of one of ordinary skill in the art). And, as particularly relevant here,

---

asked to submit to the Board evidence from the standard if it believed other parts contradicted Kingston's assertions, but chose not to.

this Court has explicitly found the Board to be in error when it ignored evidence of contradictory positions taken by a patent owner in district court litigation. *See Ultratec, Inc. v. CaptionCall, LLC*, 872 F.3d 1267, 1272 (Fed. Cir. 2017).

Here, the Board's decision should at least be vacated because the Board failed to properly consider the evidence concerning position taken by SPEX and its expert in the district court litigation. With regard to the "receiving" and "providing" limitations of claim 55, SPEX's litigation expert repeatedly and unequivocally admitted in deposition that these limitations are taught by the PCMCIA standard, and thus any reference like Jones that teaches a card compliant with those standards would teach those steps. Appx1166:10–20; Appx1166:24–1167:24; Appx1241:15–1242:3; Appx1243:18–22. As SPEX specifically hired its expert to testify on its behalf in the district court, and as SPEX had ample opportunity to disavow this position taken by its expert but didn't, this evidence amounts to an admission by SPEX that these elements were known in the prior art. *See, e.g.,* Fed. R. Evid. 801(d)(b)(2) (defining as "[a]n Opposing Party's Statement" "one the party manifested that it adopted or believed to be true"); *Neuman v. Rivers*, 125 F.3d 315, 320 (6th Cir. 1997) (a statement may be offered as an adoptive admission if it is shown that the statement was made under circumstances that would induce a reasonable person to respond and the person against whom it is sought to be used against heard, understood, and acquiesced in the statement). Even if not a party admission, this evidence should have been given heavy consideration by the Board as it was an explicit admission by

an expert hired by the Patent Owner who contended before the Board that Jones's PCMCIA teachings were insufficient to meet these elements.

Yet, apart from reciting the parties arguments concerning the testimony, the Board's decision makes no mention of it. Indeed, the entirety of the portion of the Board's decision explaining why it rejected Kingston's challenge to claim 55 and 56 (Appx27–30) never mentions the deposition admissions, much less considers them. The Board's failure to consider this important piece of evidence merits at least vacatur of the Board's decision regarding claims 55 and 56.

The Board similarly ignored the evidence Kingston submitted regarding SPEX's infringement assertions on Kingston's products from the district court litigation. This evidence consisted of a report submitted by SPEX's expert on behalf of SPEX that affirmatively asserted that transferring data from a host computer, encrypting that data, and then storing that data was sufficient to meet the disputed limitations of claim 57. *See* Appx1098; Appx1093–1094; Appx1076–1077. Neither SPEX nor the Board disputed that Jones teaches the exact same sequence, nor could it be disputed given Jones's explicit teachings. *See* Appx314; Appx317, at ll. 3–15. Yet the Board, too, failed to consider this evidence in rendering its decision on claim 57.

Instead of tacitly ignoring the evidence as the Board did with SPEX's litigation expert's admissions, the Board actively rejected consideration of SPEX's infringement read because the Board thought that it amounted to a new argument not included in Kingston's original petition. Kingston's petition, though, did address Jones's teaching

of storing data, identifying as the target module that performs the defined interaction the memory array in Jones that stores the data and discussing how the host PC transfers data to the host PC and encrypts that data before storing it. *See* Appx1815; Appx 1824–1826. In any event, the evidence of SPEX's infringement read submitted to the Board was not available at the time Kingston's original petition was filed because it had not yet been served by SPEX, and the Board should have accommodated minor changes in how the teachings of Jones were characterized based on SPEX's litigation position. "Although the PTAB has broad discretion to regulate the presentation of evidence, that discretion is not without limits." *Altaire Pharm., Inc. v. Paragon Bioteck, Inc.*, 889 F.3d 1274, 1285 (Fed. Cir. 2018) (internal quotation marks and citations omitted). Certainly, completely disregarding that a Patent Owner has characterized her own claim in a way that reads directly onto the explicit teachings of a prior art reference simply because the Board elected to read the arguments in a petition narrowly is an abuse of that discretion, and the Board's determination regarding claim 57 must similarly be vacated.

### C. The Board's Decision Is Contradictory to the Unrebutted and Unimpeached Evidence In this Case.

Finally, the Board's determination regarding claims 55–57 should be reversed because it is directly contrary to the unrebutted and unimpeached evidence of record. In actuality, there are very few, if any, actual evidentiary disputes regarding the teachings of Jones with respect to the disputed limitations.

Kingston's IPR expert, Kingston's litigation expert, and SPEX's litigation expert all agree that Jones's discussion of how the PCMCIA standard allows for the "automatic" identification of a PCMCIA card involves the host PC issuing a command specified in the PCMCIA standard to the PCMCIA card and the PCMCIA card providing identification information stored in its attribute memory in response. *See* Appx531–532; Appx1531–1532; Appx1166:10–20; Appx1166:24–1167:24; Appx1241:15–1242:3; Appx1243:18–22. No evidence of record suggests that any of these experts were impeached on this subject, nor does SPEX's IPR expert state that he disagreed that this was how Jones performed his automatic identification or in fact offer any opinion concerning these limitations of claim 55. *See generally* Appx871–902. The '135 patent, the Jones reference itself, and the PCMCIA documents all similarly point to the fact that this is, in fact, how a PCMCIA-compliant card like that disclosed in Jones operates. *See* Appx76, at 9:61–65; Appx76, at 10:28–41; Appx314; Appx317, at ll. 24–29; Appx317, l. 32–Appx318, l. 9; Appx1623; Appx1625–1626; Appx1627–1628. SPEX cited no evidence to the contrary, but offered only unsupported attorney speculation that, maybe, other parts of the specification not in evidence might say something else.

Similarly, SPEX has offered no expert testimony or evidence contradicting Kingston's assertion that Jones teaches a host PC communicating data to Jones's secure memory card, the memory card encrypting that data, and then storing the data in the memory array. Nor could it—these teachings are explicitly laid out in Jones in

unequivocal terms. *See* Appx314, at ll. 1–4; Appx317, at ll. 3–15. SPEX has similarly offered no evidence or testimony contradicting Kingston's contention that this disclosure from Jones is sufficient to teach the disputed limitations of claim 57. In fact, SPEX affirmatively asserted that the same serious of steps met the limitations of claim 57 by accusing Kingston's encrypted USB drive of infringing the claim. *See* Appx1096; Appx1076–1077; Appx1098; Appx1093–1094.

In reviewing the Board's decision for substantial evidence, this Court must consider unrebutted and unimpeached evidence even if it is in favor of the party seeking review. *See Integra Lifesciences*, 496 F.3d at 1345. In this case, the only evidence of record—which stands unrebutted an unimpeached—shows that Jones discloses the disputed limitations on which the Board based its decision that claims 55–57 of the '135 patent were patentable over Jones. Accordingly, this Court should reverse that decision and find these claims anticipated and thus unpatentable.

## CONCLUSION

For the reasons above, this Court should reverse, or, at a minimum, vacate the Board's decision finding claims 55–57 patentable.

Dated: April 1, 2019

Respectfully submitted,

*/s/ Oliver J. Richards*

Oliver J. Richards
Fish & Richardson P.C.
12390 El Camino Real
San Diego, CA 92130
(858) 678-5070

*Counsel for Appellant*
*Kingston Technology Company, Inc.*

## CERTIFICATE OF SERVICE AND FILING

I certify that I electronically filed the foregoing document using the Court's CM/ECF filing system on Monday, April 1, 2019. Counsel was served via CM/ECF on April 1, 2019.

*/s/ Oliver J. Richards*
Oliver J. Richards

## CERTIFICATE OF COMPLIANCE

The undersigned attorney certifies that Appellants' Opening Brief complies with the type-volume limitation set forth in Federal Circuit Rule 32(a). The relevant portions of the brief, including all footnotes, contain 13,903 words, as determined by Microsoft Word.

Dated: April 1, 2019

*/s/ Oliver J. Richards*
Oliver J. Richards
Fish & Richardson P.C.
12390 El Camino Real
San Diego, CA 92130
(858) 678-5070

# ADDENDUM

| Appx | Description |
| --- | --- |
| Appx0001-Appx0060 | Final Written Decision |
| Appx0061-Appx0084 | U.S. Patent No. 6,003,135 |

Trials@uspto.gov
Tel: 571-272-7822

Paper No. 39
Entered: October 1, 2018

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

KINGSTON TECHNOLOGY COMPANY, INC.,
Petitioner,

v.

SPEX TECHNOLOGIES, INC.,
Patent Owner.

---

Case IPR2017-01021
Patent 6,003,135

---

Before LYNNE E. PETTIGREW, DANIEL N. FISHMAN, and CHARLES J. BOUDREAU, *Administrative Patent Judges*.

BOUDREAU, *Administrative Patent Judge.*

# FINAL WRITTEN DECISION
*35 U.S.C. § 318(a) and 37 C.F.R. § 42.73*

# I. INTRODUCTION

Kingston Technology Company, Inc. ("Petitioner") filed a Petition (Paper 2, "Pet.") requesting *inter partes* review of claims 55–58 ("the challenged claims") of U.S. Patent No. 6,003,135 (Ex. 1001, "the '135 patent") pursuant to 35 U.S.C. §§ 311–319. SPEX Technologies, Inc. ("Patent Owner") filed a Preliminary Response (Paper 6, "Prelim. Resp."). On October 4, 2017, based on the record before us at that time, we instituted an *inter partes* review of only claim 58. Paper 7 ("Institution Decision" or "Dec."), 32.

Patent Owner filed a Patent Owner Response (Paper 13, "Response" or "PO Resp.") and Petitioner filed a Reply (Paper 16, "Pet. Reply"). Petitioner relies on a Declaration of Roy A. Griffin III, P.E. (Ex. 1010) and Patent Owner relies on a Declaration of Zaydoon Jawadi (Ex. 2003).

Following the Supreme Court's decision in *SAS Institute, Inc. v. Iancu*, 138 S. Ct. 1348 (2018), we issued an Order on May 7, 2018, modifying our Decision to institute review of all claims and all grounds. Paper 20 ("SAS Order"). In a telephone conference on May 10, 2018, we granted a request by Petitioner for authorization to file a motion for submission of supplemental information under 37 C.F.R. § 42.123 and authorized Patent Owner to file an opposition to such motion. *See* Paper 22. Petitioner filed a transcript of the conference call as Exhibit 1013. Petitioner and Patent Owner filed the authorized motion (Paper 24) and opposition (Paper 28), respectively. Following consideration of Petitioner's motion and Patent Owner's opposition, we issued an Order on May 29, 2018, granting the motion and authorizing supplemental briefing limited to argument regarding Petitioner's assertions that the supplemental information supports

arguments in the Petition or demonstrates inconsistencies in Patent Owner's arguments and evidence (Paper 31). Petitioner filed its supplemental information as Exhibits 1012–1018. Pursuant to our May 29 Order, Petitioner also filed a Supplemental Brief Addressing the Supplemental Information (Paper 33, "Pet. Supp. Br."), and Patent Owner filed a Response to Petitioner's Supplemental Brief (Paper 34, "PO Supp. Br.") (collectively, "Supplemental Briefing").

Patent Owner also filed a Motion to Exclude Evidence (Paper 35, "Mot. Excl."), to which Petitioner filed a Response (Paper 36, "Resp. Mot. Excl."). Patent Owner did not file a reply to Petitioner's Response.

Oral argument for this proceeding was held on July 23, 2018, and a transcript has been entered into the record as Paper 38 ("Tr.").

We have jurisdiction under 35 U.S.C. § 6. This Final Written Decision is issued pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73. For the reasons that follow, we determine that Petitioner has shown by a preponderance of the evidence that claim 58 of the '135 patent is unpatentable but has not shown that claims 55–57 are unpatentable.

## II. BACKGROUND

### *A. Related Matters*

The parties indicate that the '135 patent is asserted against Petitioner in *SPEX Technologies, Inc. v. Kingston Technology Corp.*, No. 8:16-cv-01790 (C.D. Cal. filed Sept. 27, 2016). Paper 9, 2; Paper 29, 2. Patent Owner further indicates the '135 patent is asserted in *SPEX Technologies, Inc. v. Western Digital Corp.*, No. 8:16-cv-01799 (C.D. Cal. filed Sept. 28, 2016); *SPEX Technologies, Inc. v. Toshiba America Electronics*

*Components Inc.*, No. 8:16-cv-01800 (C.D. Cal. filed Sept. 28, 2016); *SPEX Technologies, Inc. v. CMS Products, Inc.*, No. 8:16-cv-01801 (C.D. Cal. Filed Sept. 28, 2016); *SPEX Technologies, Inc. v. Integral Memory, PLC*, No. 8:16-cv-01805 (C.D. Cal. filed Sept. 28, 2016); and *SPEX Technologies, Inc. v. Apricorn*, No. 2:16-cv-07349 (C.D. Cal. filed Sept. 28, 2016). Paper 9, 2–3.

Claims 55 and 57 were the subject of a petition for *inter partes* review filed January 31, 2017, by Petitioner on the same grounds as asserted in the present Petition. Case IPR2017-00825, Paper 2. We denied institution of *inter partes* review in that case on August 17, 2017. Case IPR2017-00825, Paper 8.

Claims 55–58 also have been the subject of petitions for *inter partes* review filed by Western Digital Corp., Petitioner Kingston Technology Company, Inc., and Toshiba Corporation, respectively, in IPR2018-00084 (filed October 16, 2017), IPR2018-01002 (filed May 2, 2018), and IPR2018-01068 (filed May 10, 2018). Case IPR2018-00084, Paper 1; Case IPR2018-01002, Paper 2; Case IPR2018-01068, Paper 5. We instituted *inter partes* review in IPR2018-00084 on April 25, 2018. Case IPR2018-00084, Paper 14. The Petitions in IPR2018-01002 and IPR2018-01068, which were filed with motions for joinder with IPR2018-00084 (Case IPR2018-01002, Paper 3; Case IPR2018-01068, Paper 6), currently remain pending.

### *B. The ’135 Patent*

The ’135 patent, titled “Modular Security Device,” relates generally to a modular device that can communicate with a host computing device to enable one or more security operations to be performed by the modular device on data stored within the host computing device, data provided from

the host computing device to the modular device, or data retrieved by the host computing device from the modular device. Ex. 1001, [54], 1:17–26. Figures 1, 2, and 4B of the ’135 patent are reproduced below.




FIG. 1
(PRIOR ART)




FIG. 2
(PRIOR ART)




FIG. 4B

Figures 1 and 2 are block diagrams of prior art systems described in the ’135 patent. *Id.* at 1:51–3:14, 6:3–8. Figure 4B is a plan view of a modular device according to one embodiment of the invention of the ’135 patent. *Id.* at 6:18–20. The ’135 patent explains that in the prior art, security operations were either performed by the host computer, as illustrated in Figure 1 with security mechanism 101a included in host computing device 101, or by a standalone security device, as illustrated by security device 203 in Figure 2. *Id.* at 1:57–58, 2:21–31. According to the ’135 patent, both of those arrangements were deficient in various ways. *Id.* at 2:9–20, 2:58–3:14. The ’135 patent purports to solve those deficiencies

by placing a security module between the host and target modules. With reference to Figure 4B reproduced above, the ’135 patent explains that either first module 411 or second module 412 can be a security module and the other can be a target module. *Id.* at 8:25–27. The ’135 patent further explains, however, that connector 413 makes connection to a host computing device, and it is therefore preferable that first module 411 be the security module and second module 412 be the target module “to facilitate implementation of the in-line security aspect of the invention.” *Id.* at 8:27–32.

### *C. Challenged Claims*

Of the challenged claims, claims 55, 57, and 58 are independent. Those independent claims are reproduced below:

> 55. For use in a modular device adapted for communication with a host computing device, the modular device comprising a security module that is adapted to enable one or more security operations to be performed on data and a target module that is adapted to enable a defined interaction with the host computing device, a method comprising the steps of:
>
> receiving a request from the host computing device for information regarding the type of the modular device;
>
> providing the type of the target module to the host computing device in response to the request; and
>
> operably connecting the security module and/or the target module to the host computing device in response to an instruction from the host computing device.
>
> 57. For use in a modular device adapted for communication with a host computing device, the modular device comprising a security module that is adapted to enable one or more security operations to be performed on data and a target module that is

> adapted to enable a defined interaction with the host computing device, a method comprising the steps of:
>
> communicating with the host computing device to exchange data between the host computing device and the modular device;
>
> performing one or more security operations and the defined interaction on the exchanged data;
>
> mediating communication of the exchanged data between the host computing device and the modular device so that the exchanged data must first pass through the security module; and
>
> operably connecting the security module and/or the target module to the host computing device in response to an instruction from the host computing device.
>
> 58. For use in a modular device adapted for communication with a host computing device, the modular device comprising a security module that is adapted to enable one or more security operations to be performed on data and a target module that is adapted to enable a defined interaction with the host computing device, a method comprising the steps of:
>
> receiving an instruction from a host computing device regarding operation of the modular device; and
>
> operably connecting the security module and/or the target module to the host computing device in response to the instruction from the host computing device.

Ex. 1001, 26:12–25, 34–65.

*D. Asserted Grounds*

The Petition sets forth the following asserted grounds of unpatentability:

| **Reference(s)** | **Bas(is/es)** | **Claim(s) Challenged** |
|---|---|---|
| Jones[1] | § 102(b) or § 103(a)[2] | 55–58 |
| Jones in combination with either or both of Security Modules[3] and Common Interface Specification[4] | § 103(a) | 55–58 |
| Jones in combination with either or both of Schwartz[5] and Kimura[6] | § 103(a) | 57 |

Pet. 4–5.

[1] PCT Application WO 95/16238, published June 15, 1995 ("Jones") (Ex. 1003).

[2] Section IV.C. at page 4 of the Petition states "Jones (Ex. 1003) renders claims 55–58 of the '135 patent obvious," whereas Heading VII.A. at page 15 of the Petition identifies the same ground of challenge as "Anticipation or Obviousness of Claims 55–58 Based on Jones" (emphasis omitted). We consider both anticipation and obviousness herein.

[3] Charles Cresson Wood & Howard M. Zeidler, *Security Modules: Potent Information Security System Components*, 5 Computers & Security 114 (1986) ("Security Modules") (Ex. 1004).

[4] *Common Interface Specification for Conditional Access and Other Digital Video Broadcasting Decoder Applications*, Digital Video Broadcasting, DVB Document A017, dated May 31, 1996 ("Common Interface Specification") (Ex. 1005).

[5] U.S. Patent No. 5,675,645, issued Oct. 7, 1997 (filed Apr. 18, 1995) ("Schwartz") (Ex. 1006).

[6] U.S. Patent No. 5,237,609, issued Aug. 17, 1993 (filed Mar. 26, 1990) ("Kimura") (Ex. 1007).

## III. DISCUSSION

### *A. Claim Construction*

#### *1. Applicable Standard and General Principles*

The ’135 patent issued from an application filed June 4, 1997, and accordingly expired no later than June 4, 2017. 35 U.S.C. § 154(a)(2). We construe expired patent claims according to the standard applied by the district courts. *See In re Rambus Inc.*, 694 F.3d 42, 46 (Fed. Cir. 2012). Specifically, we apply the principles set forth in *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–17 (Fed. Cir. 2005) (en banc). “In determining the meaning of the disputed claim limitation, we look principally to the intrinsic evidence of record, examining the claim language itself, the written description, and the prosecution history, if in evidence.” *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 469 F.3d 1005, 1014 (Fed. Cir. 2006) (citing *Phillips*, 415 F.3d at 1312–17). Only those terms that are in controversy need to be construed, and only to the extent necessary to resolve the controversy. *Vivid Techs., Inc. v. Am. Sci. & Eng’g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999).

The words of a claim are generally given their ordinary and customary meaning, and that is the meaning the term would have to a person of ordinary skill at the time of the invention, in the context of the entire patent including the specification. *See Phillips*, 415 F.3d at 1312–13.[7] Claims are

---

[7] We note in this regard that Patent Owner contends that Mr. Griffin’s declaration and the Petition are based on the broadest reasonable interpretation standard rather than the *Phillips* standard, and that, accordingly, “no weight should be given to Mr. Griffin’s expert testimony regarding claim construction.” PO Resp. 11–12. Patent Owner, however, does not identify any specific claim terms for which a different construction

not interpreted in a vacuum but are a part of and read in light of the specification. *See Slimfold Mfg. Co. v. Kinkead Indus., Inc.*, 810 F.2d 1113, 1116 (Fed. Cir. 1987). Although it is improper to read a limitation from the specification into the claims (*In re Van Geuns*, 988 F.2d 1181, 1184 (Fed. Cir. 1993)), the claims still must be read in view of the specification of which they are a part. *See Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1347 (Fed. Cir. 2004).

If the applicant for patent desires to be its own lexicographer, the purported definition must be set forth in either the specification or prosecution history. *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002). And such a definition must be set forth with reasonable clarity, deliberateness, and precision. *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994).

*2. "security module" and "target module"*

In the Petition, Petitioner identified a dispute between itself and Patent Owner in related district court litigation as to whether the terms "security module" and "target module" recited in each challenged claim require only "functional (not necessarily physically distinct) modules." Pet. 15. In the Institution Decision, we explained that although Patent Owner in its Preliminary Response stated that it disagreed with Petitioner's position, both parties agreed that construction of "security module" and "target module" was not necessary to determine whether Petitioner had demonstrated a reasonable likelihood of prevailing on the asserted grounds of

---

would result from application of the *Phillips* standard as opposed to the broadest reasonable interpretation standard.

unpatentability for the purposes of institution of *inter partes* review.

Dec. 8–9 (citing Pet. 17–18; Prelim. Resp. 5 n.1). We agreed that it was unnecessary at that preliminary stage to construe either term. *Id.* at 9 (citing *Wellman, Inc. v. Eastman Chem. Co.*, 642 F.3d 1355, 1361 (Fed. Cir. 2011) ("[C]laim terms need only be construed 'to the extent necessary to resolve the controversy.'" (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999)))). Although we recognize that we adopted specific constructions of "security module" and "target module" as means-plus-function limitations under 35 U.S.C. § 112 ¶ 6 for purposes of the institution decision in a related proceeding also involving the challenged claims of the '135 patent (*see* Case IPR2018-00084, slip op. at 13–14 (Paper 14)), on the complete record now before us, we maintain our prior determination that it is unnecessary to expressly construe those terms for purposes of this proceeding. In particular, Patent Owner does not challenge Petitioner's specific mapping of structures disclosed in the asserted prior art references to the recited modules (*see generally* PO Resp.), and Petitioner confirmed at the oral hearing that its analysis would not be affected if we likewise were to construe those terms under § 112 ¶ 6 in this proceeding (*see* Tr. 6:22–7:25).

### *B. Analysis of Asserted Grounds of Unpatentability*

#### *1. General Principles*

A claim is anticipated under 35 U.S.C. § 102 "only if each and every element as set forth in the claim is found, either expressly or inherently described, in a single prior art reference." *Verdegaal Bros., Inc. v. Union Oil Co. of Cal.*, 814 F.2d 628, 631 (Fed. Cir. 1987). "Under the principles of inherency, if the prior art necessarily functions in accordance with, or

includes, the claimed limitations, it anticipates." *In re Cruciferous Sprout Litig.*, 301 F.3d 1343, 1349 (Fed. Cir. 2002) (citations and internal quotation marks omitted). "Inherency, however, may not be established by probabilities or possibilities. The mere fact that a certain thing may result from a given set of circumstances is not sufficient." *In re Robertson*, 169 F.3d 743, 745 (Fed. Cir. 1999) (citations and internal quotation marks omitted). Moreover,

> unless a reference discloses within the four corners of the document not only all of the limitations claimed but also all of the limitations arranged or combined in the same way as recited in the claim, it cannot be said to prove prior invention of the thing claimed and, thus, cannot anticipate under 35 U.S.C. § 102.

*Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1371 (Fed. Cir. 2008); *accord In re Arkley*, 455 F.2d 586, 587 (CCPA 1972).

A patent claim is unpatentable under 35 U.S.C. § 103(a) if the differences between the claimed subject matter and the prior art are "such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations, including (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) when presented, objective evidence of nonobviousness, i.e., secondary considerations. *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

*2. Level of Skill in the Art*

Relying on the testimony of Mr. Griffin, Petitioner asserts that "a person of ordinary skill in the art as of the time of the '135 patent would have had a bachelor's degree in Electrical Engineering and at least three years of experience working in the fields of digital electronic interfacing, computing, and electronic data security." Pet. 13 (citing Ex. 1010 ¶ 20). Patent Owner disputes Petitioner's assessment, offering instead that "[a] person having ordinary skill in the art at the time of the invention of the '135 Patent would have possessed a bachelor's degree in electrical engineering, computer engineering, or a related field, and at least one year of working experience in data storage systems or electronic data security." PO Resp. 6. According to Patent Owner, "[w]hen given the opportunity to explain Petitioner's proposed level of ordinary skill in the art, . . . Mr. Griffin[] could not meaningfully distinguish between skilled artisans with one year of working experience versus three years of working experience" (*id.* at 6–7 (citing Ex. 2002 (Griffin Dep.), 45:5–46:18)), and "[a]ccordingly, Petitioner and Mr. Griffin have no basis for requiring such [a] high . . .level of ordinary skill in the art which includes three years of working experience in three fields" (*id.* at 7 (citing Ex. 2003 ¶ 14)).

At oral argument, Petitioner's counsel represented that the differences between the parties' assessments are not decisive here and that Petitioner is willing to accept Patent Owner's standard. Tr. 23:2–20. In view of Petitioner's representations, we adopt Patent Owner's assessment to the extent necessary here.

### *3. Anticipation or Obviousness of Claims 55–58 over Jones*

Petitioner asserts that claims 55–58 are unpatentable as anticipated by or obvious over Jones. Pet. 15–32. Having reviewed the Petition, Response, and Supplemental Briefing, as well as the presented evidence and supplemental information, we determine that Petitioner has established by a preponderance of the evidence only that claim 58 is anticipated by Jones.

#### *a. Overview of Jones*

Jones, titled "Secure Computer Memory Card," describes a detachable memory card that may be interconnected with a host personal computer by means of a hardware and software interface in conformance with the Personal Computer Memory Card International Association (PCMCIA) standard. Ex. 1003, [54], [57], 4:3–7.[8] According to Jones, the memory card consists of a data storage unit, storage-access locking circuitry, and a tamper-proof key information substorage unit. *Id.* at 2:19–23. The locking circuitry is adapted to prevent access to the data stored on the memory card unless the would-be user first presents identifying information which is validated by the locking circuitry with reference to one or more key values stored in the key information substorage unit. *Id.* at 2:23–27. Figures 1 and 2 of Jones are reproduced below.

[8] Following Petitioner's usage, cited page numbers of Exhibit 1003 refer to the original pagination at the top center of the pages of Jones rather than to the page numbers added by Petitioner at the bottom of each page of the exhibit.




Fig. 1




Fig. 2

Figure 1 is a block diagram of a memory card described by Jones, shown interconnected with a host computer that is, in turn, connected to other computers by telecommunications links. Ex. 1003, 3:26–29. Figure 2

is a data flow diagram depicting a mechanism for providing password protection for information stored within a memory card of the type shown in Figure 1. *Id.* at 3:30–31. As illustrated in Figure 1, memory card 100 includes smartcard integrated circuit (I.C.) 250 for storing a password, as well as logic circuitry for preventing access to information stored on the memory card unless a user of host computer 110 to which memory card 100 is connected can supply a password matching the stored password. *Id.* at Abstract. Smartcard I.C. 250 may also be used to store public and private key values used to encrypt and decrypt data stored on memory card 100, elsewhere on host computer 110, or exchanged with remote computer 120. *Id.*

According to Jones, memory card 100 stores data in common memory array 150, preferably implemented with non-volatile flash memory integrated circuits. *Id.* at 4:29–30. Data transfers between common memory array 150 and host computer 110 are accomplished via interface data terminals 171, data bus buffer 173, internal data bus 175, internal encryption/decryption unit 177, gate 178, and internal data bus 179. *Id.* at 5:1–4. Control signals are exchanged between common memory array 150 and host computer 110 via PCMCIA interface control terminals 181 and internal control bus 185. *Id.* at 5:4–7.

Jones discloses that the address space provided by common memory array 150 is preferably partitioned into independently accessed regions, access passwords for which are stored in EEPROM 257 within smartcard I.C. 250. *Id.* at 7:8–17. Once a password has been stored for a particular partition, card lock logic circuit 220 has exclusive control over access to that partition. *Id.* at 7:25–26. Any attempt to access that partition results in

notification to device driver software that a valid password must be provided, and the driver software will then prompt the user with a password request. *Id.* at 7:26–29. If the entered password matches the password stored in EEPROM 257, smartcard I.C. 250 so notifies card lock logic 220, which in turn notifies the device driver software executing in the host that the partition has been successfully unlocked, thereafter permitting data transfers between that partition and data terminals 171. *Id.* at 7:32–8:2.

Jones additionally discloses that, when a PCMCIA card is newly inserted into the socket of a running host computer, the Client Device Driver is notified by the Card Services software, so that it can process the card's card information structure ("CIS") entries to identify each partition that may be password protected. *Id.* at 10:10–13. A similar sequence occurs when the host computer is first powered up and the Client Device Driver is initialized. *Id.* at 10:13–16. If an identified partition is locked, card lock logic 220 notifies the device driver of the locked condition, allowing the device driver to request a valid password from the user, either at the time the host computer is being initialized with an already socketed memory card, or at the time a memory card is first inserted into an already running host computer. *Id.* at 10:17–23.

Jones further notes that the data stored in a protected partition within memory card 100 is available only to those who possess both the card and the password. *Id.* at 11:21–23. Neither one without the other is sufficient to obtain access to the data. *Id.* at 11:23–25.

*b. Discussion*

*i. Claims 55 and 56*

Claim 55 recites, in part, the steps of "*receiving a request* from the host computing device for information regarding the type of the modular device" and "providing the type of the target module to the host computing device *in response to the request*." Ex. 1001, 26:18–21 (emphasis added). Claim 56 depends from claim 55 and accordingly includes the same steps in addition to reciting additional limitations. *Id.* at 26:25–33.

In support of its contentions that claims 55 and 56 are unpatentable over Jones, Petitioner contends "Jones discloses that '[c]ontrol signals are exchanged between the common memory array 150 and the host computer via the PCMCIA interface control terminals 181 and an internal control bus 185," and further quotes Jones as follows:

> [T]o implement the PCMCIA interface standard, the secure memory card includes a non-volatile attribute memory 190 which stores information enabling the host computer <u>to automatically identify the particular PCMCIA card as soon as the card and host are connected</u>, and to automatically establish the appropriate hardware/software interface using suitable driver software which executes on the host computer 110.

Pet. 18–19 (quoting Ex. 1003, 5:24–29 (emphasis added by Petitioner)). Petitioner also argues that the Jones system "is able to identify the type of modular device even in cases wherein the host computer is not provided with PCMCIA Card Services and Socket Services functions," pointing to disclosure in Jones that, "[f]or host computers which are not provided with standard PCMCIA Card Services and Socket Services functions, the device driver directly interrogates the CIS structures in the attribute memory" and "when the host computer is first powered up and the Client Device Driver is

initialized, the Client Device Driver calls Card Services functions to process the card's CIS entries to identify each partition that may be locked." *Id.* at 19 (quoting Ex. 1003, 9:4–6, 10:14–16). Petitioner concludes, "[t]hus, a request is received from the host computing device for information regarding the type of modular device," and "Jones discloses providing the type of the target module to the host computing device in response to the request mentioned above, as set forth above." *Id.* at 19–20 (citing Ex. 1010 ¶¶ 49, 51).

In the Institution Decision, we agreed with arguments raised by Patent Owner's Preliminary Response that the PCMCIA Card Services embodiments of Jones cited by Petitioner do not disclose, teach, or suggest a modular device (i.e., Jones's memory card) responding to a "receiv[ed] . . . request" from a host computer for information regarding the type of the modular device; that the "without Card Services" embodiment referenced by Petitioner is not properly combined with the PCMCIA Card Services embodiment either in an anticipation or obviousness context; and that Petitioner also fails to show that Jones discloses providing the type of target module to the host computing device "in response to the request." Dec. 16 (citing Prelim. Resp. 16–19). We further agreed with Patent Owner's arguments that Petitioner did not explain sufficiently (1) how Jones's disclosure that "[c]ontrol signals are **exchanged** between the common memory array 150 and the host computers via the PCMCIA interface control terminals 181 and internal control bus 185" teaches "the **request** of information from the host to the modular device and the modular device's response thereto" or (2) "how Jones's 'automatic' identification of 'the particular PCMCIA card as soon as the card and host are connected' relied

upon by Petitioner discloses a request by the host for information from the modular device and a response thereto." *Id.* (quoting Prelim. Resp. 16–17). As we explained:

> Petitioner does not sufficiently, persuasively explain how Jones's disclosure of a memory card that "stores information enabling [a] host computer to automatically identify the particular . . . card as soon as the card and host are connected, and to automatically establish [an] appropriate hardware/software interface" teaches or suggests "*receiving a request* from the host computing device for information regarding the type of the modular device" and "providing the type of the target module to the host computing device in response to the request," as recited in claim 55. Indeed, Jones's statement that the card includes information enabling the host to "automatically" identify the card "as soon as the card and host are connected" suggests not only that receipt of a request is unnecessary, but also that the information is not provided "in response to [a] request."

Dec. 17. As to Petitioner's alternative reliance on the embodiment of Jones in which the host computer lacks standard Card Services and Socket Services functions (Pet. 19), we agreed with Patent Owner that "Jones describes that as separate from the embodiment relied upon by Petitioner as disclosing all other limitations of claim 55, whereas anticipation requires that all of the limitations be arranged or combined in the same way in the prior art as recited in the claim." Dec. 17–18 (citing Prelim. Resp. 17; *Net MoneyIN*, 545 F.3d at 1371). We further explained:

> Moreover, because Petitioner does not advance any argument that the "CIS structures in the attribute memory" perform the remaining claim steps or explain how the "operably connecting" step of claim 55 would be taught or suggested by Jones "in cases wherein the host computer is not provided with PCMCIA Card Services and Socket Services functions," we agree with Patent Owner that this alternative argument also fails to establish a

> reasonable likelihood that Petitioner would prevail in its challenge to claim 55 over Jones.

*Id.* at 18. For these reasons, we concluded that Petitioner had not established a reasonable likelihood of showing that claims 55 and 56 are unpatentable as anticipated by or obvious over Jones. *Id.*

Following issuance of our SAS Order, as mentioned above (*see supra* Section I.), Petitioner filed the following exhibits as supplemental information on June 15, 2018:

Ex. 1012:[9] Excerpts from "Rebuttal Report of Dr. V. Thomas Rhyne Regarding the Validity of the Asserted Claims of the Patents-In-Suit," *SPEX Techs., Inc. v. Kingston Technology Corp.*, No. 8:16-cv-01790 (C.D. Cal.)

Ex. 1013:[10] Excerpts from "Expert Report of Dr. V. Thomas Rhyne re Infringement of Certain Claims of U.S. Patent Nos. 6,088,802 and 6,003,135 by Kingston Technology Corporation, Kingston Digital, Inc., and Kingston Technology Company," *SPEX Techs., Inc. v. Kingston Technology Corp.*, No. 8:16-cv-01790 (C.D. Cal.)

Ex. 1014: Transcript of April 20, 2018, Deposition of Dr. V. Thomas Rhyne, *SPEX Techs., Inc. v. Kingston Technology Corp.*, No. 8:16-cv-01790 (C.D. Cal.)

Ex. 1015: Excerpts from "Expert Report of John Villasenor," *SPEX Techs., Inc. v. Kingston Technology Corp.*, No. 8:16-cv-01790 (C.D. Cal.)

Ex. 1016: Exhibit F to Exhibit 1015 (Jones et al., U.S. Patent No. 5,623,637)

---

[9] We note that the record includes two exhibits numbered as "Ex. 1012"; specifically, Petitioner also filed a Declaration of Oliver J. Richards as Exhibit 1012 on April 17, 2018.

[10] We note that the record includes two exhibits numbered as "Ex. 1013"; specifically, Petitioner also filed a transcript of the May 10, 2018, teleconference between the Board and the parties as Exhibit 1013 on May 14, 2018.

Ex. 1017: Excerpts from Exhibits G & H to Ex. 1015 (PCMCIA PC Card Standard, Release 2.01, and PCMCIA Card Services Specification, Release 2.0, respectively)[11]

Ex. 1018: Exhibit D to Ex. 1015 (Bialick et al., U.S. Patent No. 6,088,802)

In its Supplemental Brief, Petitioner contends that Patent Owner interpreted the claims differently in district court litigation for the purpose of alleging infringement by certain of Petitioner's products and that "[t]he supplemental evidence [sic] resolves any concerns the Board might have had at institution regarding Jones' disclosure" of the "receiving" and "providing" steps that the Board found not to be disclosed by Jones. Pet. Supp. Br. 2–3. Specifically, Petitioner argues, first, that "Spex's litigation expert Dr. Rhyne admitted that because Jones (the substantive identical US counterpart[12]) discloses a PCMCIA card, Jones incorporates the teachings of the PCMCIA standard to a [person of ordinary skill in the art]"; second, that "Dr. Rhyne further admitted that 'there is teaching within the PCMCIA standard of performing' the step of 'receiving a request from a host computing device for information regarding the type of the peripheral device,'" as recited in claim 38 of related U.S. Patent No. 6,088,802 (Ex. 1018, "the '802 patent"); third, that "the PCMCIA standard taught 'providing to the host computing device in response to a request information regarding the type of defined interaction,'" as recited in claim 38 of the '802 patent; and fourth, that

[11] We note that Petitioner incompletely described Exhibit 1017 in its Exhibit List in its Supplemental Brief as "Excerpts from Exhibits G & H to Exhibit 1015, PCMCIA PC Card Standard," without any reference to the "PCMCIA PC Card Services Specification" indicated in the headers of pages 68–75 of the exhibit. Pet. Supp. Br. ii.

[12] Referring to Exhibit 1016.

"[t]hese limitations from claim 38 of a related patent are substantively identical to the limitations at issue in claim 55 and Dr. Rhyne opined that the limitations rise and fall together." Pet. Supp. Br. 3–4 (citing Ex. 1013 ¶¶ 177–180; Ex. 1014, 135:4–10, 137:18–22, 162:15–17, 281:16–24, 289:20–24; Ex. 1018, 22:18–23). Petitioner asserts that "Spex should be held to the admissions of its litigation expert, which resolve any dispute concerning whether Jones teaches these limitations of claim 55." *Id.* at 4.

Petitioner further contends that Dr. Rhyne's admissions are supported by Jones; the '135 patent itself; the testimony of Dr. John D. Villasenor, Petitioner's declarant in related litigation; and the PCMCIA PC Card standard. *Id.* at 4–5. Petitioner points, in particular, to disclosure in Jones of "attribute memory" that "holds a Card Information Structure ('CIS') which is organized in a 'Metaformat' defined in Section 5 of the PCMCIA PC Card Standard, Release 2.01, for handling numerous different data recording formats," where "[t]he CIS is organized as hierarchy of layers and takes the form of a chain (linked-list) of data blocks called 'tuples'" (*id.* (quoting Ex. 1003, 8:25–31[13])) and disclosure in the '135 patent that "[t]he PCMCIA standard . . . includes a specification, called the . . . [CIS] that defines, among other things, a location in a portion of memory of a PCMCIA card, denoted as 'attribute memory', that stores data identifying the type of the PCMCIA card" (*id.* at 5 (quoting Ex. 1001, 10:36–41)). Petitioner alleges that the stored information "unquestionably includes information regarding the type of PCMCIA device," citing disclosure in the PCMCIA PC Card

[13] Although Petitioner cites "Ex. 1003, at 10:25:31," we find the quoted language at Jones's page 8, corresponding to page 10 of Exhibit 1003. *See supra* note 8.

Standard that "device-information tuples" include, among other things, "device type . . . information." *Id.*; Ex. 1017, 27.

Citing a separate portion of Exhibit 1017 (i.e., that bearing the header "PC Card Services Specification, Release 2.0"; *see supra* note 11), Petitioner further alleges that "[w]hen a PCMCIA card is inserted into a host computer, the computer needs to 'process a [PCMCIA] Card's Card Information Structure to determine if and how [it] will interact with a card detected in a socket.'" Pet. Supp. Br. 5 (citing Ex. 1017, 68). Relying on Dr. Villasenor's declaration, Petitioner further alleges that "the PCMCIA specification 'discloses multiple commands . . . that can be used to request information including the type of peripheral device from the CIS," and that "'[t]he client retrieves the contents of the tuple by using GetTupleData' and teaches that when a card is inserted into a host computer, 'Card Services uses a "Callback" function that "attempts to read the [CIS]."'" *Id.* at 5–6 (quoting Ex. 1015 ¶¶ 259, 238). "In addition," Petitioner contends, "the PCMCIA specification also includes a command called 'GetConfigurationInfo' which 'returns information about the specified socket and PC Card configuration.'" *Id.* at 6 (quoting Ex. 1017, 72–73). According to Petitioner, "Dr. Rhyne did not dispute this and admitted in deposition that '[i]t's a standard PCMCIA interface protocol to gather tuple information on a peripheral device by the host computer' and that this tuple information include information about 'device speed, device size, device type, and address-space layout information.'" *Id.* (citing Ex. 1014, 99:21–24, 291:18–21). Petitioner further asserts, without any citation to evidence, that "[t]he 'automatic' process described in Jones is standard PCMCIA functionality, which allow the host computer to automatically request information regarding the type of

PCMCIA card and the PCMCIA card to provide the requested device information in response." *Id.*

Patent Owner responds, as an initial matter, that the Board should not consider Petitioner's arguments in its Supplemental Brief because it "injects new arguments and new invalidity theories into this review." PO Supp. Br. 1. Patent Owner contends, "[e]ssentially Petitioner seeks a do-over with Exhibit 1017 as prior-art reference" and "proposes new arguments which are not factually supported by the Jones disclosure and found only in the newly-introduced exhibits." *Id.* at 1–2. Patent Owner further contends that, whereas Petitioner represented to the Board in its motion for submission of supplemental information that "in deposition, SPEX's expert admitted that [the receiving and providing] steps [of claim 55] were taught by the U.S. counterpart to . . . Jones," "Petitioner's characterization of Dr. Rhyne's PCMCIA testimony amounts to a gross overstatement," and Dr. Rhyne did not admit that any of the claimed limitations are disclosed by the Jones reference. *Id.* at 2. According to Patent Owner, "[i]t would be improper to draw conclusions about components of the Jones disclosure based on the concepts of PCMCIA generally, unless those concepts are disclosed in [a] reference that was explicitly incorporated by reference or inherent in Jones." *Id.* at 3. "[T]hat is not the case here," Patent Owner contends, and "[e]ach of Petitioner's out-of-context excerpts identified by Petitioner in Dr. Rhyne's testimony reflects statements made concerning 'PCMCIA,' not concerning the disclosure of the Jones reference." *Id.* at 3–4.

Patent Owner further contends, "Petitioner constructs a new invalidity theory based on user-specified functions that *may* be implemented in a callback, such as GetTupleData and GetConfigurationInfo," but "neither of

the commands is mandated by the PCMCIA standard and there is no proof in this case that GetTupleData and GetConfigurationInfo have ever been actually implemented in the same embodiments as disclosed by Jones." PO Supp. Br. 6–7. In particular, Patent Owner contends, "Jones makes no reference to these commands," "Petitioner's expert in this proceeding, Mr. Roy A. Griffin, III, has not provided any testimony to the contrary," and "[t]he Petition and its expert declaration do not reference any such commands." *Id.* at 7. Patent Owner further contends that "Petitioner did not argue inherency or submit any evidence to meet its burden of proof to show inherency." *Id.* at 9.

With regard to Petitioner's alternative assertion of unpatentability over Jones under 35 U.S.C. § 103(a), Patent Owner argues

> Petitioner does not identify any obviousness argument with the requisite motivation or expert testimony from Mr. Griffin as to why the invention as claimed would have been obvious to a person of ordinary skill in the art at the time of the invention in view of Jones and the PCMCIA reference Ex. 1017."

PO Supp. Br. 9. Finally, Patent Owner argues that "Petitioner did not identify any incorporations-by-reference in the Jones disclosure . . . to the PCMCIA, and Mr. Rhyne's testimony cannot be used to circumvent the exacting requirements on incorporating a document." *Id.* According to Patent Owner, "[b]ecause Jones does not incorporate-by-reference any of the new exhibits 1012–1018, Petitioner never asserts that the Jones reference identifies which specific material for incorporation and its expert fails to opine on the same." *Id.* at 10. Patent Owner concludes, "Petitioner has failed to meet its burden to show that the claimed limitations are disclosed in or rendered obvious by the Jones reference." *Id.*

As stated in Section III.B.1. *supra*, a claim is anticipated "only if each and every element as set forth in the claim is found, either expressly or inherently described, in a single prior art reference." *Verdegaal Bros.*, 814 F.2d at 631. Because Jones does not *expressly* disclose the receiving and providing steps of claim 55, it was Petitioner's burden to show that those steps were necessarily present, i.e., that they were inherently disclosed. Petitioner has not met that burden here.

Even if we accept that Exhibit 1017 includes, *inter alia*, excerpts from the "PC Card Standard, Release 2.01" referenced by Jones (*see* Ex. 1003, 5:22–23; *see also id.* at 8:28 (referring to "PCMCIA Card Standard, Release 2.01"), the evidence of record is insufficient for us to conclude that a person of ordinary skill in the art at the time of the invention would have understood from Jones's citation to the standard and its disclosure of information stored in attribute memory of a secure memory card to enable a host computer "to automatically identify the particular PCMCIA card as soon as the card and host are connected" (*id.* at 5:24–27) that the memory card in Jones's system *necessarily* functions by "*receiving a request* from the host computing device for information regarding the type of the modular device" and "*providing* the type of the target module . . . *in response to the request*," as recited in claim 55 (italics added). Although the GetTupleData or GetConfigurationInfo commands appear to provide two potential ways that a host computer could request information from a PCMCIA-compliant card, we are not persuaded that either command is *necessarily* involved in the "automatic[] identif[ication]" recited by Jones. Although those commands *may* be involved, "inherency . . . may not be established by probabilities or possibilities." *Robertson*, 169 F.3d at 745. We note in this

regard that Exhibit 1017 provides only bibliographic information, a table of contents, and one section from what purports to be the PCMCIA PC Card Standard, Release 2.01, whereas the remainder—including the specific pages cited by Petitioner and relied upon in Dr. Villasenor's declaration[14] as disclosing the GetTupleData and GetConfigurationInfo commands—instead are from what appears to be the PCMCIA PC Card Services Specification, Release 2.0. *See supra* note 11. Without the complete versions of these documents or persuasive evidence that the GetTupleData and GetConfigurationInfo commands provided the only means by which a PCMCIA-compliant card could have provided module type information to a host, we can only speculate as to what else might be disclosed in them.

Indeed, Petitioner's omission from its description of Exhibit 1017 of any reference to the PC Card Services Specification (*see id.*; Pet. Supp. Br. ii) is particularly substantial, given that Petitioner's arguments in its Supplemental Brief and at the oral hearing were premised in substantial part on the fact that Jones contains explicit references to the PCMCIA PC Card Standard, Release 2.01. We find no reference in Jones to the PCMCIA PC Card *Services Specification*, whether Release 2.0 or any other release.

---

[14] As Patent Owner points out (PO Supp. Br. 6), Petitioner's district court declarant, Dr. Villasenor, is not an expert in this proceeding and has not filed any expert testimony in this proceeding, and, Patent Owner contends, Patent Owner has not had the opportunity to cross-examine Dr. Villasenor in connection with the Petition (*id.*). As Patent Owner also points out (*id.* at 7), neither the Petition nor the declaration of Petitioner's declarant in *this* proceeding, Mr. Griffin, referenced the GetTupleData and GetConfigurationInfo commands relied upon by Petitioner in its Supplemental Brief, nor did either the Petition or Mr. Griffin's declaration cite the PCMCIA PC Card Standard or PC Card Services Specification (*see generally* Pet.; Ex. 1003).

Further, although Exhibit 1017 includes a table of contents for the PC Card Standard (*see* Ex. 1017, 9–15), it includes no table of contents for the PC Card Services Specification, leaving the record devoid of any evidence of what was not included in the provided excerpts.

Further, despite Petitioner's argument that, "[w]hen a PCMCIA card is inserted into a host computer, the computer needs to 'process a [PCMCIA] Card's Card Information Structure to determine if and how [it] will interact with a card detected in a socket'" (Pet. Supp. Br. 5 (quoting Ex. 1017, 68–69)), we find that the quoted portion of the PC Card Services Specification, in context, does not include such mandatory language. Rather, the complete sentence from which Petitioner abstracted the quoted language, and a following explanatory parenthetical, state: "Card Services clients *may* need to process a PC Card's Card Information Structure (CIS) to determine if and how they will interact with a card detected in a socket. (*Some clients may receive all the information they require from the CARD_INSERTION event*)." Ex. 1017, 68 (italics added). The complete quotation suggests that the described functions that follow—including later in the same paragraph the use of the GetTupleData command relied upon by Petitioner—are not necessarily required.

Lastly, with regard to Petitioner's alternative assertion of unpatentability over Jones under 35 U.S.C. § 103(a), we agree with Patent Owner (PO Supp. Br. 9) that Petitioner also has not made out a persuasive case of obviousness by a preponderance of the evidence. As we stated in our discussion of claim 58 in the Institution Decision, and equally applicable here with regard to claims 55 and 56, "despite asserting obviousness, Petitioner does not identify which, if any, of the limitations of the Jones

reference may be missing and how those limitations might be obvious." Dec. 26 (quoting Prelim. Resp. 3). Whereas Petitioner recognizes, in connection with its asserted ground based on the combination of Jones with either or both of Security Modules and Common Interface Specification the possibility that we might find that Jones does not disclose physically separate security and target modules recited in claim 55 (*see* Pet. 33; *see also infra* Section III.B.4.), Petitioner does not allege that such physically separate structures would have been obvious to a person of ordinary skill in the art in view of Jones if they are not taught by Jones. More to the point here, Petitioner does not allege that a person of ordinary skill in the art would have been motivated to modify Jones to include the recited "receiving" and "providing" steps, but instead merely alleges that Jones itself discloses or teaches those steps. Pet. 18–20; Pet. Supp. Br. 3–7.

In conclusion, therefore, we agree with Patent Owner that Petitioner has not met its burden to show by a preponderance of the evidence that claims 55 and 56 are anticipated or rendered obvious by Jones. PO Supp. Br. 10.

*ii. Claim 57*

Claim 57 recites, in part, the steps of "*communicating* with the host computing device *to exchange data* between the host computing device and the modular device" and "*performing* one or more security operations and *the defined interaction on the exchanged data*." Ex. 1001, 26:42–46 (italics added). Petitioner contends with respect to the first of these steps that "[t]he preferred embodiments [of the '135 patent] utilize a PCMCIA bus to communicate with the host computing device to exchange data." Pet. 26 (citing Ex. 1001, Fig. 1; Ex. 1010 ¶ 64). In support of its contention that

Jones teaches or suggests this step, Petitioner merely asserts that "Jones discloses using the same bus (i.e., PCMCIA) for communication between the host and the modular device." *Id.* (citing Ex. 1003, 4:1–15; Ex. 1010 ¶ 65). With respect to the step of "performing one or more security operations and the defined interaction on the exchanged data," Petitioner contends that "Jones's modular device performs one or more security operations on the exchanged data," including "selectively enabl[ing] and disabl[ing] the exchange of data between a host and modular device based upon a security comparison involving a password," and "[i]f the comparison involving the password is successful, the defined interaction (i.e., the transfer of data between the host computer 110 and the data storage 150) is effected." *Id.* at 26–28 (citing Ex. 1003, 7:16–8:12, 11:15–20, Figs. 1, 2; Ex. 1010 ¶¶ 67–69).

In the Institution Decision, we found that Petitioner did not identify, in connection with the "communicating" step of claim 57, any disclosure in Jones of "communicating . . . to exchange data between [a] host computing device and [a] modular device," but instead that the only disclosure Petitioner identified in Jones of any such communication is the transfer of data between host computer 110 and data storage 150 that Petitioner relies upon as corresponding to the step of "performing . . . the defined interaction on the exchanged data.'" Dec. 19–20 (citing Pet. 26–28). We agreed with Patent Owner that claim 57 "explicitly requires 'communicating . . . to exchange data' as a separate limitation from 'performing one or more security operations and the defined interaction on the exchanged data,'" and "[t]hus, the 'defined interaction on the exchanged data' cannot simply be the transfer of data that satisfies the 'communicating . . . to exchange data'

step." *Id.* at 20 (citing Prelim. Resp. 23; claim 57). Because Petitioner did not identify in the Petition any disclosure in Jones of "communicating . . . to exchange data" as a step separate from the exchange alleged to teach the "perform[ance of] . . . the defined interaction," we concluded Petitioner had not established a reasonable likelihood of prevailing in showing that Jones anticipates or renders obvious the subject matter of claim 57. *Id.*

In its Supplemental Brief, Petitioner contends it explained in its Petition "that because the PCMCIA card of Jones allowed for the transfer and storage of data, it taught the steps of 'communicating with the host computing device to exchange data . . .' and the 'performing . . . the defined interaction' steps of claim 57." Pet. Supp. Br. 8 (citing Pet. 26–28). Petitioner further contends that although the Board denied institution "[b]ased on Spex's argument that these limitations could not both be met by transfer and storage of data" (*id.* at 8–9 (citing Dec. 19–20)), Patent Owner's "arguments . . . are directly contrary to what Spex asserted in accusing infringement in the district court litigation" (*id.* at 9). In particular, citing Dr. Rhyne's expert report on infringement, Petitioner asserts, "[a]ccording to Spex's litigation expert, the 'defined interaction' in the accused storage devices performed was 'mass storage' – *i.e.* the transfer and storage of data." *Id.* (citing Ex. 1013 ¶¶ 88–90, 163, 192). Petitioner points out that Dr. Rhyne also "[a]t deposition . . . confirmed that 'the defined interaction would be then it can store data.'" *Id.* (citing Ex. 1014, 191:12–16). Petitioner further alleges that "[w]ith respect to the 'communicating' step, the expert similarly identified 'mass storage' – arguing that because the accused products were 'data storage device[s],' they infringed this element." *Id.* (citing Ex. 1013 ¶¶ 161, 189; Ex. 1012, 89–90; Ex. 1015, 130–132).

Petitioner argues, "Spex cannot argue that claim limitations can be met by transfer and storage of data for infringement purposes, then deny that transfer or storage of data is sufficient to anticipate these elements." *Id.*

Patent Owner responds:

> Petitioner submits new argument and new invalidity theories based on various citations to new exhibits 1012–1015. However, Petitioner did not assert any "mass storage" to disclose or render obvious the defined interaction limitation. Indeed, Petitioner only asserted that "transfer of data" constituted a defined interaction. *See* Pet. at 27; see also Paper 7 at 19. Petitioner's expert in this proceeding, Mr. Griffin, has not provided any testimony to the contrary. Accordingly, Petitioner's new "mass storage" argument constitutes a new invalidity theory. The Board should reject these new arguments and find that the defined interaction limitations are not disclosed by Jones or otherwise obvious.

PO Supp. Br. 8.

We agree with Patent Owner that Petitioner's Supplemental Brief presents new argument and new invalidity theories not presented or relied upon in the Petition. *See* 37 C.F.R. § 42.23(b) ("A reply may only respond to arguments raised in the corresponding opposition, patent owner preliminary response, or patent owner response."); *see also* Office Patent Trial Practice Guide, August 2018 Update 14, https://go.usa.gov/xU7GP ("Petitioner may not submit new evidence or argument in reply that it could have presented earlier, e.g. to make out a prima facie case of unpatentability."). Notwithstanding Petitioner's assertions in its Supplemental Brief (Pet. Supp. Br. 8), we do not find in the Petition any mapping of "storage of data" to the communicating and performing steps of claim 57. In fact, the only mention of the word "storage" in the discussion of those steps in the Petition is in a parenthetical statement identifying the

physical components between which the "transfer of data," alleged in the Petition to be the recited "defined interaction," allegedly takes place: "If the comparison involving the password is successful, the defined interaction (i.e., the transfer of data between the host computer 110 and the data storage 150) is effected." Pet. 27–28.[15] Whether or not Patent Owner in district court litigation asserted that "data storage" may, itself, be a "defined interaction" within the meaning of that term in claim 57, that position was not presented in the Petition, and constitutes impermissible new argument.

For these reasons and the reasons stated in our Institution Decision as summarized above, we conclude Petitioner has not established by a preponderance of the evidence that Jones anticipates or would have rendered obvious the subject matter of claim 57.

*iii. Claim 58*

Claim 58 recites a method "[f]or use in a modular device adapted for communication with a host computing device, the modular device comprising a security module that is adapted to enable one or more security operations to be performed on data and a target module that is adapted to enable a defined interaction with the host computing device." Referring to Figure 1 of Jones, reproduced in Section III.B.2.a. *supra*, Petitioner contends that Jones's memory card 100 is a "modular device" that is "adapted for communication with a host computing device" (i.e., host personal computer 110). Pet. 16. Petitioner further contends that memory card 100 includes two "security modules" (smartcard I.C. 250 and application specific integrated circuit (ASIC) 290), each of which is "adapted to enable one or

[15] Nor does any other grammatical form of "storage," such as "store" or "storing," appear in the Petition in connection with these limitations.

more security operations to be performed on data," as well as "target modules" (common memory array 150, attribute memory 190). *Id.* at 16–17. With respect to the security modules, Petitioner argues that ASIC 290, for example, performs security operations such as Encrypt-Decrypt of bus data (177), gating of bus data (178), and card lock logic functions (220). *Id.* at 16. Petitioner asserts that smartcard I.C. 250 similarly performs security operations. *Id.* at 16–17 (citing Ex. 1003, 8:7–8 ("The unit 250 encrypts data from the data bus buffer 173 prior to storing the data in the common memory array 150 . . . ."); Ex. 1010 ¶ 43). With respect to the target modules, Petitioner argues that common memory array 150 and attribute memory 190 each store and retrieve data on command by host personal computer 110. *Id.* at 17. Based on these assertions, Petitioner contends that Jones discloses a "modular device comprising a security module that is adapted to enable one or more security operations to be performed on data and a target module that is adapted to enable a defined interaction with the host computing device," as recited in the preamble of claim 58. *Id.* at 29.

With respect to the first recited step of the claimed method, "receiving an instruction from a host computing device regarding operation of the modular device," Petitioner contends Jones teaches provision by the host of various instructions regarding operation of the modular device, including both "conventional PCMCIA standard mechanisms for host computer/PCMCIA Card communications" and "partition lock and partition unlock command[s] . . . for the purpose of establishing access controls (partition locks and unlocks) for subsequent secure access to particular partitions in the target module." Pet. 29–30. Petitioner asserts, "[t]he partition lock and partition unlock commands are exemplary host originated

instructions regarding operation of the module device." *Id.* (citing Ex. 1003, 9:16–10:23; Ex. 1010 ¶ 75). Petitioner contends "Jones also teaches that, once a partition lock command has been processed, host access to data within locked partitions requires the communication of a host-originated command that conveys an obfuscated password from the host to the security module so that the security module can validate the password," and "[i]f the password is successfully validated, the security module then provides the host with access to a locked partition within the target module." *Id.* at 30–32 (quoting Ex. 1003, 7:20–24, 7:29–33, 10:10–23, 10:32–11:20, Fig. 2; Ex. 1010 ¶¶ 76–77).

With respect to the second recited step of the claimed method, "operably connecting the security module and/or the target module to the host computing device in response to the instruction from the host computing device," Petitioner refers back to its analysis of a substantively identical step in independent claim 55 and also cites Mr. Griffin's Declaration. Pet. 32 (citing Ex. 1010 ¶ 78 (citing Ex. 1003, 7:32–8:2)). The referenced analysis of claim 55 advances several theories as to how this step is disclosed by Jones. *Id.* at 20–22. First, Petitioner contends, "operably connecting the target module to the host computing device in response to an instruction from the host computing device is met by the normal 'unsecured' operation of the PCMCIA memory card device features." *Id.* at 20–21 (citing Ex. 1010 ¶ 52). Second, Petitioner asserts that "a partition lock and partition unlock command from the host to the modular device operatively connects the host to the security module for the purpose of establishing access controls (partition locks and unlocks) for subsequent secure access to particular partitions in the target module." *Id.* at 21. According to

Petitioner, "[t]he partition lock and partition unlock commands are exemplary host originated instructions that operatively connect the security module to the host computing device." *Id.* (citing Ex. 1003, 10:7–23; Ex. 1010 ¶ 53). Third, Petitioner again cites Jones's teaching that once a partition lock command has been processed, host access to data within locked partitions requires the communication of a host-originated command that conveys an obfuscated password from the host to the security module so that the security module can validate the password, as being "yet another example of Jones teaching operably connecting the host to the security module in response to a host instruction." *Id.* In particular, Petitioner contends, "[i]f the password is successfully validated, the security module then provides the host with access to a locked partition within the target module." *Id.* (citing Ex. 1003, 10:17–23, 10:32–11:20); *see also id.* at 21–22 (citing Ex. 1003, 6:14–20, 7:8–24, 7:29–33, 10:10–20; Ex. 1010 ¶¶ 54–55). Petitioner contends further that this conclusion is reinforced by "Patent Owner's admissions regarding prior art in connection with the prosecution" of a commonly owned patent application filed the same day as the application for the '135 patent. *Id.* at 22 (citing Ex. 1009, 5–6; Ex. 1010 ¶ 56).

In the Preliminary Response, Patent Owner argued Petitioner had failed to show that the step of "operably connecting the security module and/or the target module to the host computing device in response to an instruction from the host computing device" is disclosed in Jones. Prelim. Resp. 19. Regarding Petitioner's argument that this step is disclosed by "the conventional PCMCIA card services specification" (Pet. 20), Patent Owner argued, "[o]ther than this conclusion, . . . Petitioner offers no evidence from

Jones to suggest that this operative connection is made 'in response to an instruction from the host computing device'" (Prelim. Resp. 19). Regarding Petitioner's alternative argument, relying on the "partition lock" and "partition unlock" commands of Jones (Pet. 20–21), Patent Owner asserted that "Petitioner does not explain why these commands meet the stated limitations of this step," and "[i]ndeed, if Petitioner's arguments are to be taken at face value, 'the conventional PCMCIA card services specification' should operably **connect** the modular device to the host computing device prior to the receipt of any 'PARTITION LOCK' or 'PARTITION UNLOCK' claims" (Prelim. Resp. 19–20). According to Patent Owner, "Petitioner argues that its second argument is in support of its first argument, not in the alternative," and "Petitioner, however, does not explain how the 'PARTITION LOCK' and 'PARTITION UNLOCK' commands are relevant if the device is already operably connected to the host computing device." *Id.* at 20 (citing Pet. 22). Lastly, Patent Owner pointed out that the prosecution history excerpt identified by Petitioner as allegedly reinforcing its arguments was in fact a statement made by the examiner, and contended that Petitioner's characterization of that excerpt as an admission by Patent Owner is misleading. *Id.*

In our Institution Decision, we explained that we were persuaded, on the record then before us, that Petitioner had established a reasonable likelihood of showing that claim 58 is anticipated by Jones. Dec. 24. We agreed with Patent Owner that Petitioner does not sufficiently demonstrate in the Petition that the step of "operably connecting the security module and/or the target module to the host computing device *in response to an instruction from the host computing device*" (emphasis added) is taught or

suggested by "the conventional PCMCIA card services specification," but we explained that we were persuaded by Petitioner's showing that the operation of Jones's partition lock and partition unlock commands discloses that step. *Id.* at 24–25. We further explained that, contrary to Patent Owner's argument that "Petitioner argues that its second argument is in support of its first argument" (Prelim. Resp. 20), we understood Petitioner to have presented the partition lock and partition unlock commands as an alternative to—rather than in support of—its mapping of the conventional PCMCIA card services specification to that step. Dec. 25 (citing Pet. 21 ("Jones teaches that, *in addition to conventional card services* . . . ." (italics added))). We additionally pointed out that Petitioner further contends that "Jones *also* teaches that, once a partition lock command has been processed, host access to data within locked partitions requires the communication of a host-originated command . . . so that the security module can validate the password," and that "[*t*]*his is yet another example* of Jones teaching operably connecting the host to the security module in response to a host instruction." *Id.* (quoting Pet. 21 (italics added)).

We also disagreed with Patent Owner's argument that Petitioner "does not explain how the 'PARTITION LOCK' and 'PARTITION UNLOCK' commands are relevant if the device is already operably connected to the host computing device" (Prelim. Resp. 20), finding that Petitioner persuasively contends that "a partition lock and partition unlock command from the host to the modular device operatively connects the host to the security module," and similarly, that "[t]he partition lock and partition unlock commands are exemplary host originated instructions that operatively connect the security module to the host computing device."

Dec. 25 (quoting Pet. 21). Thus, contrary to the premise of Patent Owner's argument—that the "device" is "already operably connected" to the host computing device (Prelim. Resp. 20)—we found that Petitioner instead contends that the security module is operably connected to the host computing device only in response to an instruction (e.g., a partition unlock command) from the host computing device, as recited in claim 58. Dec. 25–26.

As to Petitioner's alternative assertion that claim 58 is unpatentable as obvious over Jones, we agreed with Patent Owner that, "despite asserting obviousness, Petitioner does not identify which, if any, of the limitations of the Jones reference may be missing and how those limitations might be obvious." Dec. 26 (quoting Prelim. Resp. 3). Whereas Petitioner recognized, in connection with its asserted ground based on the combination of Jones with either or both of Security Modules and Common Interface Specification, the possibility that we might find that Jones does not disclose physically separate security and target modules (*see* Pet. 33; *see also infra* Section III.B.3.), we found that Petitioner does not allege that such physically separate structures would have been obvious to a person of ordinary skill in the art in view of Jones if they are not taught by Jones. Dec. 26.

Lastly, we noted that we were not relying on Petitioner's arguments concerning the prosecution history (Pet. 22 (quoting Ex. 1009, 5–6)) in support of our determinations. Dec. 26. We agreed with Patent Owner that the excerpt quoted by Petitioner from the prosecution history is a statement of the Examiner, not of the Patent Owner, and that excerpt does not, in any

event, appear to refer to Jones or to any of the other references relied upon in the Petition. *Id.*

In its Response, Patent Owner raises four principal arguments in response to Petitioner's contentions: (1) Jones fails to disclose "receiving an instruction from a host computing device regarding operation of the modular device"; (2) Jones fails to disclose "operably connecting the security module and/or the target module to the host computing device in response to the instruction from the host computing device"; (3) Petitioner failed to identify where Jones discloses the claimed "defined interaction"; and (4) Petitioner's interpretation of the terms "instruction," "security operation," and "operation of the modular device" impermissibly renders required claim limitations superfluous. PO Resp. 13–23. We address each, along with Petitioner's counterarguments in its Reply, in turn below.

*"receiving an instruction . . . regarding operation of the modular device"*

With respect to the "receiving" step, Patent Owner summarizes Petitioner's three proposed mappings of Jones's disclosure to "receiving an instruction . . . regarding operation of the modular device" (i.e., (1) "conventional PCMCIA standard mechanisms for host computer/PCMCIA Card communications," (2) "partition lock and partition unlock command . . . for the purpose of establishing access controls (partition locks and unlocks) for subsequent secure access to particular partitions in the target module," and (3) "a host-originated command that conveys an obfuscated password from the host to the security module so that the security module can validate the password" (Pet. 30–31)), and contends:

> The Board rejected the first theory regarding PCMCIA Card Services in its Institution Decision, and Patent Owner agrees. Paper 7 at 17-18, 24. The second and third theories are

> directed to access control, which lacks relation to the ***operation of the modular device*** and cannot disclose the claimed *instruction regarding. . . the operation of the modular device*.

PO Resp. 14–15. In particular, according to Patent Owner, "neither the communication of a password from user via the host, nor the attempts to access a partition, constitutes an *instruction regarding the operation of the modular device* as claimed," but "[a]t best a password is merely supplied data." *Id.* at 15 (citing Ex. 1003, 14:9–10; Ex. 2003 ¶ 27).

Moreover, Patent Owner asserts, "Jones discloses that attempts to access the partition cause the modular device to notify the host about the locked condition and request a password (instead of the modular device receiving an instruction)." PO Resp. 15 (citing Ex. 1003, 7:26–30, 10:17–23; Ex. 2003 ¶ 27). According to Patent Owner:

> Following Petitioner's mapping of Jones's "command[s]" to the claimed *instruction*, communicating an identity of a modular device is more than simply identifying the presence of the modular device upon a physical (not yet operable) connection. Ex. 1001, at 9:20-50. And, in the broadest sense, the claimed ***instruction*** is undoubtedly different from access control information because the identity or type of device will be used to inform whether security operations are configured or enabled for the modular device and whether the requirement of access control information (e.g. a password) is, in fact, necessary. Ex. 1001, at 9:51-55 and 13:38-44; Ex. 2003, ¶ 28. One clear example showing that the claimed instruction is different from access control information is that the identity or mode of the modular device may include a mode that configures or enables only the target module, but not the security module and the security module's operations. Ex. 2003, ¶ 28. Furthermore, receiving access control information ahead of the ordered sequence of claimed steps, would impermissibly exclude key embodiments of the invention.

*Id.* at 15–16.

In its Reply, Petitioner argues that Patent Owner incorrectly asserts that the recited "instruction . . . regarding operation of the modular device" excludes instructions related to "access control," but that "there is no basis in the claim language for such an exclusion." Pet. Reply 3. Petitioner contends that "the claim language is undoubtedly quite broad – merely requiring an instruction 'regarding operation' of the entire modular device," and "[Patent Owner] has not asserted any construction of the terms 'regarding,' 'operation,' or 'modular device' that would somehow exclude access control commands from being an instruction regarding operation." *Id.* Petitioner further contends, "[Patent Owner's] argument on this term . . . does little more than declare conclusory that access control commands, like password loading commands are 'undoubtedly different' from the claim limitation," but "[Patent Owner] never explains how the password loading commands fail to be in 'regard' to the operation of Jones's memory card (the modular device), and as Jones shows, it clearly does." *Id.* at 3–4. For example, Petitioner contends, "as noted in the Petition, the host sends the PARTITION LOCK/PARTITION UNLOCK command and the password loading command to the modular device to enable operation of device after a partition lock has occurred." *Id.* at 4 (citing Pet. 30–32; Ex. 1010 ¶¶ 76–78; Ex. 1003, 9:20–30, 10:7–23). "To the extent that [Patent Owner] is arguing that the password loading command, partition lock and unlock commands are merely data (password) and not instructions," Petitioner contends, "this is clearly contradicted by Jones, which even used the term command to refer to the 'password loading command.'" *Id.* at 4 n.1.

In response to Patent Owner's argument that the access control information fails to satisfy this limitation because the claimed instruction

"may include a mode that configures or enables only the target module, but not the security modules" (PO Resp. 16), Petitioner argues that "[e]ven if this was true, a command that configures the target means on the modular device as taught by Jones is still an instruction that regards the operation of the modular device, which is all this limitation requires." Pet. Reply 4–5. In particular, Petitioner points out, "[t]here is no requirement in this limitation that the claimed instruction concern every component within the modular device," and "[m]oreover, as the commands cited by Petitioner concern password protection (*i.e.*, security), the [Patent Owner's] entire example actually fails, as the partition lock and unlock commands undoubtedly do affect the operation of the security module." *Id.* at 5.

We are persuaded by Petitioner's arguments. Patent Owner has not pointed to any evidence of claim scope disavowal or other special lexicography suggesting that the inventors of the '135 patent intended to give the phrase "instruction . . . regarding operation" anything other than its plain and ordinary meaning, so as to exclude access-control commands such as the partition lock and partition unlock commands disclosed by Jones as being received by Jones's modular device from Jones's host computer and mapped to this limitation by Petitioner. *See* Pet. 30 (citing Ex. 1003, 9:16–10:23; Ex. 1010 ¶ 75). We agree with Petitioner that Jones's access-control commands clearly "regard operation" of Jones's memory card 100, because, for example, "the host send[ing] the . . . PARTITION UNLOCK command and the password loading command to the modular device . . . enable[s] operation of [the] device after a partition lock has occurred." *See* Pet. Reply 4 (citing Pet. 30–32; Ex. 1010 ¶¶ 76–78; Ex. 1003, 9:20–30, 10:7–23). We additionally agree with Petitioner that Patent Owner's example

purportedly "showing that the claimed instruction is different from access control information" (PO Resp. 16) actually supports Petitioner's position. *See* Pet. Reply 4. Claim 58 recites a "modular device comprising a security module . . . and a target module" and further recites an "instruction . . . regarding operation of the *modular device*" generally, as opposed to operation of *every component within the modular device*. *See* claim 58 (italics added); Pet. Reply 5. Accordingly, we agree with Petitioner that a command that "configures or enables only the target module" within the modular device would nonetheless be an instruction "regarding operation of the modular device" even if it did not also configure or enable the modular device's security module. Pet. Reply 4–5; *cf.* PO Resp. 16. Finally, although we are unable to ascertain exactly what "ordered sequence" or "key embodiments" Patent Owner is referring to in its argument that "receiving access control information ahead of the ordered sequence of claimed steps, would impermissibly exclude key embodiments of the invention" (PO Resp. 16), which relies on a verbatim statement in Dr. Jawadi's declaration (Ex. 2003 ¶ 28), we are persuaded by Petitioner's arguments and evidence that access-control commands such as Jones's partition unlock command result in—and indeed would logically precede—operable connection of the host and a previously locked memory module. *See* Pet. 30–32; Pet. Reply 4; Ex. 1003 ¶¶ 74–78.

*"operably connecting the security module and/or the target module to the host computing device in response to the instruction from the host computing device"*

With respect to the "operably connecting" limitation of claim 58, Patent Owner argues, first, that "[***t***]***he instruction*** of this limitation, by antecedent basis, must correspond to the ***instruction*** of the previous

limitation," and "[b]ecause the Board rejected the conventional PCMCIA Card Services . . . , disclosure of this limitation must come from the second and third theories advanced above, *i.e.*, partition lock, partition unlock, and host-originated password commands." PO Resp. 17. According to Patent Owner, however, Petitioner "[i]nstead . . . advances only the already-rejected first theory to allege disclosure of this limitation," and "Petitioner's failure to explain, or even allege, whether the second or third theories apply to this limitation is fatal to its case." *Id.* (citing Pet. 32).

Patent Owner next argues that "Jones fails to disclose *operably connecting . . .* ***in response to the instruction from the host computing device***," as "Jones's failure to disclose the claimed instruction regarding operation of the modular device permeates to this limitation." *Id.* at 18. Patent Owner states that it agrees, in this regard, with the Board's finding in the Institution Decision that "Petitioner has not sufficiently demonstrated that the [operably connecting] step . . . is taught or suggested by 'the conventional PCMCIA card services specification.'" *Id.* at 18 (citing Dec. 24). While contending "the analyses should stop here and the validity of claim 58 should be affirmed," Patent Owner further contends that "Petitioner's second and third theories [also] fail to disclose operably connecting the security module and/or the target module to the host computing device in response to an instruction from the host computing device," because "[t]he evidence in Jones supports that the target module and/or security module become operably connected immediately upon configuration, i.e. long before the PARTITION LOCK/UNLOCK commands and the password loading command." *Id.* at 19. According to Patent Owner, "Jones discloses that the 'memory card 100 is intitialized [sic]

as a standard memory card before being first delivered to the end user, and provides one or more freely accessible storage partitions **<u>prior to receiving the first PARTITION LOCK command</u>**.'" *Id.* (quoting Ex. 1003, 10:3–5 (emphasis added)). Lastly, Patent Owner alleges:

> [R]egardless of whether "PARTITION LOCK" and "PARTITION UNLOCK" commands could constitute an instruction, the fact remains that each and every embodiment of Jones is implemented in accordance with the PCMCIA interface standard, about which Jones explains: "To implement the PCMCIA interface standard, the secure memory card includes a non-volatile attribute memory 190 which stores information enabling the host computer to automatically identify the particular PCMCIA card as soon as the card and host are connected, **<u>and to automatically establish the appropriate hardware/software interface using suitable driver software which executes on the host computer 1 10</u>** [sic]." Ex. 1003, 5:24-29 (Emphasis added.); Ex. 2003, ¶ 32. Thus, Jones discloses that the *operably connecting* occurs **<u>prior to</u>** the proposed commands being sent. Ex. 2003, ¶ 32.

*Id.* at 19–20.

In its Reply, Petitioner responds that Patent Owner's argument that "unlocking a target module so that a host computer can write to it is not enough to qualify as an operable connection" is "clearly wrong." Pet. Reply 5. According to Petitioner, "[t]here is no legitimate dispute that the host computer in Jones cannot perform a write operation to a locked card"; "[t]he card is locked and not connected to the host for its intended storage purpose," and "only becomes operable and connected for reading and writing in response to the PARTITION LOCK/PARTITION UNLOCK command and the password." *Id.* at 5–6. Petitioner contends that although Patent Owner's argument apparently "relies on a narrow construction of 'operably connecting' that limits that term to initialization," "[Patent Owner]

never proposed such a construction and the Board did not adopt such a narrow construction in its institution decision." *Id.* at 6. Moreover, Petitioner argues, Patent Owner "provides absolutely no support from the specification of the '135 Patent to justify this narrow construction" and "does not provide a single citation to the '135 Patent in its entire argument about 'operably connecting.'" *Id.* Indeed, Petitioner points out, "[t]he term 'operably connecting' only appears once outside of the claims of the '135 Patent, and that is in the Summary of the Invention section," where its use is merely as a copy of its use in the claims. *Id.*

Nonetheless, Petitioner contends, the specification does provide some insight into the meaning of the term—specifically, according to Petitioner, "[s]ince the operable connection occurs in response to a command from the host, the operable connection cannot be the physical connection of a memory card to the computer." Pet. Reply 6. Petitioner explains as follows:

> Th[e] physical connection (step 501 shown in Figure 5) is the main type of connection described in the specification of the '135 Patent.
>
> However, as part of Step 505 of Figure 5, the '135 Patent describes that use of the claimed modular device "can be enabled by one or more Software programs (referred to collectively herein after as a 'modular device driver'…"). Ex. 1001 at 12:10–16. In other words, prior to enabling actions taken by the device driver on the host, the physical connection with the modular device is not operable to store data on the card. It is only through additional commands from the host that the physical connection become enabled and operable.
>
> Jones describes a virtually identical function. While the card of Jones may be physically connected to a system at any earlier point in time, the storage (*i.e.*, the target module) would not be operably connected if it is in in locked state. PO does not appear to dispute that a locked card is not operable to store data,

> and, indeed, it cannot. It is only when the host computer sends the password loading command and unlocks the partition that the connection between the host and the modular device becomes operational.
>
> Accordingly, given that the PO has not requested a claim construction for "operably connecting" that be limited to just the initial physical connection and the '135 Patent itself does not support finding the plain meaning to be limited in this way, the password loading command and unlock partition commands clearly meet the requirements of claim 58.

*Id.* at 6–8 (footnote omitted).

We are persuaded by Petitioner's arguments and cited evidence that Jones discloses the step of "operably connecting the security module and/or the target module to the host computing device in response to the instruction from the host computing device," where the "instruction" is, for example, a partition unlock command, as discussed in our discussion above of the step of "receiving an instruction . . . regarding operation of the modular device." Although Patent Owner correctly points out that we found in the Institution Decision that Petitioner had not sufficiently demonstrated in the Petition that this step was taught or suggest by "the conventional PCMCIA card services specification," as explained above we also found in that Decision that Petitioner had cross-referenced its arguments with respect to a similar limitation of claim 55, including its reliance on the partition lock, partition unlock, and host-originated password commands as being the recited "instructions." *See* Dec. 22–25; Pet. 20–22, 32; *see also* Pet. Reply 8–9 ("[T]he operably connecting limitation occurs identically in non-instituted claim 55, which is section VII.A.1.d in the Petition. Pet at 20–22. In addressing the identical limitation in claim 58, it is not necessary to repeat the entire discussion in claim 55, and, indeed, Petitioner did not. . . . SPEX

cannot plausibl[y] argue that it believed that Petitioner was . . . somehow dropping that reliance for the same 'instruction' in the second limitation."). Accordingly, we are not persuaded by Patent Owner's arguments that "Petitioner fails to carry through each of the . . . theories discussed in the preceding section to this limitation" and that "the analyses should stop here" on the basis of that alleged failure. PO Resp. 17–19. Further, we agree with Petitioner that there is no basis for limiting "operably connecting" to an initial physical connection between a host computing device and modular device, and particularly that, "[s]ince the operable connection occurs in response to a command from the host, the operable connection cannot be the physical connection of a memory card to the computer." Pet. Reply 6.

We also are not persuaded by Patent Owner's arguments based on Jones's disclosures either of a memory card being initialized "before being first delivered to the end user, and provid[ing] . . . freely accessible storage partitions prior to receiving the first PARTITION LOCK command" or of the PCMCIA card having "store[d] information enabling the host computer to automatically identify the particular PCMCIA card as soon as the card and host are connected, and to automatically establish the appropriate hardware/software interface." PO Resp. 19–20 (emphasis omitted) (quoting Ex. 1003, 10:3–5, 5:24–29). In the paragraphs of Jones following the first of those quotations, Jones further discloses, for example, that a PCMCIA card may already have locked partitions at the time that it is "newly inserted into the socket of a running host computer" or "when the host computer is first powered up." *See* Ex. 1003, 10:10–23 (cited at Pet. 21). In such scenarios, although a hardware/software interface may be automatically established as soon as the card and host are connected, we are persuaded by Petitioner's

arguments and evidence that no "operable connection" would exist between the host computer and the locked memory partitions until after the appropriate access-control commands had been received from the host computer.

*"defined interaction"*

Regarding the term "defined interaction," which appears in the preamble of claim 58, Patent Owner contends that Mr. Griffin "confirm[ed] that he did not consider the term 'defined' in construing the meaning of the claimed limitation 'defined interaction' and simply ignored the term." PO Resp. 20 (citing Ex. 2002 (Griffin Dep.), 86:11–19). According to Patent Owner, "Mr. Griffin's testimony confirms that Petitioner and Mr. Griffin failed to address the particularity of the claimed invention when Mr. Griffin's declaration overlooked the 'defined' aspect of the required term 'defined interaction.'" *Id.* at 21. Accordingly, Patent Owner contends, "Petitioner cannot show that each and every element as set forth in the claim is found in Jones," and "[m]oreover, Petitioner has failed to meet its burden to specify where this element of the claim is found in the prior art." *Id.* (citing 37 C.F.R. § 42.104(b)(4); Ex. 2003 ¶ 33).

Petitioner responds that "[t]he Petition clearly identifies a purported defined interaction"; "[Patent Owner] never claims there is a flaw in this section of the Petition nor does it assert that Jones lacks a 'defined interaction'"; and "[i]ndeed, in its argument, [Patent Owner] never even references the section of the Petition that addresses the 'defined interaction' term." Pet. Reply 9.

We agree with Petitioner that it sufficiently accounted for the term "defined interaction," as recited in the preamble of claim 58, in its mapping

of Jones's "exchange of data between the host and the target module (memory)" to the defined interaction recited in claim 57, both of which claims cross-reference discussion in the Petition of the same term in claim 55. *See* Pet. 25–26 (discussion of claim 57, citing discussion of claim 55), 29 (discussion of claim 58, citing discussion of claim 55). Notably, although Patent Owner contends that Mr. Griffin failed to address the "'defined' aspect" of this term (PO Resp. 21), Patent Owner does not allege that Jones's exchange of data is not a defined interaction within the meaning of claim 58 or provide any proposed construction for that term that would exclude such a mapping. Finally, we do not find in the '135 patent any express definition of "defined interaction," but find that "communication" between a host computing device and a remote device, a biometric module, or a smart card reader module adapted to communicate with a smart card are provided as examples thereof. *See* Ex. 1001, 4:18–21.

*Alleged conflation of claim terms*

Patent Owner contends,

> Claim 58 requires three distinct claim terms: *instruction*, *security operation*, and *operation of the modular device*. Mr. Griffin's deposition testimony confirms that Petitioner applied the same interpretation to the three distinct claim terms, thus impermissibly rendering several claim limitations superfluous. Mr. Griffin admitted that he asserted Jones's commands not only to meet the instruction limitations, but also the *security operation* and *operation of the modular device* limitations . . . . Ex. 2002, Griffin Dep., 87:19–88:25.
>
> Accordingly, Petitioner cannot show that each and every element as set forth in the claim is found in . . . Jones, and Petitioner has failed to meet its burden to specify where this

> element of the claim is found in the prior art. 37 C.F.R. § 42.104(b)(4). Ex. 2003, ¶ 34.

PO Resp. 21–23.

Petitioner responds that there is no basis in the claims for Patent Owner's arguments. Pet. Reply 10. Petitioner contends the section of deposition testimony cited by Patent Owner "simply shows that Mr. Griffin was relying on various aspects of the Access Control functions to cover multiple claim elements," and "[n]othing in the language of claim 58 mandates that the received instruction has no relationship to the claimed security operation." *Id.* Petitioner points out that Patent Owner does not identify any specific flaw in the Petition or argue a missing element from Jones, does not cite any law that would prevent a received instruction from both operably connecting the target module and being part of a security operation, and does not propose any particular construction for those terms that would require them not to have any relation to one another. *Id.* at 10, 12. Indeed, Petitioner further points out, claim 58 uses the terms "instruction" and "operation of the modular device" within the same limitation and, thus, does not require that they be "wholly unrelated." *Id.* at 10–11.

Furthermore, Petitioner contends, Patent Owner mischaracterizes Mr. Griffin's testimony in its arguments. In particular, Petitioner points out, Mr. Griffin "described the PARTITION LOCK/PARTITION UNLOCK command as an example of 'one instruction that can be received regarding operation of the modular device'"; "explained . . . the term 'security operation' and 'operation of the modular device' while related have different scopes"; and both in his declaration and at his deposition "referred to several Jones's teachings to correspond to the term 'security operation' in claim 58,

not the PARTITION LOCK/PARTITION UNLOCK command alone." Pet. Reply 11 (citing Ex. 2002, 87:1–18, 88:16–29; Ex. 1010 ¶ 43).

We are again persuaded by Petitioner's arguments. In view of the evidence cited by both Patent Owner and Petitioner, we do not understand Mr. Griffin to have improperly conflated the terms "instruction," "security operation," and "operation of the modular device." As Petitioner points out, these terms are not unrelated in the context of claim 58, and claim 58 specifically requires an "instruction . . . regarding operation of the modular device." We are persuaded, for the reasons previously set forth in this Decision, that Petitioner has established Jones's PARTITION LOCK/PARTITION UNLOCK *command* is an "instruction" that "regards operation" of Jones's memory card (i.e., modular device) by locking or unlocking partitions in, and hence preventing or permitting access to data stored on, Jones's common memory array 150. *See* Pet. 30–32. We further are persuaded that the partition lock and partition unlock *operations* (as opposed to the commands) are "security operations" that are enabled by Jones's ASIC 290. *See id.* We do not understand Mr. Griffin's testimony to be inconsistent with this distinction. *See, e.g.*, Ex. 2002, 88:20–24 (Mr. Griffin agreeing that "partition lock and partition unlock" have been mapped to security operations and instruction, where the questioning attorney did not specify whether the question related to commands or operations).

*iv. Conclusion*

For the foregoing reasons, we conclude that Petitioner has demonstrated by a preponderance of the evidence that claim 58 is anticipated by Jones, but that Petitioner has not demonstrated by a preponderance of the

evidence that claims 55–57 are anticipated by or would have been obvious over Jones.

#### 4. *Obviousness of Claims 55–58 over Jones in Combination with Either or Both of Security Modules and Common Interface Specification*

Petitioner asserts that claims 55–58 are unpatentable over Jones in combination with either or both of Security Modules and Common Interface Specification. Pet. 32–37. Petitioner presents this ground as a fallback position in the event we determine, first, that the challenged claims require that the recited security module be physically separate from the recited target module, and second, that Jones does not disclose such physically separate structures. *Id.* at 33. According to Petitioner, Security Modules and Common Interface Specification both disclose that using a security module that is separate from a target module can enhance data security, and Petitioner further contends that one of ordinary skill in the art "would have been motivated to combine Security Modules and/or Common Interface Specification with Jones, to provide a structure that has a security module that is separate from the data storage structure, to provide the enhanced security taught in Security Modules and Common Interface Specification." *Id.* at 32–33 (citing Ex. 1010 ¶¶ 84–85).

In its Preliminary Response, Patent Owner contended this ground is "malformed," arguing that "Petitioner does not identify any differences between the references and the claims, and provides merely conclusory statements with regard to any alleged motivation to combine." Prelim. Resp. 26. Patent Owner further contended that the addition of Security Modules and Common Interface Specification does not address the alleged

deficiencies identified in connection with the grounds based solely on Jones. *Id.* at 27.

*a. Claims 55–57*

We agree with Patent Owner that the addition of Security Modules and Common Interface Specification does not address the deficiencies of Jones with respect to claims 55–57. Petitioner does not rely in the Petition on Security Modules or Common Interface Specification to teach or suggest "*receiving a request* from the host computing device for information regarding the type of the modular device" and "providing the type of the target module to the host computing device *in response to the request*," as recited in claim 55 (italics added), or to teach or suggest "communicating with the host computing device" and "performing one or more security operations and the defined interaction on the exchange[d] data," as recited in claim 57. Petitioner instead relies solely on Jones for each of those limitations. *See generally* Pet. 18–20, 25–28, 32–37. Accordingly, for the same reasons as set forth in Section III.B.3.b.i.–ii. *supra* with respect to the alleged grounds based on Jones alone, we conclude that Petitioner has not established by a preponderance of the evidence that claims 55–57 are unpatentable over the combined teachings of Jones, Security Modules, and Common Interface Specification.

*b. Claim 58*

In our Institution Decision, we stated that we were persuaded on the preliminary record then before us that Petitioner had established that it would have a reasonable likelihood of prevailing in showing that the subject matter of claim 58 would have been obvious over the combined teachings of Jones and Security Modules in the event that the full record at trial did not

establish that Jones alone disclosed the recited security module and target module as physically separate structures. Dec. 28–30.[16] Having now found claim 58 unpatentable over Jones (*see supra* Section III.B.3.b.iii.), we do not separately reach these additional challenges to claim 58.

### 5. *Obviousness of Claim 57 over Jones in Combination with Either or Both of Schwartz and Kimura*

Petitioner asserts that claim 57 is unpatentable over Jones in combination with either or both of Schwartz and Kimura. Pet. 37–38. Petitioner does not rely in the Petition on Schwartz or Kimura to teach or suggest "communicating with the host computing device" and "performing one or more security operations and the defined interaction on the exchanged data," as recited in claim 57, but instead relies solely on Jones for those limitations. Accordingly, for the same reasons as set forth in Section III.B.3.b.ii. *supra* with respect to the alleged grounds based on Jones alone, we conclude that Petitioner has not established by a preponderance of

---

[16] Because Petitioner cited Common Interface Specification for essentially the same teachings as it cited Security Modules and did not provide any persuasive explanation as to the relative strengths and weaknesses of those references, we declined in the Institution Decision to institute *inter partes* review as to the alternative grounds based on the two-way combination of Jones and Common Interface Specification and the three-way combination of Jones, Common Interface Specification, and Security Modules. Dec. 29–30. Notably, the Petition does not cite either Security Modules or Common Interface Specification to teach or suggest the limitations of claim 58 disputed by Patent Owner the "defined interaction" or the steps of "receiving an instruction . . . regarding operation of the device" and "operably connecting the security module and/or the target module to the host computing device in response to the instruction from the host computing device" recited in claim 58.

the evidence that claim 57 is unpatentable over the combined teachings of Jones, Schwartz, and Kimura.

*C. Patent Owner's Motion to Exclude Evidence*

In *inter partes* review proceedings, documents are admitted into evidence subject to an opposing party asserting objections to the evidence and moving to exclude the evidence. 37 C.F.R. § 42.64. Patent Owner moves to exclude Exhibits 1012–1015, 1017, 1019, and 1020, to which it previously objected. Mot. Excl. 1–20. We dismiss as moot Patent Owner's motion because (1) even without excluding Exhibits 1012–1015, 1017, 1019, and 1020, Petitioner has failed to establish by a preponderance of the evidence that claims 55–57 are unpatentable; and (2) we have not relied on any of Exhibits 1012–1015, 1017, 1019, and 1020 in reaching our determination that Petitioner has established the unpatentability of claim 58 by a preponderance of the evidence. *See supra* Sections III.B.3.–5.

*D. Summary*

Upon due consideration of the trial record, we conclude that Petitioner has demonstrated by a preponderance of the evidence that claim 58 of the '135 patent is unpatentable as anticipated by Jones but has not demonstrated by a preponderance of the evidence that claims 55–57 are unpatentable on any of the asserted grounds.

## IV. ORDER

Accordingly, for the foregoing reasons, it is

ORDERED that claim 58 of U.S. Patent No. 6,003,135 is held unpatentable;

FURTHER ORDERED that claims 55–57 of U.S. Patent No. 6,003,135 have not been shown to be unpatentable;

FURTHER ORDERED that Patent Owner's Motion to Exclude Exhibits 1012–1015, 1017, 1019, and 1020 is denied; and

FURTHER ORDERED that because this is a final written decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

PETITIONER:

David Hoffman
FISH & RICHARDSON P.C.
hoffman@fr.com

Martha Hopkins
LAW OFFICES OF S. J. CHRISTINE YANG
mhopkins@sjclawpc.com

PATENT OWNER:

Vincent J. Rubino, III
Alfred R. Fabricant
Enrique W. Iturralde
Peter Lambrianakos
BROWN RUDNICK LLP
vrubino@brownrudnick.com
afabricant@brownrudnick.com
eiturralde@brownrudnick.com
plambrianakos@brownrudnick.com

US006003135A

# United States Patent [19]

**Bialick et al.**

[11] **Patent Number: 6,003,135**

[45] **Date of Patent: *Dec. 14, 1999**

[54] **MODULAR SECURITY DEVICE**

[75] Inventors: **William P. Bialick**, Clarksville, Md.; **Mark J. Sutherland**, Milpitas, Calif.; **Janet L. Dolphin-Peterson**, Belvedere, Calif.; **Thomas K. Rowland**, Los Gatos, Calif.; **Kirk W. Skeba**, Fremont, Calif.; **Russell D. Housley**, Herndon, Va.

[73] Assignee: **Spyrus, Inc.**, Santa Clara, Calif.

[ * ] Notice: This patent is subject to a terminal disclaimer.

[21] Appl. No.: **08/869,120**

[22] Filed: **Jun. 4, 1997**

[51] **Int. Cl.**[6] .......... **G06F 12/14**

[52] **U.S. Cl.** .......... **713/201**

[58] **Field of Search** .......... 395/186, 800, 395/188.01; 380/26, 4, 23, 25, 30, 49, 50; 235/492; 713/200, 201, 202

[56] **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,709,136 | 11/1987 | Watanabe | 235/379 |
| 4,910,776 | 3/1990 | Dyke | 380/25 |
| 5,191,611 | 3/1993 | Lang | 380/25 |
| 5,282,247 | 1/1994 | Mclean et al. | 380/4 |
| 5,297,206 | 3/1994 | Orton | 380/30 |
| 5,442,704 | 8/1995 | Holtey | 380/23 |
| 5,457,590 | 10/1995 | Barrett et al. | 360/133 |
| 5,473,692 | 12/1995 | Davis | 380/25 |
| 5,491,827 | 2/1996 | Holtey | 395/800 |
| 5,524,134 | 6/1996 | Gustafson et al. | 380/9 |
| 5,537,544 | 7/1996 | Morisawa | 395/188.01 |
| 5,546,463 | 8/1996 | Caputo et al. | 380/26 |
| 5,548,721 | 8/1996 | Denslow | 395/187.01 |
| 5,610,981 | 3/1997 | Mooney et al. | 380/25 |
| 5,630,174 | 5/1997 | Stone, III et al. | 395/883 |
| 5,640,302 | 6/1997 | Klkinis | 361/687 |
| 5,694,335 | 12/1997 | Hollenberg | 364/514 |
| 5,742,683 | 4/1998 | Lee et al. | 380/23 |
| 5,770,849 | 6/1998 | Novis et al. | 235/492 |
| 5,790,674 | 8/1998 | Houvener et al. | 380/23 |
| 5,828,832 | 10/1998 | Holden et al. | 713/201 |
| 5,878,142 | 3/1999 | Caputo et al. | 380/25 |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| WO 82/03286 | 9/1982 | WIPO . |
| WO 97/29416 | 8/1997 | WIPO . |

OTHER PUBLICATIONS

U.S. application No. 08/869,305, Bialick et al., filed Jun. 4, 1997.

*Primary Examiner*—Joseph E. Palys
*Assistant Examiner*—Rijue Mai
*Attorney, Agent, or Firm*—David R. Graham

[57] **ABSTRACT**

The invention enables a modular, typically portable, device to communicate with a host computing device to enable one or more security operations to be performed by the modular device on data stored within the host computing device, data provided from the host computing device to the modular device (which can then be, for example, stored in the modular device or transmitted to yet another device), or data retrieved by the host computing device from the modular device (e.g., data that has been stored in the modular device, transmitted to the modular device from another device or input to the modular device by a person). In particular, the modular device can include a security module that is adapted to enable performance of one or more security operations on data, and a target module that is adapted to enable a defined interaction with a host computing device. The target module can be embodied by any of a variety of modules having different types of functionality (e.g., data storage, data communication, data input and output, user identification). The modular device can also be implemented so that the security operations are performed in-line, i.e., the security operations are performed between the interface of the host computing device to the modular device and the external communications interface of the target module. Moreover, the modular device can be implemented so that the security functionality of the modular device is transparent to the host computing device.

**58 Claims, 10 Drawing Sheets**






FIG. 1
(PRIOR ART)




FIG. 2
(PRIOR ART)


300
Host Computing Device
301
303
Modular Device
Security
302
302a

FIG. 3A


311
313
312

FIG. 3B


400
Security
Module
401
Target
Module
402

FIG. 4A


410
414a
411
412
413
414b

FIG. 4B


500
501
User connects modular device to host computing device.
502
Host computing device detects presence of modular device.
503
Modular device establishes its identity.
504
Host computing device identifies modular device.
505
User interacts with host computing device to begin using modular device.

FIG. 5


616
617
μP
I/O
618
617a
612
612b
619
620
610
612a
I/O
614
μP
I/O
613
611
615
602
604
606
606b
606a
601
I/O
608
609
605
μP
I/O
607
603a
603b

FIG. 6

FIG. 7


FIG. 7A
FIG. 7B
700
701
Request host to execute security device driver.
702
Does the modular device include the proper security module?
No
Yes
703
Is use of security operations required or requested?
No
Yes
704
Has an acceptable user access and/or identification code been entered?
No
Yes
705
Select mode of operation.
Security Only
Security and Target Module
Target Module Only

FIG. 7A


706
Input all instructions regarding use of security operations for a transaction.
710
Input all instructions regarding use of security operations for a transaction.
707
Input all instructions regarding use of target module for this transaction.
711
Input all instructions regarding use of target module for this transaction.
714
Input all instructions regarding use of target module for this transaction.
Execute transaction.
708
Execute transaction.
712
Execute transaction.
715
Yes
Another transaction?
709
No
Yes
Another transaction?
716
No
Yes
Adopt another personality ?
713
No
Yes
Use of security operations desired?
717
No
718
END

FIG. 7B


Target Module
50 pin Compact Flash I/F
807
flash
803
RAM
804
801
CPU
RTC
805
FPGA
802
local bus
PCMCIA Bus
800
68 pin PCMCIA I/F
806
Host Computing Device

FIG. 8


Host
Interface
806
Cryptographic
Processing
Device
Interface
808
802
Target Module
Interface
807

FIG. 9A


PCMCIA INTERFACE
PCMCIA I/O CNTLR
PCMCIA ADDR BUFFER
PCMCIA DATA BUFFER
BUF EN
8
18
16
RDY/BSY REGISTER
RDY/BSY
COMMAND DETECTOR
COMPACT FLASH SECTOR CNTR
I/O CNTROL
ADDRESS
DATA
18
16
STATE CNTLR
LOCAL CONTROL
LOCAL DATA
16
LCL ADDRESS
12
CRYPTO PROCESSOR INTERFACE
COMPACT FLASH I/O CONTROL
COMPACT FLASH DATA BUFFER
CARD ENABLE DCDR
CONFIG REGISTERS
COMPACT FLASH INTERFACE
910
911

FIG. 9B

# MODULAR SECURITY DEVICE

## CROSS-REFERENCE TO RELATED APPLICATION

This application is related to the commonly owned, copending U.S. patent application entitled "Peripheral Device With Integrated Security Functionality," by William P. Bialick, Mark J. Sutherland, Janet L. Dolphin-Peterson, Thomas K. Rowland, Kirk W. Skeba and Russell D. Housley, filed on the same date as the present application and having Ser. No. 08/869,305, the disclosure of which is incorporated by reference herein.

## BACKGROUND OF THE INVENTION

1. Field of the Invention

This invention relates to a modular, typically portable, device (as well as the methods employed by such a modular device, and systems including such a modular device and a host computing device with which the modular device communicates) that can communicate with a host computing device to enable one or more security operations to be performed by the modular device on data stored within the host computing device, data provided from the host computing device to the modular device, or data retrieved by the host computing device from the modular device.

2. Related Art

Computing capability is becoming increasingly portable. In particular, there are more and more portable peripheral devices that are adapted for communication with a host computing device (e.g., desktop computer, notebook computer or personal digital assistant) to enable particular functionality to be achieved. These portable peripheral devices can take a variety of physical forms (e.g., PCMCIA cards, smart cards, CD-ROMs) and can perform an assortment of functions (e.g., storage, communications and cryptography).

However, while portable computing affords a number of advantages, it has a significant disadvantage in that the computational environment (including the portable peripheral devices, the host computing devices in which they are used, and any other computational devices that communicate with those devices) is more susceptible to security breaches, i.e., unauthorized access to, or modification of, programs and/or data resident within the environment. Consequently, cryptographic devices and methods have been developed for use with such computational environments (as well as other computational environments) to enable increased levels of environment security to be obtained.

FIG. **1** is a block diagram of a prior art system for enabling a host computing device to provide secured data to, and retrieve secured data from, a portable device. In FIG. **1**, a system **100** includes a host computing device **101** and a portable device **102**. The host computing device **101** and portable device **102** are adapted to enable communication between the devices **101** and **102**. The host computing device **101** includes a security mechanism **101***a* (which can be embodied by appropriately configured hardware, software and/or firmware, such as, for example, a general purpose microprocessor operating in accordance with instructions of one or more computer programs stored in a data storage device such as a hard disk) which can be directed to perform one or more cryptographic operations.

In the system **100**, if it is desired to provide secured data from the host computing device **101** to the portable device **102**, the host computing device **101** causes the security



mechanism **101***a* to perform appropriate cryptographic operations on data before the data is transferred to the portable device **102**. Similarly, the host computing device **101** can receive secured data from the portable device **102** and perform appropriate cryptographic operations on the data to convert the data into a form that enables the data to be accessed and/or modified by a person who is authorized to do so.

A significant deficiency of the system **100** is that the security mechanism **101***a* is itself typically not adequately secure. It is commonly accepted that the components (including hardware, software and/or firmware) of most host computing devices are inherently insecure. This is because the system design of host computing devices is, typically, intentionally made open so that components made by different manufacturers can work together seamlessly. Thus, an unauthorized person may obtain knowledge of the operation of the security mechanism **101***a* (e.g., identify a cryptographic key), thereby enabling that person to gain access to, and/or modify, the (thought to be secured) data.

FIG. **2** is a block diagram of another prior art system for enabling a host computing device to provide secured data to, and retrieve secured data from, a portable device. In FIG. **2**, a system **200** includes a host computing device **201**, a portable device **202** and a security device **203**. The host computing device **201**, the portable device **202** and security device **203** are adapted to enable communication between the devices **201** and **202**, and between the devices **201** and **203**. The security device **203** includes appropriately configured hardware, software and/or firmware which can be directed to perform one or more cryptographic operations.

In the system **200**, if it is desired to provide secured data from the host computing device **201** to the portable device **202**, the host computing device **201** first causes data to be transferred to the security device **203**, where appropriate cryptographic operations are performed on the data. The secured data is then transferred back to the host computing device **201**, which, in turn, transfers the secured data to the portable device **202**. Similarly, the host computing device **201** can receive secured data from the portable device **202** by, upon receipt of secured data, transferring the secured data to the security device **203**, which performs appropriate cryptographic operations on the data to convert the data into a form that enables the data to be accessed and/or modified by a person who is authorized to do so, then transfers the unsecured data back to the host computing device **201**.

The system **200** can overcome the problem with the system **100** identified above. The security device **203** can be constructed so that the cryptographic functionality of the device **203** can itself be made secure. (Such a security device is often referred to as a security "token.") An unauthorized person can therefore be prevented (or, at least, significantly deterred) from obtaining knowledge of the operation of the security device **203**, thereby preventing (or significantly deterring) that person from gaining access to, and/or modifying, the secured data.

However, the system **200** may still not always ensure adequately secured data. In particular, unsecured data may be provided by the host computing device **201** to the portable device **202** if the host computing device **201**—whether through inadvertent error or deliberate attack by a user of the host computing device **201**, or through malfunction of the host computing device **201**—fails to first transfer data to the security device **203** for appropriate cryptographic treatment before providing the data to the portable device **202**.

Additionally, the system **200** requires the use of two separate peripheral devices (portable device **202** and security device **203**) to enable the host computing device **201** to exchange secured data with the portable device **202**. For several reasons, this may be inconvenient. First, both devices **202** and **203** may not be available at the time that it is desired to perform a secure data exchange (e.g., one may have been forgotten or misplaced). Second, even if both devices **202** and **203** are available, it may not be possible to connect both devices **202** and **203** at the same time to the host computing device **201**, making use of the devices **202** and **203** cumbersome and increasing the likelihood that unsecured data is provided by the host computing device **201** to the portable device **202**.

## SUMMARY OF THE INVENTION

A modular device according to the invention can be used to communicate with a host computing device to enable one or more security operations to be performed by the modular device on data stored within the host computing device, data provided from the host computing device to the modular device (which can then be, for example, stored in the modular device or transmitted to yet another device), or data retrieved by the host computing device from the modular device (e.g., data that has been stored in the modular device, transmitted to the modular device from another device or input to the modular device by a person). In particular, the modular device can include a security module that is adapted to enable performance of one or more security operations on data, and a target module that is adapted to enable a defined interaction with a host computing device. The target module can be embodied by any of a variety of modules having different types of functionality (e.g., data storage, data communication, data input and output, user identification), as described further below. The modular device can be implemented so that the modular device can be operated in any one of multiple user-selectable modes: a security functionality only mode, a target functionality mode, and a combined security and target functionality mode. The modular device can also be implemented so that the security operations are performed in-line, i.e., the security operations are performed between the interface of the host computing device to the modular device and the external communications interface of the target module. Moreover, the modular device can be implemented so that the security functionality of the modular device is transparent to the host computing device.

A modular device according to the invention can advantageously enable application of security operations to a wide variety of interactions with a host computing device. In particular, a modular device according to the invention can accomplish this without necessity to use multiple peripheral devices that each include security functionality in addition to the primary functionality of the peripheral device. This can, for example, facilitate use of peripheral devices having security capability that operate in a predictable, reliable and consistent (yet secure) manner, since a single security module can be used to provide security to multiple types of interaction with a host computing device. This can also enable ease and flexibility in use of secure peripheral devices, since the same security module can be used with a variety of target modules. Moreover, the provision of in-line security in a modular device according to the invention enables a more secure exchange of data between a host computing device and the modular device, overcoming the problems identified above in previous systems for performing security operations on data exchanged between such devices. Additionally, implementing a modular device according to the invention so that the performance of security operations by the modular device is transparent can reduce or eliminate the need to modify aspects of the operation of the host computing device (e.g., device drivers of the host computing device), making implementation and use of a data security system including the modular device simpler and easier. Thus, the possibility that a user will use the system incorrectly (e.g., fail to apply security operations to an interaction with the host computing device, or apply the security operations incorrectly or incompletely) is reduced. Making the security operations transparent can also enhance the security of those operations.

In one embodiment of the invention, a modular device that is adapted to enable communication with a host computing device includes a security module and a target module that are constructed so that the modules can physically engage with one another, as well as communicate with each other. The target module is adapted to enable a defined interaction with a host computing device (examples of which are given below). The security module is adapted to enable performance of one or more security operations on data. The target module can be embodied, for example, as a memory module adapted to enable non-volatile storage of data (e.g., a module including a solid-state disk storage device such as a compact flash memory device), a communications module adapted to enable communication between the host computing device and a remote device (e.g., a modem module or a LAN transceiver module), a biometric module (e.g., a fingerprint scanning module, a retinal scanning module, a faceprint scanning module), or a smart card reader module adapted to communicate with a smart card. In a further particular embodiment of the modular device, the security module is adapted to enable communication with a host computing device. In another further particular embodiment, the modular device is further adapted to enable provision of the type of a target module to a host computing device in response to a request from the host computing device for information regarding the type of the modular device.

In another embodiment of the invention, a modular device includes a security module that is adapted to enable performance of one or more security operations on data, and a target module that is adapted to enable a defined interaction with a host computing device (such as the interactions discussed above with respect to exemplary embodiments of the target module of the previously discussed embodiment of the invention). The security and target modules are adapted so that the modules can communicate with each other. However, only the security module is enabled to communicate directly with the host computing device. In a further particular embodiment of the modular device, the security module is further adapted to enable provision of the type of a target module to a host computing device in response to a request from the host computing device for information regarding the type of the modular device.

In yet another embodiment of the invention, a modular device that is adapted to enable communication with a host computing device, and that includes a security module that is adapted to enable performance of one or more security operations on data and a target module that is adapted to enable a defined interaction with a host computing device, is further adapted to enable provision of the type of a target module to a host computing device in response to a request from the host computing device for information regarding the type of the modular device. As with the previously discussed embodiments of the invention, the target module can be embodied by any of a variety of modules.

In still another embodiment of the invention, a modular device that is adapted to enable communication with a host computing device, and that includes a security module that is adapted to enable performance of one or more security operations on data and a target module that is adapted to enable a defined interaction with a host computing device, is further adapted to enable the security module and/or the target module to be operably connected to the host computing device in response to an instruction from the host computing device. As with the previously discussed embodiments of the invention, the target module can be embodied by any of a variety of modules.

In another embodiment of the invention, a security module is adapted to enable communication with a host computing device, performance of one or more security operations on data, and communication with a target module that is adapted to enable a defined interaction with a host computing device. The security module can also be adapted to enable physical engagement with the target module. Additionally, the security module can be adapted to enable communication with a target module to obtain information from the target module that can be used to identify the type of the target module. Such a security module can further be adapted to enable provision of the information to a host computing device in response to a request from the host computing device for information regarding the type of the device of which the security module is part.

In yet another embodiment of the invention, a data security system includes a host computing device and a modular device including a security module. The host computing device and the security module are adapted to enable communications with each other. The security module is also adapted to enable performance of one or more security operations on data, and communication with a target module that is adapted to enable a defined interaction with a host computing device. In a further particular embodiment of the system, the modular device further includes a target module which is adapted to enable communication with a security module, as well as to enable a defined interaction with a host computing device (examples of which are discussed above with respect to exemplary embodiments of the target module of previously discussed embodiments of the invention). In another further particular embodiment of the system, the security module is further adapted to enable communication with a target module to obtain information from the target module that can be used to identify the type of the target module, and subsequent provision of the information to a host computing device in response to a request from the host computing device for information regarding the type of the modular device.

In still another embodiment of the invention, a method for use in a modular device adapted for communication with a host computing device, the modular device including a security module and a target module, includes the steps of receiving a request from the host computing device for information regarding the type of the modular device, and providing the type of the target module to the host computing device in response to the request. In a further particular embodiment of the method, the method includes the step of controlling the security module to communicate with the target module so as to obtain information from the target module that can be used to identify the type of the target module. This last step can be particularly advantageous when used with a modular device in which only the security module can communicate directly with the host computing device, since the method allows the presence of the security module to be masked from the host computing device.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a block diagram of a prior art system for enabling a host computing device to provide secured data to, and retrieve secured data from, a portable device.

FIG. **2** is a block diagram of another prior art system for enabling a host computing device to provide secured data to, and retrieve secured data from, a portable device.

FIG. **3**A is a block diagram of a system according to the invention.

FIG. **3**B is a perspective view of a physical implementation of the system of FIG. **3**A, according to one embodiment of the invention.

FIG. **4**A is a block diagram of a modular device, according to one embodiment of the invention, including a security module and a target module that, together, can embody the modular device of the system of FIG. **3**A.

FIG. **4**B is a plan view of a modular device that represents a physical implementation, according to one embodiment of the invention, of the modular device of FIG. **4**A.

FIG. **5** is a flow chart of a method, according to an embodiment of the invention, for initiating use of a system according to the invention.

FIG. **6** is a block diagram of a system, according to an embodiment of the invention, illustrating operation of the system during a method according to the invention as in FIG. **5**.

FIG. **7** is a flow chart of a method, according to an embodiment of the invention, for using a modular device according to the invention.

FIG. **8** is a block diagram of a security module according to one embodiment of the invention.

FIG. **9**A is a block diagram illustrating the flow of data through the interface control device of FIG. **8**.

FIG. **9**B is a block diagram of a particular embodiment of an interface control device for use in a security module according to the invention.

## DETAILED DESCRIPTION OF THE INVENTION

FIG. **3**A is a block diagram of a system **300** according to the invention. The system **300** includes a host computing device **301** and a modular device **302** that communicate via a communications interface **303**. The modular device **302** includes at least a security module **302***a* that enables security operations (examples of which are described in more detail below) to be performed on data that is stored within the host computing device **301**, data that is transmitted from the host computing device **301** to the modular device **302**, or data that is transmitted from the modular device **302** to the host computing device **301**. As explained in more detail below, such a modular device can also include a target module for providing additional functionality to a system according to the invention, such as, for example, a memory module (e.g., a module including a compact flash memory device), a communications module (e.g., a module including a modem or a LAN transceiver), a biometric module (e.g., a module including a fingerprint scanning device, a retinal scanning device, or a faceprint scanning device) or a smart card reader module.

Generally, the communications interface **303** can be any embodied by any of a variety of communication interfaces, such as a wireless communications interface, a PCMCIA interface, a smart card interface, a CD-ROM interface, a serial such as an RS-232 interface, a parallel interface, or a

SCSI interface. Each embodiment of the communications interface **303** includes hardware present in each of the host computing device **301** and modular device **302** that operates in accordance with a communications protocol (which can be embodied, for example, by software stored in a memory device and/or firmware that is present in the host computing device **301** and/or modular device **302**) appropriate for that type of communications interface, as known to those skilled in the art. Each embodiment of the communications interface **303** also includes mechanisms to enable physical engagement, if any, between the host computing device **301** and modular device **302**.

Generally, the security module **302***a* can be configured to perform any electronic data security operation (herein, referred to simply as a "security operation") including, for example, operations that provide one or more of the basic cryptographic functions, such as maintenance of data confidentiality, verification of data integrity, user authentication and user non-repudiation. Particular security operations that can be implemented in a modular device according to the invention are described in more detail below.

The security module **302***a* can be, for example, a security token. Herein, "security token" refers to a device that performs security operations and that includes one or more mechanisms (such as, for example, use of a hardware random number generator and/or protected memory) to provide security for the content of those operations.

FIG. **3**B is a perspective view of a physical implementation of the system **300** of FIG. **3**A, according to one embodiment of the invention. In FIG. **3**B, the modular device **302** is embodied as a card **312** that can be inserted into a corresponding slot **313** formed in a portable computer **311** that, in FIG. **3**B, embodies the host computing device **301**.

FIG. **4**A is a block diagram of a modular device **400**, according to one embodiment of the invention, including a security module **401** and a target module **402** that, together, can embody the modular device **302** of the system **300** of FIG. **3**A. (Note, though, that it is possible, as explained in more detail below, to use the modular device **400** with only the security module **401**.) The security module **401** and target module **402** are physically separate devices that can be physically and electrically joined (as described further below) to enable communication between the modules **401** and **402**.

The modular device **400** can have a number of advantageous characteristics. The modular device **400** can be implemented in a manner that enables the security operations to be performed in a manner that is transparent to a host computing device (and, depending upon the particular implementation of the modular device **400**, to a user of a system including the modular device **400**) of a system according to the invention, so that the host computing device (and, perhaps, user) is aware only of the presence of the functionality associated with the target module **402**. Additionally, the modular device **400** can be implemented so that security operations are performed "in-line," i.e., the security operations are performed between the interface of the host computing device to the modular device **400** and the external communications interface of the target module **402**. Further, the modular device **400** enables a wide variety of secure target module functionality to be easily provided to a host computing device.

FIG. **4**B is a plan view of a modular device **410** that represents a physical implementation, according to one embodiment of the invention, of the modular device **400** of FIG. **4**A. The modular device **410** includes a first module **411** and a second module **412**. A connector **413** is formed at one end of the first module **411**. Opposite the connector **413**, two opposing arms **414***a* and **414***b* extend from the first module **411**, forming a recess therebetween. The second module **412** has a size such that the second module **412** can fit into the recess between the arms **414***a* and **414***b* of the first module. When the second module **411** is inserted into the recess of the first module **410**, the modules **410** and **411** can be physically engaged with, or attached to, each other. Such engagement or attachment can be accomplished in any appropriate manner. For example, a friction fit between corresponding pins and sockets formed on the modules **410** and **411** can be used to hold the modules **410** and **411** in place with respect to each other (the pins and sockets can also enable electrical communication between the modules). The modular device **410** can have a size and shape such that the modular device **410** can be inserted into a Type II PCMCIA card slot, and the connector **413** can conform physically to the specification for Type II PCMCIA cards, so that the modular device **410** can be inserted into a Type II PCMCIA card slot of a host computing device to enable communication between the host computing device and the modular device **410**.



In general, either of the first module **411** or second module **412** can be a security module and the other can be a target module. However, since as shown in FIG. **4**B and described above, the connector **413** makes connection to the host computing device, it is preferable that the first module **411** be the security module and the second module **412** be the target module to facilitate implementation of the in-line security aspect of the invention.

FIG. **5** is a flow chart of a method **500**, according to one embodiment of the invention, for initiating use of a system according to the invention. The method **500** enables an aspect of the invention in which the presence of a security module as part of a modular device is not detected by a host computing device, thus making the security operations performed by the security module transparent to the host computing device and, depending upon the particular manner in which the security module is implemented, to a user of the system.

FIG. **6** is a block diagram of a system **600**, according to an embodiment of the invention, illustrating operation of the system **600** during a method according to the invention such as the method **500** of FIG. **5**. The system **600** includes a host computing device **601** and a modular device **602**. The modular device **602** includes a security module **610** and a target module **620**. The host computing device **601** includes a display device **603***a* (e.g., a conventional computer display monitor) and user input device **603***b* (e.g., a keyboard, mouse, trackball, joystick or other appropriate device), referred to collectively hereinafter as user interface device **603**. The host computing device **601** also includes, mounted within a housing **604**, a processing device **605**, a memory device **606**, an input/output (I/O) device **607** for enabling communication with the user interface device **603**, and an input/output (I/O) device **608** for enabling communication with modular device **602**. The devices **605**, **606**, **607** and **608** can each be implemented by conventional such devices and can communicate with each other via a conventional computer bus **609**, as is well known and understood. The security module **610** of the modular device **602** includes a processing device **611**, a memory device **612**, an input/output (I/O) device **613** for enabling communication with the host computing device **601**, and an input/output (I/O) device **614** for enabling communication with the target module **620** of the

modular device **602**. The devices **611**, **612**, **613** and **614** can each be implemented by conventional such devices and can communicate with each other via a conventional computer bus **615**, as is well known and understood. The target module **620** of the modular device **602** includes a processing device **616**, a memory device **617**, and an input/output (I/O) device **618** for enabling communication with the security module **610**. The devices **616**, **617** and **618** can each be implemented by conventional such devices and can communicate with each other via a conventional computer bus **619**, as is well known and understood. The host computing device **601**, and the security module **610** and target module **620** of the modular device **602** are shown in simplified form in FIG. **6** to facilitate clarity in illustration of this aspect of the invention; as described in more detail below and as understood by those skilled in the art, the host computing device **601**, the security module **610** and the target module **620** can—and typically will—include other devices not shown in FIG. **6**.

Returning to FIG. **5**, use of a system according to the invention begins when, as shown by step **501**, a user of the system connects a modular device according to the invention to a host computing device. Such connection can occur in any manner that enables the modular device to communicate with the host computing device. Frequently, this will occur as a result of a physical connection of the modular device to the host computing device. (In general, such physical connection can occur either before or after the host computing device begins operating; however, in the former case, subsequent steps of the method **500**—with the exception of, depending upon the implementation of the modular device, the step **503**—cannot be performed until the host computing device begins operating.) For example, the modular device can be embodied in a card or disk (e.g., a card conforming to a PCMCIA form factor as established by the appropriate standard) that is inserted into a corresponding socket formed in the host computing device. Or, the modular device can be embodied in a housing from which a cord extends, a plug of the cord being inserted into a mating receptacle formed in the host computing device. However, such physical connection need not necessarily occur; the modular device can also be connected to the host computing device by any type of wireless communication for which the host computing device contains an appropriate interface.

Once connection between the modular device and the host computing device is made, the host computing device detects the presence of the modular device, as shown by step **502**. Such detection of the presence of a peripheral device is typically enabled as a standard aspect of the operating system software of the host computing device.

Typically, once the presence of a new peripheral device is detected by the operating system software of the host computing device, the operating system software (or companion software program) also identifies the type of the peripheral device. This can be accomplished, for example, by a standard software device driver (hereinafter, "host driver") for devices of the type that use the host computing device interface that is being used by the modular device **602**. In FIG. **6**, the host driver is shown stored in the memory section **606***a* of the memory device **606** of the host computing device **601**. (The Card Services or Socket Services programs that often are bundled with the Windows95™ operating system software for use in performing various "housekeeping" functions associated with a PCMCIA interface are examples of such drivers.) However, in the method **500**, before the operating system software can perform such identification, the modular device according to the invention suspends operation of this aspect of the operating system software, so that the modular device can establish its identity, as shown by step **503**, and explained further below. As will be apparent from that explanation, performance of the step **503** advantageously enables the modular device to assume the identity of the target module that is part of the modular device at that time. Since, as described elsewhere herein, a variety of types of target modules can be used as part of a modular device according to the invention, the modular device can take a variety of identities.

The particular manner in which operation of the operating system software is suspended so that the modular device can establish its identity can depend on the characteristics of the operating system software and/or the device interface. However, for many combinations of operating system software and device interface, the operating system software waits for confirmation that the device connected to the device interface is ready for further interaction with the operating system software before the operating system software seeks to identify the type of the device connected to the interface (the standard for PCMCIA interfaces, for example, specifies such operation). In such cases, the modular device can be configured to delay informing the operating system software that the modular device is ready for further interaction until the modular device has established its identity.

The following description of one way in which the step **503** can be implemented can best be understood by reference to the system **600** shown in FIG. **6**. One way in which the operating system software of a host computing device can identify the type of a peripheral device is to access a known memory section of a memory device of the peripheral device, as established by an interface standard developed for that type of peripheral device, that stores data representing the type of the peripheral device. This is true for a variety of types of peripheral devices, such as, for example, peripheral devices that conform to the PCMCIA standard. (The PCMCIA standard, for example, includes a specification, called the Card Information Structure, that defines, among other things, a location in a portion of memory of a PCMCIA card, denoted as "attribute memory", that stores data identifying the type of the PCMCIA card.) In the system **600**, the modular device **602** is such a device. Further, since the modular device **602** is configured so that the security module **610** communicates with the host computing device **601**, the memory section which the host computing device **601** seeks to access is in the memory device **612** of the security module **610**. This section is shown as the memory section **612***a* in FIG. **6** and the data stored therein is referred to herein as "modular device identification data."

Prior to use of the modular device **602** with the host computing device **601**, the data stored in the memory section **612***a* of the security module **610** is data that identifies the type (i.e., security device) of the security module **610** ("security module identification data"). Thus, initially, the modular device **602** is identified as a security device. However, in FIG. **6** (and in many other embodiments of a modular device according to the invention as well), the modular device **602** includes a target module **620**. According to the invention, and as explained in more detail below, the modular device **602** can be implemented so that the modular device **602** assumes the identity of the target module **620** rather than that of the security module **610**. This enables the host computing device **601** to interact with the modular device **602** as though the modular device **602** were a device of the type of the target module **620**, without recognizing that a security module **610** is present that may be performing security operations. Thus, the need to modify aspects of the

operation of the host computing device (e.g., the host device driver) is reduced or eliminated, making implementation and use of a data security system including the modular device **602** simpler and easier. Since use of the data security system is easier (e.g., a user need not provide input to cause the host driver to be appropriately tailored to enable desired interaction with a security device), the possibility that a user will use the system incorrectly (e.g., fail to apply security operations to an interaction with the host computing device, or apply the security operations incorrectly or incompletely) is reduced.

When the modular device **602** is connected to the host computing device **601** (e.g., step **501** of the method **500**), power is applied to the modular device **602**. Upon application of power to the modular device **602**, a startup program stored in the memory device **612** of the security module **610** of the modular device **602** begins to execute. This program can include instructions that cause the processing device **611** of the security module **610** to communicate via the I/O interface **614** with the target module **620** to ascertain the type of the target module **620**. Each target module to be used as part of a modular device according to the invention can be implemented so that data representing the type of that target module ("target module identification data") is stored at a particular memory section in a memory device of the target module. In FIG. **6**, this is shown by the memory section **617***a* in the memory device **617** of the target module **620**. Thus, the startup program executed on the security module **610** can include instructions to cause the processing device **616** of the target module **620** to access the memory section **617***a* in the memory device **617**, and transfer to the security module **610**, via the I/O interface **618**, the data representing the type of the target module **620**. When the target module identification data is transferred to the security module **610**, the data is stored in the memory section **612***a* which the host computing device operating system software will access to obtain the modular device identification data, thus resulting in identification of the modular device **602** by the host computing device **601** as a device of the type of the target module **620**.

Alternatively, the same result can be achieved by modifying the host driver so that the host driver accesses a different section of the memory **612** at which data representing the type of the target module is known to be stored. However, because the former approach does not necessitate modifying the host driver, the former approach may be preferable.

Though, as shown in FIG. **6**, the modular device **602** includes the security module **610** and target module **620**, the system **600** can also operate when the modular device **602** includes only the security module **610**, the modular device **602** being used in that case to enable security operations to be performed on data stored in the host computing device **601**. In such a case, when the modular device **602** establishes its identity to be supplied to the host computing device **601** (e.g., step **503** of the method **500**), such identity is established simply by retaining unchanged in the location **612***a* of the memory device **612** the information identifying the modular device **602** as a security device.

Before the target module identification data is stored in the memory section **612***a* of the memory device **612** of the security module **610**, the security module identification data is moved from the memory section **612***a* in the memory device **612** to a different, predefined memory section **612***b* of the memory device **612**. This enables the security module identification data to be accessed by the modular device driver (discussed below), so that the security functionality of the modular device can be used.

Returning to FIG. **5**, after the modular device has established its identity, the host computing device identifies the modular device, as shown by step **504**. This can be implemented as part of the host driver, as indicated above.

Once the host computing device has identified the modular device (and other host computing device operating system software operations concluded, if applicable), the user can begin using the modular device (in particular, the security functionality of the modular device), as shown by step **505** of the method **500**. Such use can be enabled by one or more software programs (referred to collectively hereinafter as a "modular device driver," though such programs can include programs in addition to those conventionally termed "drivers," such as programs conventionally termed "applications") that are executed by the host computing device.

The use of a separate driver to control and interact with the security functionality of a modular device according to the invention can be advantageous because it reduces or eliminates the need to modify the host driver. As a practical matter, such modification of the host driver can likely only be accomplished by requiring a user to interact with a standard host driver to appropriately modify the standard host driver. This is undesirable because the user may forget to modify the driver or modify the driver incorrectly or incompletely.

The modular device driver can have previously been installed on a data storage device (e.g., hard disk) of the host computing device (in FIG. **6**, the modular device driver is shown stored in the memory section **606***b* of the memory device **606** of the host computing device **601**), or can be made accessible to the host computing device via an appropriate interface (such as a floppy disk drive, CD-ROM drive or network connection) at a time when the user wishes to initiate interaction between the host computing device and the modular device. Additionally, when a modular device according to the invention is used with a host computing device which utilizes operating system software that supports the feature informally referred to as "plug and play", it is also possible to store the modular device driver in a memory device of the modular device and configure the modular device so that, when the modular device is connected for the first time to a particular host computing device, the host computing device automatically provides the user with the opportunity to instruct the host computing device to cause the modular device driver to be transferred from the modular device to the host computing device.

FIG. **7** is a flow chart of a method **700**, according to an embodiment of the invention, for using a modular device according to the invention. It is to be understood that the method **700** shown in FIG. **7** is not the only way to enable the aspects of use of a modular device according to the invention that are illustrated in FIG. **7**; as can be readily appreciated by those skilled in the art, such aspects can be implemented using any of a variety of other appropriate methods. Further, the use of a modular device according to the invention can include aspects not illustrated in FIG. **7**; likewise, such use may not include some of the aspects illustrated in FIG. **7**. The method **700** of FIG. **7** is shown merely to aid in the illustration of certain aspects of the invention, and should not be interpreted as restricting the manner in which a modular device according to the invention can be used.

To begin using a modular device according to the invention, a user instructs the host computing device to begin execution of the modular device driver, as shown by

step **701** of the method **700**, the user having obtained knowledge of the appropriate command to begin execution of the modular device driver in any appropriate manner (e.g., from a user manual accompanying the modular device driver and/or the modular device). In general, the steps of the method **700** occur as a result of operation of a modular device driver; however, operation of the host driver may be necessary or desirable to enable some aspects of the method **700** (e.g., execution of a transaction, as in steps **708**, **712** and **715**).

As indicated above, a modular device according to the invention can be implemented so that, when a target module is present as part of the modular device, the host driver cannot detect the presence of the security functionality of the modular device. In such case, the modular device driver enables the detection of the security functionality, as shown by step **702** of the method **700**. This can be accomplished by including instructions as part of the modular device driver that, when the modular device driver first begins executing, cause the modular device driver to access a predefined location of a memory device of the modular device (preferably, and as described above, a memory device of a security module of the modular device) for data that identifies whether the modular device is a device having security functionality that is compatible with the modular device driver. (In FIG. **6**, this is shown as the memory section **612***b*.) If the modular device is such a device, then the modular device driver can enable the user to make use of the security functionality of the modular device. Further, the modular device driver can be implemented, as shown in FIG. **7**, so that, if the proper security functionality is not detected, execution of the modular device driver terminates, preventing use of the modular device. Alternatively, the modular device driver can be implemented so that, if the proper security functionality is not detected, the functionality of a target module of the modular device can be used without the security functionality of the modular device.

A modular device according to the invention that includes a security module and a target module can, in general, be operated in one of three modes: 1) a mode in which only the functionality of the security module is used, 2) a mode in which the functionality of both the security and the target modules is used, and 3) a mode in which only the functionality of the target module is used. The user can be enabled to, via the modular device driver, select any one of the three modes of operation. However, in some applications, it may be desirable to inhibit operation in one or two of the modes. In particular, it may be desirable to prevent operation of the modular device in the last of the above-listed modes, i.e., a mode in which the security module is not used, if it is desired to ensure that use of the target module can only occur with the application of one or more security operations. This could be accomplished by implementing the modular device driver so that the option to operate in that mode is not presented to the user, or the modular device could be configured during manufacture to prohibit operation in that mode. For example, if the target module is a communications module or a memory module, it may be desirable to ensure that unencrypted data cannot be transferred via the communications module or stored on the memory module, whether done inadvertently or on purpose.

In the method **700**, all three of the above-listed modes are available for use. In the step **703** of the method **700**, a determination is made as to whether the security module is to be used. (As noted above, such use may be required.) If yes, the modular device is operated in one of the first two modes above (security functionality only, or security functionality plus target functionality); if no, the third mode is used (target functionality only).

The modular device driver can be implemented so that the user must successfully enter an acceptable access code (e.g., a password or PIN) before the user is enabled to use the modular device. In particular, it can be desirable to require an access code before enabling a user to use the security functionality, thus establishing a layer of security that protects the integrity of the security operations themselves. In the method **700**, as shown by the step **704**, an acceptable access code must be entered by the user before the security functionality of the modular device can be used. An access code can be entered, for example, by inputting the access code in a conventional manner using a user interface device (e.g., keyboard) of the host computing device. Or, an access code can be entered using a target module (such as a biometric module, discussed in more detail below) that is part of the modular device according to the invention.

Advantageously, an access code can be used not only to control access to the security (or other) functionality of the modular device, but also to identify a "personality" of the user. Each personality is represented by data that establishes certain characteristics of operation of the modular device, such as, for example, restrictions on operation of the modular device (e.g., limitations on the types of security operations that can be performed) or specification of operating parameters or characteristics (e.g., cryptographic keys or specification of a particular incarnation of a type of security algorithm, such as a particular encryption algorithm). A single user can have multiple personalities: each personality might, for example, correspond to a different capacity in which a user acts. Data representing personalities and corresponding user access codes can be stored in a memory device of the security module of the modular device.

Upon receipt of an acceptable access code, the modular device driver controls the host computing device to present a user interface that enables the user to effect desired control of the modular device, and, in particular, to use the modular device to perform security operations, as described below. (If access codes are also used to identify personalities, upon receipt of an acceptable access code, the modular device driver can also access and retrieve the data representing the corresponding personality, so that the operation of the modular device can be controlled accordingly.) The user interface for enabling a user to operate the modular device can be implemented in any of a variety of well known ways (e.g., as a graphical user interface) using methods and apparatus that are well known to those skilled in the art. Generally, the user interface enables the user to perform any functionality that is provided by the modular device, as described in more detail elsewhere herein.

As indicated above, a modular device according to the invention can be operated in any of three modes. Once an acceptable access code has been entered, the modular device driver can enable the user to select one of the three modes, as shown in step **705** of the method **700**. (Alternatively, as mentioned above, it may be desirable to present the user only with the option of choosing the security functionality only mode or the security functionality plus target functionality mode, so as to eliminate the possibility that the user will effect an unsecured use of the target module.) If the security functionality only mode, or the security functionality plus target functionality mode, is selected, then the user interface (and the underlying modular device driver) enables the user to input all desired or required instructions regarding the security operations to be performed for a particular "transaction" (e.g., a storage of data in a memory module, a

transmission of data by a communications module, or an exchange of data with a smart card reader module), as shown by steps **706** and **710** of the method **700**. For example, the user interface can enable the user to select data to which security operations are to be performed, specify the application of particular security operations to data, or specify parameters or other information required for a particular security operation. If the security functionality plus target functionality mode, or the target functionality only mode, is selected, then the user interface and modular device driver enable the user to input all desired or required instructions regarding use of the target module for the transaction, as shown by steps **707** and **711** of the method **700**. For example, if the target module is a memory module, the user interface can enable the user to specify a name for the stored data. Or, for example, if the target module is a communications module, the user interface can enable the user to specify a destination (e.g., an electronic mail address) for the data.

Once the user has provided instructions in steps **706** and **707**, in step **710**, or in step **711**, the transaction is executed, as shown by step **708** or step **712** of the method **700**. After execution of the transaction, the user can be allowed to execute further transactions, as shown by step **709** of the method **700**. It is also possible for the user to begin using another personality (by entering an appropriate access code), as shown by step **709** of the method **700**. Eventually, use of the modular device ends, as shown by step **718** of the method **700**.

As indicated above, the modular device and associated modular device driver can be implemented so that it is possible to use only the target functionality of the modular device, even without entering an appropriate access code. In the method **700**, such operation is shown by the steps **714**, **715** and **716**, which function in the same manner as steps **711**, **712** and **709**, described above. Using the modular device in this way can be useful, for example, when the target module is a biometric module, as described further below, that is used to perform user authentication. In particular, if the biometric module is to be used as the mechanism to enter the access code in step **704**, operation in this mode may be necessary (depending on the capabilities of the biometric module) to enable such use of the biometric module. (Of course, in this case, security functionality, i.e., user authentication, is used as part of the step **715**). The step **717** can also enable use of the security functionality to begin by causing a prompt for an appropriate access code to appear (step **704**). Again, eventually, use of the modular device ends (step **718**).

As described above, a modular device according to the invention that includes a security module and target module can be implemented so that the host computing device is not aware of the presence of the security module. It may also be desirable to shield the user from knowledge of the presence of the security module and cause predetermined security operations to be performed automatically. This may be desirable so that, for example, it is not necessary for the user to provide input regarding the performance of security operations, thus eliminating the possibility that the user will neglect to provide such input, or will provide the input incorrectly or incompletely. Or, it may be desirable to make security operations transparent to users to enhance the security of those operations, since, if the performance of such operations is unknown, there will be no attempt to defeat the security provided by those operations. If such is the case, the modular device driver can be implemented so that the modular device can operate only in the security functionality plus target functionality mode (steps **710**, **711**, **712**, **714**, **715**, **716** and **717** of the method **700** cannot be performed) and so that no indication (e.g., presentation of a user interface display that allows input of instructions regarding the performance of security operations, as in step **706** of the method **700**) is given of the presence of the security functionality of the modular device. Rather, the user would simply be presented with options regarding operation of the target module (step **707** of the method **700**). In such an implementation, the modular device driver can be implemented to automatically cause one or more predetermined security operations to be performed based upon a user-specified interaction with the target module, or the modular device can be configured to cause such security operations to be performed any time a specified interaction with the target module occurs.



A significant advantage of a modular device according to the invention is that the modular device can be implemented so that any of a variety of types of target modules can be included as part of the modular device. In particular, as described in more detail below, the security module includes an interface control device which enables and manages communications between and among the host computing device, a cryptographic processing device that is part of the security module, and a target module. The interface control device, together with a target module I/O interface, provides a uniform interface with which each target module communicates. Thus, in general, a target module having any desired functionality can be used with a modular device according to the invention, so long as the target module is implemented so as to enable communication with an interface of the type presented by the security module. Those skilled in the art of data communications can readily understand how to implement such communication in a target module in view of the detailed description below (see FIGS. **8**, **9**A and **9**B) of an embodiment of a security module according to the invention, and, in particular, an interface control device of such a security module.

For example, a target module of a modular device according to the invention can be embodied as a memory module adapted to enable non-volatile storage of data. In general, any such memory module can be used as a target module. More particularly, a memory module including a solid-state disk storage device (e.g., NAND flash memory device) can advantageously be used. Illustratively, a memory module that can be used as a target module in a modular device according to the invention can include a compact flash memory device, such as an ATA format flash disk drive. Other solid-state disk storage devices, such as SCSI disks and IDE disks can be used. The construction and operation of memory devices in general, as well as those identified particularly above, is well understood by those skilled in that art, so that, together with an understanding of the required communication capability between the target module and the security module, a memory module for use with the invention can be easily constructed and operated. A modular device according to the invention that includes a memory module as a target module can be used, for example, to securely store data in a manner that enables a user of the data to easily carry the data with them wherever they go.

A target module of a modular device according to the invention can also be embodied as a communications module adapted to enable communication between the host computing device and a remote device. In general, any such communications module can be used as a target module. A communications module that can be used as a target module in a modular device according to the invention can include,

for example, a data communications modem (such as, for example, a conventional telephone line modem, ISDN modem, a cable modem, or a wireless modem) or a LAN transceiver (either wired or wireless and, in the latter case, operating in, for example, the infrared or radiofrequency spectrum). The construction and operation of communication devices in general, as well as those identified particularly above, is well understood by those skilled in that art, so that, together with an understanding of the required communication capability between the target module and the security module, a communication module for use with the invention can be easily constructed and operated. A modular device according to the invention that includes a communications module as a target module can be used, for example, to encrypt electronic mail before transmission to an addressee. Or, such a modular device can be used, for example, to encrypt data files that a person wishes to securely transfer between a computing device at the person's place of work and a computing device at the person's home.

A target module of a modular device according to the invention can also be embodied as a biometric module, which is defined herein as any module that is adapted to receive input data regarding a physical characteristic of a person based upon a physical interaction of the person with the module. In general, any such biometric module can be used as a target module. Biometric modules that can be used in a modular device according to the invention can include, for example, a fingerprint scanning device, a retinal scanning device or a faceprint scanning device.

In addition to conventional computational devices for storing and/or manipulating digital data, a biometric module includes a sensor for sensing the physical characteristic, and an analog-to-digital converter to transform the analog data representing the sensed characteristic into digital data. For example, a fingerprint scanning module includes a sensor upon which a person can place a finger, the sensor sensing the fingerprint of the finger, the content of the sensed fingerprint being converted into digital data by the module. Similarly, a retinal scanning module includes a sensor which can be placed proximate to a person's eye, the sensor sensing characteristics of the eye such as blood vessel pattern or iris pattern, the module translating the content of the sensed characteristics into digital data. The construction and operation of biometric devices in general, as well as those identified particularly above, is well understood by those skilled in that art, so that, together with an understanding of the required communication capability between the target module and the security module, a biometric module for use with the invention can be easily constructed and operated. Fingerprint scanning devices and retinal scanning devices that can readily be modified for use with the invention, i.e., to communicate with a security module according to the invention, are known to those skilled in that art. For example, fingerprint scanning devices such as those available from Identix Incorporated of Sunnyvale, Calif. can be used in a fingerprint scanning module for use with the invention.

A modular device according to the invention that includes a biometric module as a target module can be used, for example, to enable user authentication to a host computing device before allowing access to particular data stored on the host computing device. Such user authentication can be accomplished by using a biometric module to obtain biometric data from a user, transmitting the user's biometric data to a security module, and comparing the biometric data to an appropriate library of biometric data representing a predetermined group of people (e.g., authorized users). The library of data can be stored in a memory device of the security module.

When a modular device including a fingerprint scanning module is embodied as a card adapted to be inserted into a slot of a host computing device, it may be useful to make the fingerprint scanning module relatively long, so that a portion of the card on which the sensor is positioned can extend from the slot of the host computing device, thereby enabling fingerprints to be scanned while the modular device is inserted in the host computing device. Similarly, for a fingerprint scanning module, retinal scanning module or faceprint scanning module, it may be desirable to form the module so that the sensor is connected to the remainder of the module via an appropriate communication line, thus providing some range of movement of the sensor while the modular device is inserted in the host computing device, thereby facilitating use of the module.

A biometric module can be used in different ways with a system according to the invention, depending upon the capabilities of the biometric module. Using known apparatus and methods, a "smart" biometric module can be implemented with the capability to detect the presence of an input to the sensor, and, upon such detection, initiate acquisition of the biometric data, transfer of the data to the security module, and performance by the security module of the appropriate data comparison. Such a biometric module can be used to perform user authentication as in step **704** of the method **700** above. Alternatively, the biometric module may be "stupid" and require that a user initiate the data acquisition and authentication process. Such a biometric module can be used to perform user authentication in a modular device that allows operation without entry of a proper access code, as in steps **714** and **715** of the method **700**.

A target module of a modular device according to the invention can also be embodied as a smart card reader module adapted to communicate with a smart card such as, for example, a smart card compliant with the ISO 7816 standard. Such a module can be implemented by adapting a conventional smart card reader, the construction and operation of which is well known to those skilled in that art, to provide a communications interface that enables the smart card reader to communicate with the security module. A modular device according to the invention that includes a smart card reader module can be used to provide security features to a smart card reader, or add to existing security features of a smart card reader.

As indicated elsewhere herein, a modular device according to the invention can also be used with a host computing device when the modular device includes only a security module, such a situation capable of being detected as described above. In that case, the modular device can be used to, for example, encrypt or decrypt data stored on the host computing device by receiving the data from the host computing device, encrypting or decrypting the data as appropriate, then returning the encrypted or decrypted data to the host computing device. (It can also be possible to use only the security module, in the manner just indicated, of a modular device that includes a target module.)

It is to be understood that the examples given above are merely illustrative, not exhaustive, of the ways in which a modular device according to the invention can be used. Many more possibilities exist.

FIG. **8** is a block diagram of a security module **800** according to one embodiment of the invention. The security module **800** includes a cryptographic processing device **801**, an interface control device **802**, a first memory device **803**,

a second memory device **804**, a real-time clock **805**, a host computing device input/output (I/O) interface **806** and a target module input/output (I/O) interface **807**.

The host computing device I/O interface **806** and the target module I/O interface **807** enable communications between the security module **800** and a host computing device, and security module **800** and a target module, respectively. The electrical and mechanical characteristics of the I/O interfaces **806** and **807**, as well as the protocols used to enable communication via the interfaces **806** and **807**, are established in any manner that conforms to the industry standard specifications for an interface of that type. For example, a modular device according to the invention can be adapted for insertion into a PCMCIA slot of a host computing device. In such a modular device, the electrical and mechanical characteristics and protocol for the host computing device I/O interface **806** are established in conformance with the appropriate PCMCIA standards. Similarly, a modular device according to the invention can include a target module that is a compact flash memory module. In such a modular device, the electrical and mechanical characteristics and protocol for the target module I/O interface **807** are established in conformance with the appropriate compact flash interface standards.

The cryptographic processing device **801** can be adapted to perform security operations. Generally, the cryptographic processing device **801** can be embodied by any processor capable of performing the cryptographic operations desired to be provided by the security module **800**. In one embodiment of the security module **800**, the cryptographic processing device **801** is a special purpose embedded processor, embodied on a single integrated chip and designated as MYK-82 (and also referred to by the name Capstone), which includes an ARM6™ processor core and several special purpose cryptographic processing elements that have been developed by the Department of Defense. The construction and operation of the Capstone chip is known by those skilled in the art of cryptographic processing.

The first memory device **803** can be a non-volatile data storage device which can be used to store computer programs and persistent data. The first memory device **803** can be implemented by any appropriate such device (of which there are many conventional, readily available incarnations), such as, for example, a conventional flash memory device.

The second memory device **804** can be a volatile data storage device that can also be a rapidly accessible data storage device in which frequently used data and program instructions can be stored during operation of the security module **800**. The second memory device **804** can also be implemented by any appropriate such device (of which there are many conventional, readily available embodiments), such as, for example, a conventional random access memory (RAM) device.

The real-time clock **805** enables the creation of time stamps, which can be used in a number of security operations. Advantageously, the time stamps created by the real-time clock **805** are more secure than those that could otherwise be produced by the relatively insecure clock of a host computing device. The real-time clock **805** includes a conventional battery backup device that maintains power to the real-time clock **805** when the security module **800** is not in use (i.e., when power is not supplied to the security module **800**), so that the correct time is continuously preserved within the security module **800**. The real-time clock **805** (including battery backup) can be embodied by any conventional such device, such as the DS1302 clock available from Dallas Semiconductor of Dallas, Tex.



In the security module **800**, the interface control device **802** mediates the interaction between the host computing device, the target module and the cryptographic processing device **801**. In one embodiment of the security module **800**, the interface control device **802** is a conventional field-programmable gate array (FPGA) that is programmed to perform the functions that it is desired to implement with the interface control device **802**, as described in more detail below. The interface control device **802**, under control of the cryptographic processing device **801**, can be adapted to enable the modular device to assume the identity of the target module, as discussed above. The interface control device **802** also enables the in-line cryptography aspect of the invention, since the interface control device **802** controls the flow of data between the host computing device and the target module.

FIG. **9**A is a block diagram illustrating the flow of data through the interface control device **802** of FIG. **8**. Data transferred from a host computing device enters the security module **800** (not demarcated in FIG. **9**A) through the host computing device I/O interface **806**. The interface control device **802** presents the data to a cryptographic processing device interface **808** (not shown in FIG. **8**). Depending on the configuration of the interface control device **802**, as determined by operation of the modular device driver and/or by settings established during the manufacture of the security module **800**, the data may or may not be processed by the cryptographic processing device **801** (FIG. **8**). Typically (or, in some cases, necessarily), as discussed in more detail above, cryptographic processing will occur. The interface control device **802** then causes the data to be transferred to the target module I/O interface **807**, the data exiting the security module and being transferred to the target module. Data being transferred from the target module to the host computing device follows a similar path in the reverse direction. When the target module is not present or is not being used, data transferred from the host computing device, after being presented to the cryptographic processing device interface **808** and being processed by the cryptographic processing device **801**, is caused to be transferred back to the host computing device I/O interface **806** (and, from there, to the host computing device) by the interface control device **802**.

FIG. **9**B is a block diagram of a particular embodiment of an interface control device **910** for use in a security module according to the invention. As shown in FIG. **9**B, the host computing device communicates via a PCMCIA interface and the target module is a compact flash memory device. Those skilled in the art will readily appreciate how the interface control device **910** can be modified for use with other host computing device interfaces and/or target modules.

The interface control device **910** includes sets of configuration registers **911**. The data stored in the configuration registers **911** establish operating characteristics of the interface control device: in particular, the content of the configuration registers enables the interface control device to present to the host computing device a desired identification of the modular device, and determines whether data passing through the security module must be subjected to security operations.

A set of configuration registers is maintained for the host computing device I/O interface, the cryptographic processing device interface, and the target module interface. In particular, the content of the host computing device I/O interface configuration registers is such that the interaction of the host computing device with the modular device is the

same as if the security functionality were not present (unless the data security system is operating in security functionality only mode). The content of the target module interface registers reflects the presence of the security functionality. The cryptographic processing device interface registers bridge the gap between the other two sets of registers.

The remainder of the functional blocks of the interface control device **910** shown in FIG. **9**B perform functions and operate in a manner that can readily be understood by those skilled in the art from the designation and interconnection of those blocks in FIG. **9**B.

In general, the security mechanism (e.g., security module) of a modular device according to the invention can be configured to perform any cryptographic operation, as well as other, related mathematical operations. A configuration of the security mechanism that enables a particular cryptographic or mathematical operation can be produced, for example, by using appropriate existing cryptographic software, application-specific hardware, or combination of the two, as known by those skilled in the art of producing cryptographic devices. Following is a description of exemplary cryptographic and mathematical operations that can be implemented as part of a security mechanism of a modular device according to the invention. These cryptographic and mathematical operations are well-known and can readily be implemented in a modular device according to the invention by a person of skill in the art of cryptography.

For example, a modular device according to the invention can implement one or more cryptographic key exchange operations. Any key exchange operation can be implemented, such as, for example, the Department of Defense Standard, the RSA, the Diffie-Hellman, and the X9.42 (ANSI Banking Standard) key exchange algorithms.

A modular device according to the invention can also implement one or more hash operations. Any hash operation can be implemented, such as, for example, the FIPS **180-1** (SHA-**1**), the Message Digest **2** (RSA), and the Message Digest **5** (RSA) algorithms.

A modular device according to the invention can also implement one or more digital signature operations. Any digital signature operation can be implemented, such as, for example, the FIPS **186** (DSA - **512**, **1024**) and the RSA Signature (**512**, **768**, **1024**, **2048**) algorithms.

A modular device according to the invention can also implement one or more key wrapping operations for both symmetric and asymmetric keys. A key wrapping operation can ensure that plaintext keys are not accessible external to the modular device. Any key wrapping operation can be implemented.

A modular device according to the invention can also implement one or more symmetric encryption operations. Any symmetric encryption operation can be implemented, such as, for example, the FIPS **185** (implemented completely in hardware), the DES (including **3**DES, EDE**3**, CBC and ECB), the RC-**2** and the RC-**4** algorithms.

A modular device according to the invention can also implement one or more asymmetric (public key) encryption operations. While asymmetric encryption operations underlie the key exchange operations described above, asymmetric key operations can also be used independently in a modular device according to the invention for bulk encryption. Any asymmetric encryption operation can be implemented, such as, for example, the RSA and Diffie-Hellman algorithms.

A modular device according to the invention can also implement one or more exponentiation operations, which are required in many cryptographic operations. Any exponentiation operation can be implemented. Since exponentiation requires a significant amount of processing time relative to other mathematical operations, it can be desirable to implement an exponentiation operation in dedicated hardware. In one embodiment of a modular device according to the invention, the security mechanism of the modular device includes a full 1024 bit exponentiator implemented in hardware.

Various embodiments of the invention have been described. The descriptions are intended to be illustrative, not limitative. Thus, it will be apparent to one skilled in the art that certain modifications may be made to the invention as described above without departing from the scope of the claims set out below.

We claim:

**1**. A modular device, comprising:

a security module, comprising:

means for enabling one or more security operations to be performed on data;

means for physically engaging with a target module; and

means for communicating with a target module;

a target module, comprising:

means for enabling a defined interaction with a host computing device;

means for physically engaging with a security module; and

means for communicating with a security module;

means for communicating with a host computing device; and

means for operably connecting the security module and/or the target module to the host computing device in response to an instruction from the host computing device.

**2**. A modular device as in claim **1**, wherein the target module comprises a memory module adapted to enable nonvolatile storage of data.

**3**. A modular device as in claim **2**, wherein the memory module includes a solid-state disk storage device.

**4**. A modular device as in claim **1**, wherein the target module comprises a communications module adapted to enable communication between the host computing device and a remote device.

**5**. A modular device as in claim **4**, wherein the communications module comprises a modem module.

**6**. A modular device as in claim **4**, wherein the communications module comprises a LAN transceiver module.

**7**. A modular device as in claim **4**, wherein the communications module comprises a wireless communications module.

**8**. A modular device as in claim **4**, wherein the communications module comprises a wired communications module.

**9**. A modular device as in claim **1**, wherein the target module comprises a biometric module.

**10**. A modular device as in claim **9**, wherein the biometric module comprises a fingerprint scanning module.

**11**. A modular device as in claim **9**, wherein the biometric module comprises a retinal scanning module.

**12**. A modular device as in claim **1**, wherein the target module comprises a smart card reader module adapted to communicate with a smart card.

**13**. A modular device as in claim **1**, wherein the target module comprises a module including means for receiving user input data that identifies a user of the modular device.

**14**. A modular device as in claim **1**, wherein the security module further comprises the means for communicating with a host computing device.

**15**. A modular device as in claim **1**, further comprising means for providing the type of a target module to a host computing device in response to a request from the host computing device for information regarding the type of the modular device.

**16**. A modular device, comprising:

a security module, comprising:

means for enabling one or more security operations to be performed on data;

means for communicating with a target module; and

means for communicating with a host computing device;

a target module, comprising:

means for enabling a defined interaction with a host computing device; and

means for communicating with a security module; and

means for operably connecting the security module and/or the target module to the host computing device in response to an instruction from the host computing device;

wherein communication between the target module and the host computing device must first pass through the security module.

**17**. A modular device as in claim **16**, wherein the security module further comprises means for providing the type of a target module to a host computing device in response to a request from the host computing device for information regarding the type of the modular device.

**18**. A modular device as in claim **16**, wherein the target module comprises a memory module adapted to enable non-volatile storage of data.

**19**. A modular device as in claim **16**, wherein the target module comprises a communications module adapted to enable communication between the host computing device and a remote device.

**20**. A modular device as in claim **16**, wherein the target module comprises a biometric module.

**21**. A modular device as in claim **16**, wherein the target module comprises a smart card reader module adapted to communicate with a smart card.

**22**. A modular device, comprising:

a security module, comprising:

means for enabling one or more security operations to be performed on data; and

means for communicating with a target module;

a target module, comprising:

means for enabling a defined interaction with a host computing device; and

means for communicating with a security module;

means for communicating with a host computing device;

means for operably connecting the security module and/or the target module to the host computing device in response to an instruction from the host computing device; and

means for providing the type of a target module to a host computing device in response to a request from the host computing device for information regarding the type of the modular device.

**23**. A modular device as in claim **22**, wherein the target module comprises a memory module adapted to enable nonvolatile storage of data.

**24**. A modular device as in claim **22**, wherein the target module comprises a communications module adapted to enable communication between the host computing device and a remote device.

**25**. A modular device as in claim **22**, wherein the target module comprises a biometric module.

**26**. A modular device as in claim **22**, wherein the target module comprises a smart card reader module adapted to communicate with a smart card.

**27**. A modular device, comprising:

a security module, comprising:

means for enabling one or more security operations to be performed on data; and

means for communicating with a target module;

a target module, comprising:

means for enabling a defined interaction with a host computing device; and

means for communicating with a security module;

means for communicating with a host computing device; and

means for operably connecting the security module and/or the target module to the host computing device in response to an instruction from the host computing device.

**28**. A modular device as in claim **27**, wherein the target module comprises a memory module adapted to enable nonvolatile storage of data.

**29**. A modular device as in claim **27**, wherein the target module comprises a communications module adapted to enable communication between the host computing device and a remote device.

**30**. A modular device as in claim **27**, wherein the target module comprises a biometric module.

**31**. A modular device as in claim **27**, wherein the target module comprises a smart card reader module adapted to communicate with a smart card.

**32**. A security module, comprising:

means for communicating with a host computing device;

means for performing one or more security operations on data;

means for communicating with a target module that is adapted to enable a defined interaction with the host computing device; and

means for operably connecting the security module and/or the target module to the host computing device in response to an instruction from the host computing device.

**33**. A security module as in claim **32**, further comprising means for physically engaging the security module with the target module.

**34**. A security module as in claim **32**, further comprising means for controlling the means for communicating with the target module to obtain information from the target module that can be used to identify the type of the target module.

**35**. A security module as in claim **34**, further comprising means for providing the information to the host computing device in response to a request from the host computing device for information regarding the type of the security module.

**36**. A security module as in claim **32**, further comprising means for mediating communication of data between the host computing device and the target module so that the communicated data must first pass through the means for performing one or more security operations on data.

**37**. A security module as in claim **32**, further comprising means for operably connecting the security module and/or the target module to the host computing device in response to an instruction from the host computing device.

**38**. A data security system, comprising:

a host computing device including one or more device interfaces adapted to enable communication with another device;

a modular device, comprising a security module, comprising:

means for communicating with the host computing device;

means for performing one or more security operations on data; and

means for communicating with a target module that is adapted to enable a defined interaction with the host computing device; and

means for operably connecting the security module and/or the target module to the host computing device in response to an instruction from the host computing device.

**39**. A data security system as in claim **38**, wherein the modular device further comprises a target module, the target module comprising:

means for communicating with the security module; and

means for enabling a defined interaction with the host computing device.

**40**. A data security system as in claim **39**, wherein the security module further comprises:

means for controlling the means for communicating with the target module to obtain information from the target module that can be used to identify the type of the target module; and

means for providing the information to the host computing device in response to a request from the host computing device for information regarding the type of the modular device.

**41**. A data security system as in claim **39**, wherein the target module comprises a memory module adapted to enable non-volatile storage of data.

**42**. A data security system as in claim **41**, wherein the memory module includes a solid-state disk storage device.

**43**. A data security system as in claim **39**, wherein the target module comprises a communications module adapted to enable communication between the host computing device and a remote device.

**44**. A data security system as in claim **43**, wherein the communications module comprises a modem module.

**45**. A data security system as in claim **43**, wherein the communications module comprises a LAN transceiver module.

**46**. A data security system as in claim **43**, wherein the communications module comprises a wireless communications module.

**47**. A data security system as in claim **43**, wherein the communications module comprises a wired communications module.

**48**. A data security system as in claim **39**, wherein the target module comprises a biometric module.

**49**. A data security system as in claim **39**, wherein the target module comprises a smart card reader module adapted to communicate with a smart card.

**50**. A data security system as in claim **39**, wherein the target module comprises a module including means for receiving user input data that identifies a user of the modular device.

**51**. A data security system as in claim **48**, wherein the biometric module comprises a fingerprint scanning module.

**52**. A data security system as in claim **48**, wherein the biometric module comprises a retinal scanning module.

**53**. A data security system as in claim **38**, wherein the modular device further comprises means for mediating communication of data between the host computing device and the target module so that the communicated data must first pass through the means for performing one or more security operations on data.

**54**. A data security system as in claim **38**, wherein the modular device further comprises means for operably connecting the security module and/or the target module to the host computing device in response to an instruction from the host computing device.

**55**. For use in a modular device adapted for communication with a host computing device, the modular device comprising a security module that is adapted to enable one or more security operations to be performed on data and a target module that is adapted to enable a defined interaction with the host computing device, a method comprising the steps of:

receiving a request from the host computing device for information regarding the type of the modular device;

providing the type of the target module to the host computing device in response to the request; and

operably connecting the security module and/or the target module to the host computing device in response to an instruction from the host computing device.

**56**. A method as in claim **55**, wherein the security module is adapted to enable communication with the host computing device and the target module, and the target module is adapted to enable communication with the security module and prevent direct communication with the host computing device, the method further comprising the step of controlling the security module to communicate with the target module so as to obtain information from the target module that can be used to identify the type of the target module.

**57**. For use in a modular device adapted for communication with a host computing device, the modular device comprising a security module that is adapted to enable one or more security operations to be performed on data and a target module that is adapted to enable a defined interaction with the host computing device, a method comprising the steps of:

communicating with the host computing device to exchange data between the host computing device and the modular device;

performing one or more security operations and the defined interaction on the exchanged data;

mediating communication of the exchanged data between the host computing device and the modular device so that the exchanged data must first pass through the security module; and

operably connecting the security module and/or the target module to the host computing device in response to an instruction from the host computing device.

**58**. For use in a modular device adapted for communication with a host computing device, the modular device comprising a security module that is adapted to enable one or more security operations to be performed on data and a target module that is adapted to enable a defined interaction with the host computing device, a method comprising the steps of:

receiving an instruction from a host computing device regarding operation of the modular device; and

operably connecting the security module and/or the target module to the host computing device in response to the instruction from the host computing device.

* * * * *